In re METLIFE DEMUTUALIZATION LITIGATION.

No. 00 CV 2258.

United States District Court, E.D. New York.

Feb. 12, 2010.

Stamell & Schager, LLP by Jared B. Stamell, Esq., New York, NY, Mandel & Mandel, LLP, by David S. Mandel, Esq., Miami, FL, Berman DeValerio, by Joseph J. Tabacco, Jr., Esq., San Francisco, CA, for Federal Plaintiffs.

Weiss & Lurie, by Joseph H. Weiss, Esq., Lovell Stewart Halebian, LLP, by Christopher Lovell, Esq., Ian T. Stoll, Esq., Jody Krisilott, Milberg, LLP, by Barry A. Weprin, Esq., New York, NY, Mark Smilow, Esq., for State Plaintiffs.

Stull, Stull & Brody, by Mark Levine, Esq., New York, NY, for State Plaintiff Mark Smilow.

Debevoise & Plimpton, LLP, by Bruce E. Yannett, Esq., Carl Micarelli, Esq., Jennifer Spain, Esq., Metlife, Inc., by Teresa Wynn Roseborough, Esq., Duncan J. Logan, Esq., New York, NY, for Defendants.

Roy Jacobs & Associates, by Roy L. Jacobs, Esq., New York, NY, Attorneys for Steven Waldman.

John J. Pentz, Esq., Maynard, MA, Attorney for Thomas Bell & John Pentz, Jr.

Richard J. Davis, Esq., Special Master.

MEMORANDUM, ORDER AND JUDG-
 MENT ON FINAL APPROVAL OF
 SETTLEMENT, FEES, EXPENSES
 AND COMPENSATION AWARDS

 JACK B. WEINSTEIN, Senior District
Judge:

### Table of Contents

I. Introduction ................................................................306

II. Facts......................................................................307
 A. MetLife's Plan of Reorganization .....................................308
 1. New York Insurance Law § 7312 ...................................308
 2. Features of the Plan.............................................310
 3. Exercise of Board's Business Judgment in Selecting Method of
 Demutualization ...............................................310
 4. Reliance on Superintendent .....................................311
 B. Solicitation of Policyholder Votes ..................................312
 1. Mailings ........................................................312
 2. Telephone........................................................314
 C. Superintendent's Investigation and Approval .........................314
 1. Appointment and Reliance on Advisors ...........................314
 2. Public Hearing ..................................................315
 3. Written Submissions .............................................316
 4. Opinion and Decision ............................................316
 D. Demutualization Procedure ...........................................318
 E. Related Lawsuits ....................................................320
 F. Class Certification and Notice ......................................321
 G. Discovery and Preparation for Trial..................................322
 H. Settlement Negotiations .............................................322
 I. Terms of Settlement .................................................322
 J. Notice of Settlement ................................................323
 K. Objections ..........................................................323

III. Hearings on Proposed Settlement and Related Applications .................323
 A. Trial and November 2, 2009 Preliminary Fairness Hearing..............323
 B. December 30, 2009 Fairness Hearing...................................326
 1. History of Litigation, Discovery and Readiness for Trial .......326
 2. Arguments of Parties ............................................327
 3. Statements of Objectors ........................................327
 a) Thomas Sterrett Bell and John J. Pentz, Jr. ...............327
 b) Steven Waldman .............................................327
 c) Thomas Tierney ............................................327
 4. Statement of State Plaintiff Mark Smilow .......................328
 5. Continuance of Hearing..........................................328
 C. February 9, 2009 Hearing on Applications for Fees, Expenses, and
 Compensation ......................................................328

IV. Law and Application of Law to Facts ......................................328
 A. Standard of Review ..................................................329
 B. Presumption of Fairness.............................................330
 C. Criteria for Approval of Settlement .................................331
 1. Complexity, Expense, and Likely Duration of Litigation..........331
 2. Favorable Reaction of Class .....................................333
 3. Stage of Proceedings and Amount of Discovery Completed .........333
 4. Risks of Establishing Liability and Risks of Establishing Damages.....334
 a) Difficulty of Establishing Material Misrepresentation or Omission.....335

 b) Difficulty of Establishing Intent to Deceive . . . . . . . . . . . . . . . . . . . . . . . . 337
 c) Difficulty of Proving Injury to Class Members . . . . . . . . . . . . . . . . . . . . . 337
 d) Other Defenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 338
 e) Difficulty of Proving Claims in State Action . . . . . . . . . . . . . . . . . . . . . . . . 339
 5. Risks of Maintaining Action Through Trial . . . . . . . . . . . . . . . . . . . . . . . . . 339
 6. Ability of MetLife to Withstand a Greater Judgment . . . . . . . . . . . . . . . . . 339
 7. Range of Reasonableness of Settlement Fund in Light of Possible
 Recovery and Risks of Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 340
 8. Attorneys' Fees and Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 341
 D. Manner of Allocation of Settlement Funds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 341
 1. $32.5 Million Allocation to the Closed Block . . . . . . . . . . . . . . . . . . . . . . . . . 341
 2. $2.5 Million *Cy Pres* Allocation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 343
 3. Division of Settlement Amount Between Closed–Block and
 Non–Closed–Block Allocations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 344
 E. Notice of Settlement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 345
 F. Objections to Settlement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 346
 1. Steven Waldman . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 346
 2. John J. Pentz, Jr. and Thomas Sterrett Bell . . . . . . . . . . . . . . . . . . . . . . . . . 350
 3. Robert Gould . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 351
 4. Christopher P. Mueller . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 353
 5. Lawrence Kuczynski . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 353
 6. Thomas P. Tierney, in Support of Mueller's Objection . . . . . . . . . . . . . . . . . 354

V. Fees and Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 356
 A. Class Counsel's Joint Application for Fees and Expenses . . . . . . . . . . . . . . . . . 356
 B. Standard of Review for Award of Fees and Expenses to Class Counsel . . . . . 356
 C. Criteria for Approval of Fees and Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . 358
 1. Percentage–of–the–fund Method . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 358
 2. Lodestar Method . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 359
 3. Other Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 360
 a) Time and Labor Expended . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 360
 b) Magnitude and Complexity of the Litigation . . . . . . . . . . . . . . . . . . . . . . 361
 c) Risk of the Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 361
 d) Quality of Representation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 362
 e) Requested Fee in Relation to the Settlement . . . . . . . . . . . . . . . . . . . . . . 362
 f) Public Policy Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 363
 4. Class Counsel's Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 363
 5. Reaction of the Classes to Fee and Expense Application . . . . . . . . . . . . . . . 364
 6. Award of Fees and Expenses to Class Counsel . . . . . . . . . . . . . . . . . . . . . . . . 364
 D. Notice of Applications for Fees and Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . 365
 E. MetLife's Objections to Class Counsel's Application for Fees and
 Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 366
 F. Objector Steven Waldman's Application for Attorney's Fees . . . . . . . . . . . . . . . 367

VI. Compensation to Class Representatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 369
 A. Federal Plaintiffs' Applications for Compensation Pursuant to PSLRA . . . . . . 369
 B. State Plaintiffs' Applications for Compensation . . . . . . . . . . . . . . . . . . . . . . . . . 370
 1. New York Law Concerning "Incentive Awards" . . . . . . . . . . . . . . . . . . . . . . . 371
 2. Plaintiffs Theresa Hazen, Mark Smilow, and Vijay Shah . . . . . . . . . . . . . . . 371
 3. Compensation for Efforts on Behalf of the Class . . . . . . . . . . . . . . . . . . . . . . 372

VII. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 373

## I. Introduction

This case and a related case in New York Supreme Court, *Fiala v. Metropolitan Life Ins. Co.*, Index No. 601181/2000, are class actions arising out of Metropolitan Life Insurance Company's ("MetLife") demutualization—its conversion from a mutual insurance company to a stock cor-

poration. The classes consist of individuals who held MetLife mutual insurance policies at the time of the demutualization in 2000 who were allegedly harmed by the demutualization. The parties in this action and the *Fiala* action have arrived at a joint proposed settlement disposing of all claims in both cases.

The parties seek final approval of the proposed settlement. Plaintiffs' counsel, and counsel for one objector to the settlement, have applied for attorneys' fees and expenses, to be paid out of the settlement fund. Named plaintiffs in both actions have applied for compensation in recognition of time and effort expended in participating in these cases.

It is the policy of the federal courts to encourage coordination of pending state and federal cases concerning the same and closely related transactions. *See, e.g., In re Zyprexa Prods. Liab. Litig.,* 467 F.Supp.2d 256, 262 (E.D.N.Y.2006) ("Cooperation with state courts will continue to be stressed."); *In re Zyprexa Prod. Liab. Litig.,* No. 04–MD–1596, 2006 WL 898105, at *1 (E.D.N.Y. Apr. 6, 2006) ("Coordination and cooperation between state and federal courts has been encouraged."). In this instance close cooperation between the Supreme Court of the State of New York and the United States District Court for the Eastern District of New York, utilization of a single special settlement master, and joint hearings on the settlement permitted termination of this litigation with minimal transaction costs, on the merits.

For the reasons indicated below, after full hearings, the proposed settlement of these actions is found to be fair, reasonable, and adequate to all parties and to all persons who might be directly or indirectly affected. *See* Fed.R.Civ.P. 23(e). The fees and expenses of class counsel are approved as fair, reasonable, and fully supported. Objector's counsel's fees are ap-

proved in part. Named plaintiffs' applications for compensation are approved in part and denied in part. Disposition of the amounts approved in the settlement is properly provided for.

For the convenience of the reader, parts of prior memoranda and orders of this court are incorporated in the present document. Relevant documents issued in the state case have been considered as if they were admitted in the federal action. Hearings conducted jointly with the New York Supreme Court and evidence reviewed in such joint hearings are relied upon in the findings of this court.

This Memorandum, Order and Judgment is not effective until the New York Supreme Court's judgment of approval of the settlement is issued in the *Fiala* case.

## II. Facts

Detailed information concerning the factual and procedural history of these related litigations is provided in prior decisions of this court and the state court. *See, e.g., In re MetLife Demut. Litig.,* 156 F.Supp.2d 254 (E.D.N.Y.2001) (denying MetLife's motion to dismiss); *In re MetLife Demut. Litig.,* 322 F.Supp.2d 267 (E.D.N.Y.2004) (denying MetLife's second motion to dismiss); *In re MetLife Demut. Litig.,* 229 F.R.D. 369 (E.D.N.Y.2005) (certifying plaintiff class), *pet. for interlocutory appeal denied* No. 05–8020 (2d Cir. Mar. 29, 2009); *In re MetLife Demut. Litig.,* 624 F.Supp.2d 232 (E.D.N.Y.2009) (denying cross-motions for partial summary judgment); Order Appointing Special Settlement Master, *In re MetLife Demut. Litig.,* No. 00–cv–2258, Docket Entry No. 501 (E.D.N.Y. Oct. 16, 2009); Order Regarding Motions In Limine, *In re MetLife Demut. Litig.,* No. 00–cv–2258, Docket Entry No. 537 (E.D.N.Y. Oct. 30, 2009); *In re MetLife Demut. Litig.,* 262 F.R.D. 205 (E.D.N.Y.2009) (Mem. & Order Re-

garding Notice & Hearing on Approval of Proposed Settlement); Order Approving Form of Class Notice, *In re MetLife Demut. Litig.*, No. 00–cv–2258, Docket Entry No. 540 (E.D.N.Y. Nov. 11, 2006); *Shah v. Metropolitan Life Ins. Co.*, Nos. 108887/2000 & 601181/200, 2003 WL 728869 (N.Y.Sup.Ct. Feb. 21, 2003) (granting MetLife's motion to dismiss); *Fiala v. Metropolitan Life Ins. Co.*, 6 A.D.3d 320, 776 N.Y.S.2d 29 (N.Y.App.Div.2004) (reversing in part decision on MetLife's motion to dismiss); *Fiala v. Metropolitan Life Ins. Co.*, 235 N.Y.L.J. 106, No. 601181/2000, 2006 N.Y. Misc. LEXIS 4092 (N.Y. Sup.Ct. June 2, 2006) (certifying plaintiff class); *Fiala v. Metropolitan Life Ins. Co.*, 17 Misc.3d 1102(A), No. 601181/2000, 2007 WL 2772230 (N.Y.Sup. Ct. Aug. 28, 2007) (unreported disposition) (approving procedure for class notification); *Fiala v. Metropolitan Life Ins. Co.*, 52 A.D.3d 251, 859 N.Y.S.2d 426 (N.Y.App. Div.2008) (affirming class certification as modified); Order Regarding Notice & Hearing on Approval of Proposed Settlement, *Fiala v. Metropolitan Life Ins. Co.*, No. 601181/2000 (N.Y.Sup.Ct. Nov. 5, 2009).

**A. MetLife's Plan of Reorganization**

MetLife, a New York corporation, was founded in 1868, and in 1915 became a mutual insurance company—that is, a non-stock corporation whose policyholders were its members. *See* Oct. 30, 2009 Stipulation of Agreed Facts, Docket Entry No. 530–9, ¶¶ 1–2 ("Parties' Stip."); April 4, 2000 Opinion and Decision of New York State Superintendent of Insurance Neil D. Levin, Docket Entry No. 578–9, at 1 (the "Superintendent's Opinion" or "Sup. Opinion"). In 1998, MetLife's Board of Directors (the "Board") authorized management to pursue demutualization—that is, conversion to a stock life insurance company. *See* Parties' Stip. ¶ 10; Sup. Opinion

¶ 15. This process was governed by section 7312 of the New York Insurance Law. On September 28, 1999, MetLife's Board adopted a Plan of Reorganization (the "Plan"). *See* Metropolitan Life Ins. Co., Plan of Reorganization Under Section 7312 of the New York State Insurance Law, as Adopted on Sept. 28, 1999 (and as amended and restated by amendments dated Nov. 3, 1999 and Nov. 16, 1999) by the Board of Directors, Docket Entry No. 578–9. After appropriate consideration, the Board determined that the Plan was in the best interests of the company and its policyholders, and that it was fair and equitable to the policyholders. *See* Sup. Opinion ¶ 31.

**1. New York Insurance Law § 7312**

Demutualization is authorized by section 7312 of the New York Insurance Law. The state legislature found that:

> "[I]t is in the interest of the state to maintain a financially sound and competitive life insurance industry in this state and to provide statutory authority for domestic mutual life insurance companies that find it in the best interest of the company and its policyholders to convert to stock form to do so pursuant to this legislation.... [F]lexibility of corporate form can be an important factor in an environment of rapidly changing economic conditions.

Section 1 of L.1988, ch. 683; amended L.1988, ch. 684, § 1 (Sept. 1, 1988), *reprinted in* N.Y. Ins. Law § 7312 note (McKinney 2000) (legislative findings).

To demutualize, a mutual life insurance company must adopt, by action of three-fourths of its entire board of directors, a detailed plan of reorganization that is consistent with the statute and "fair and equitable" to policyholders. N.Y. Ins. Law § 7312(e)(1). The plan must: "(1) demonstrate a purpose and specify reasons for the proposed reorganization; (2) be in the

best interest of the mutual life insurer and its policyholders; (3) be fair and equitable to policyholders; (4) provide for the enhancement of the operations of the reorganized insurer; and (5) not substantially lessen competition in any line of insurance business." *Id.* § 7312(c). It must provide, among other things: (1) "the manner and basis by which the reorganization shall take place;" (2) "the consideration to be given to policyholders;" (3) "the method of allocating the consideration among policyholders;" and (4) "a plan of operation for the reorganized insurer including actuarial projections." *Id.* § 7312(e)(1).

Four different methods of demutualization are specified. The fourth encompasses "[a]ny method approved by the [New York State Superintendent of Insurance (the "Superintendent")] under which the policyholders' membership interest is converted into or exchanged for consideration determined by the superintendent to be fair and equitable to policyholders and meeting the requirements of this section." *Id.* § 7312(d)(4).

In order to become effective, the demutualization plan must be approved by two-thirds of votes cast by policyholders entitled to vote. *Id.* § 7312(k)(2). The Superintendent controls the voting procedure, including the notice that must be sent to policyholders before the vote. *Id.* § 7312(k)(3). Notice must be "preceded or accompanied by a true and complete copy of the plan, or by a summary thereof approved by the superintendent, and such other explanatory information as the superintendent shall approve or require." *Id.* § 7312(k)(1).

The Superintendent's approval of the demutualization plan must also be obtained:

The superintendent shall ... approve the plan of reorganization if he finds that the proposed reorganization, in whole and in part, does not violate this chapter, is fair and equitable to the policyholders and is not detrimental to the public and that, after giving effect to the reorganization, the reorganized insurer will have an amount of capital and surplus ... reasonably necessary for its future solvency.

*Id.* 7312(j). Broad authority to review a proposed demutualization is provided to the Superintendent. Before issuing written approval, the Superintendent must hold a public hearing on the fairness of the plan, the reasons and purposes for the demutualization, and whether it is in the best interests of the insurer and its policyholders. *Id.* § 7312(i). The Superintendent may "appoint one or more qualified disinterested persons or institutions as consultants to advise him on any matter related to the reorganization." *Id.* § 7312(h)(1). These advisors may request access to the mutual company's books and records and any other information in its possession. *Id.* § 7312(h)(4). The Superintendent may "request any additional documents or information and may examine the mutual life insurer or any of its affiliates, to the extent he may determine necessary to enable him to make the findings required ... for the approval by him of the plan of reorganization." *Id.* § 7312(g).

These provisions are consistent with the plenary authority the state legislature has delegated to the Superintendent to "make an examination into the affairs of any insurance corporation or other insurer doing or authorized to do any insurance business in this state ... as often as he deems it expedient for the protection of the interests of the people of this state, in addition to examinations authorized by other provisions of [the Insurance Law]." *Id.* § 309(a); *see also id.* § 401(b) (granting Superintendent "broad authority ... to investigate activities which may be fraudu-

lent and to develop evidence thereon"); *id.* § 201 ("The Superintendent shall possess rights, powers, and duties ... expressed or reasonably implied by any applicable law of this state").

## 2. Features of the Plan

The Plan adopted by MetLife's Board provided for the fourth statutory method of demutualization. *See* Plan at 6 (§ 3.2, "Basis for Choice of Method"); N.Y. Ins. Law § 7312(d)(4). The major features of the Plan included:

1) a requirement that consideration be given to policyholders in the form of shares of common stock, cash, or policy credits, allocated among policyholders based on an actuarial calculation, as detailed in a separate Actuarial Contribution Memorandum, Plan at 18 (§ 7. 1, "Allocation of Allocable Common Shares");

2) the creation of a MetLife Policyholder Trust (the "Trust") to hold the common stock that would be issued to eligible policyholders in consideration for their extinguished membership interests, *id.* at 6 (§ 3.3, "Establishment and Operation of the Trust.");

3) the establishment of an accounting mechanism known as the "Closed Block," the stated purpose of which was "to ensure [ ] the reasonable dividend expectations of policyholders," *id.* at 2 (defining "Closed Block"); *id.* at 22 (Article VIII, "Method of Operation for Participating Business");

4) a condition that the demutualization would not be effective unless it received the approval of the Superintendent, *id.* at 10 (§ 5.2, "Effectiveness of Plan");

5) an initial public offering ("IPO") to take place simultaneously with the effective date of the demutualization, *id.* at 10–12 (§ 5.2, "Effectiveness of Plan"); and

6) a caveat that the Board had authority to withdraw the Plan at any time prior to its effective date, *id.* at 27 (§ 10.4, "Amendment or Withdrawal of the Plan").

The sixth aspect was particularly significant for purposes of the instant case. The Superintendent's public hearing, the circularization of voters with a package of explanatory materials approved by the Superintendent, the availability of a telephone hotline to answer questions of voters, and the Opinion and Decision of the Superintendent approving the Plan and notice to policyholders all occurred before the Board's power to withdraw the Plan expired. *See* Parts II.B–C, *infra.*

## 3. Exercise of Board's Business Judgment in Selecting Method of Demutualization

After considering the limitations of alternate statutory methods of demutualization one and two, *see* N.Y. Ins. Law §§ 7312(d)(1) & (2), the Board determined that the flexibility of the fourth method, *id.* § 7312(d)(4), was "best suited to provide [MetLife's] policyholders with a fair and equitable result." Plan at 6 (§ 3.2, "Basis for Choice of Method"). The Board concluded that it was "the most appropriate method of reorganization under Section 7312 for [MetLife]." *Id.* (noting that the third statutory method, N.Y. Ins. Law § 7312(d)(3), is available only to insurers with less than $50 million of surplus).

Under the business judgment rule, the Board had broad discretion in adopting policy, strategy, and tactics. *See, e.g., Clifford v. Metropolitan Life Ins. Co.,* 264 A.D. 168, 170, 34 N.Y.S.2d 693 (N.Y.App. Div.1942) ("Directors are presumed to act honestly and in accordance with their best judgment[.] ... [In matters] of internal management ... courts seldom interfere

with the discretion so exercised by directors."); *see also* James A. Smallenberger, *Restructuring Mutual Life Insurance Companies: A Practical Guide Through the Process,* 49 Drake L.Rev. 513, 541–42 (2001) (noting that demutualization approval process is structured to ensure that boards are protected by business judgment rule).

Based on the evidence presented, the court finds that the Board appropriately exercised its discretion in choosing method four and in selecting the detailed means of execution of the proposed demutualization.

#### 4. Reliance on Superintendent

In late 1998, soon after the Board authorized management to develop a plan of reorganization, MetLife notified the Superintendent of its intention to demutualize. *See* Sup. Opinion ¶ 15; Parties' Stip. ¶ 10. Because the Board opted for the fourth method, which lacked statutory detail, it had to ensure that the details of the Plan satisfied the Superintendent.

MetLife personnel and advisors worked closely with the Superintendent and his staff and advisors for over a year in developing the Plan's details. There were, for example, meetings regarding what the Plan was going to provide to policyholders, how the Plan would be explained to policyholders, and the contents of the explanatory materials that would be sent to policyholders. *See, e.g.,* Apr. 10, 2002 Tr. of Joseph Reali Dep. 59:8–62:13, Docket Entry No. 363–35 (stating that MetLife representatives met and corresponded with Insurance Department representatives regarding terms of the Plan and contents of materials sent to policyholders); *id* at 37:23–25 (stating that MetLife "discussed issues time and again with the New York Insurance department"); *id.* at 83:8–20 (stating that MetLife personnel kept its own advisors apprised of "where [it was] on discussions with the Insurance Department"); *see also* Nov. 5, 2002 Tr. of Michael Harwood Dep. 22:6–21, Docket Entry No. 431–2 (stating that MetLife representatives met weekly with Insurance Department regarding formation of closed block and calculation of actuarial equity share).

MetLife's Board and management relied on the Superintendent's review and expertise in assuring themselves that the demutualization was being conducted properly—particularly with respect to critical actuarial calculations and the formation of the closed block that would assure future dividends to policyholders. *See, e.g.,* May 25, 2006 Tr. of Robert G. Schwartz Dep. 78:22–79:11, Docket Entry No. 508–4 ("I relied ... on the insurance department, who in turn hired, as I recall, outside professionals, actuaries. You know, we were extremely well-regulated and constantly under their supervision and review, so I felt very comfortable that it was being done well and properly"); May 11, 2006 Tr. of Stewart Nagler Dep. 202:20–203:14, Docket Entry No. 508–5 (stating that Board adopted Plan when Superintendent had indicated that Plan was "approvable ... [and MetLife] could go ahead and just plan that it would be approved"); Mar. 9, 2006 Tr. of Robert H. Benmosche Dep. 61:9–14, Docket Entry No. 508–6 (stating that, in connection with technical and actuarial matters, "you have to rely on the advisers and the Insurance Department. The Insurance Department has a large number of people that go through the details of how you calculate it and review the calculations").

The Plan adopted by the Board—and then approved by voting policyholders—reflected MetLife's responses to the Insurance Department's "comments on elements of the plan, suggestions, [and] questions." May 17, 2006 Tr. of Joseph Reali Dep. 9:17–23, Docket Entry No. 363–37.

The Board was aware that MetLife's demutualization could not be effective without the Superintendent's approval. By its own terms, the Plan could be amended, withdrawn, or altered in response to any concerns the Superintendent might raise before the IPO. *See* Plan at 27 (§ 10.4, "Amendment or Withdrawal of Plan"); *see also* Oct. 13, 2009 Hr'g Tr. at 56:16–57:8 (statement of MetLife's counsel). Any amendments would have required the Superintendent's approval to become effective. Plan at 27.

## B. Solicitation of Policyholder Votes

### 1. Mailings

On November 24, 1999, MetLife began mailing a package of explanatory materials (the "Policyholder Packet") to policyholders describing the Plan in advance of the policyholder vote. *See* Parties' Stip. ¶ 20; Sup. Opinion ¶¶ 20–21. The mailing was completed on December 21, 1999, having by then reached substantially all of the 11 million policyholders entitled to vote on and receive compensation under the Plan. *See* Parties' Stip. ¶¶ 17, 20; Sup. Opinion ¶ 24.

Each Policyholder Packet contained:

- a cover letter from MetLife's Chairman of the Board;
- a brochure titled "Important! Read Me First";
- a two-part Policyholder Information Booklet;
- a ballot for voting on MetLife's demutualization plan;
- a card listing the policies for which a policyholder was eligible to receive compensation and the form of compensation to be received;
- a card that allowed policyholders eligible to receive compensation in the form of stock to elect instead to receive compensation in the form of cash;
- an Internal Revenue Service Form W–9, along with a return envelope for returning the ballot, the Form W–9, and/or the card electing cash compensation.

*See* Policyholder Packet, Docket Entry Nos. 530–12 & 530–13; *see also* Parties' Stip. ¶ 19 (listing contents of Policyholder Packet).

Featured in the Policyholder Packet was a notice of the purpose, date, time, and location of the policyholder vote:

In order for the Plan to be approved, at least two-thirds of the votes validly cast by eligible policyholders must be in favor of the Plan. You may cast your vote in person at MetLife or return your ballot by mail using the postage-paid envelop enclosed. You may vote in person at the offices of MetLife:

Place: MetLife
 One Madison Avenue, 1st Floor
 New York, New York

Date: February 7, 2000

Time: 10:00 a.m. to 4.00 p.m. (EST)

\* \* \*

You must either vote in person or mail the ballot card (card # 2) so that we receive it by 4:00 p.m. (EST) February 7, 2000 in order for your vote to count.

Policyholder Packet, Docket Entry No. 530–12, at 5; *see also id.* at 9–10 (letter of Insurance Department stating, time, date, and place of vote).

Included was notice of the public hearing to be conducted by the Superintendent in advance of the policyholder vote. It stated that policyholders could make oral statements or written submissions in connection with the hearing:

The Superintendent of Insurance of the state of New York has scheduled a pub-

lic hearing to consider the Plan of Reorganization adopted by the Board of Directors of Metropolitan Life Insurance Company (MetLife) on September 28, 1999 and as amended by amendment adopted on November 16, 19999.

THE PUBLIC HEARING WILL BE HELD AT THE GRAND HYATT NEW YORK, PARK AVENUE AT GRAND CENTRAL (AT EAST 42ND STREET), IN THE EMPIRE STATE BALLROOM, NEW YORK, NEW YORK, BEGINNING AT 10:00 A.M. (EST) ON JANUARY 24, 2000.

\* \* \*

If you would like to submit a written statement concerning the Plan to the New York State Superintendent, you may do so. . . . If you would like to make an oral statement at the public hearing, you should register [to do so] by January 20, 2000.

*Id.* at 8 (emphasis in original).

The bulk of the Policyholder Packet consisted of the two-part, 350–plus page Policyholder Information Booklet (PIB). Part One summarized the Plan, including a complete copy of the Plan of Reorganization (with some exhibits and schedules in summary form). Policyholder Packet, Docket Entry No. 530–12, at 20–50 & Docket Entry No. 530–13, at 1–114. Part Two contained information about MetLife's business and finances. Policyholder Packet, Docket Entry No. 530–13, at 115–338. The stated purpose of the PIB was to "give [policyholders] information to help [them] decide how to vote." Policyholder Packet, Docket Entry No. 530–12, at 6.

The Policyholder Packet was designed to provide information necessary for an informed decision and to convince policyholders to vote for the Plan. It assured them that the Plan, though adopted by the Board, was subject to final approval by the Superintendent. The Chairman's Letter supported a favorable vote, explaining:

In electing to demutualize, the Board was guided by one overriding concern: the best interests of our policyholders.

\* \* \*

The Board of Directors has determined that the reorganization is in the best interests of MetLife and its policyholders, and has found the demutualization to be fair and equitable to policyholders. Therefore, the Board urges you to vote YES in favor of approving the demutualization plan.

*Id.* at 1.

The pivotal role of the Superintendent was highlighted throughout the Policyholder Packet. A letter from the Insurance Department—embossed with the state agency's seal—was enclosed with the Read–Me–First brochure at the front of the Policyholder Packet. Signed by the Deputy Superintendent, the letter described the Insurance Department's involvement in the process and made clear that, even if policyholders were to vote in favor of the transaction, MetLife's demutualization would not become effective without final approval by the Superintendent. *Id.* at 10–11. Similar statements were contained throughout. *See, e.g., id.* at 4, 5, 37–38.

The Superintendent reviewed, commented upon, and approved the Policyholder Packet. Sup. Opinion ¶ 216 ("The policyholder notices and accompanying documents, including the Policyholder Information Booklets, Parts One and Two . . . were approved by the Superintendent[.]"); Apr. 10, 2002 Tr. of Joseph Reali Dep. 61:23–62:13, Docket Entry No. 363–35 ("Everything that was sent out [to policyholders] was discussed with the Insurance Department").

## 2. Telephone

Included in the Policyholder Packet were toll-free telephone numbers for policyholders to call if they had questions, needed assistance, or wanted additional information. *See, e.g.*, Policyholder Packet, Docket Entry No. 530–12, at 1, 2, 57, Docket Entry No. 530–13, at 31. Prospective voters took advantage of this telephone hotline:

> MetLife received **over 2.5 million phone calls** from policyholders with questions about the demutualization, from the time of the mailing until after the initial public offering. To handle those calls, MetLife had a voice response unit that will [sic] allow policyholders to get answers to the frequently asked questions at any time. In addition, MetLife had 500 customer service representatives available to answer further questions.
>
> \* \* \*
>
> As of April 11, 2000, the call centers had received 2,513,183 calls (including 66,183 calls in Canada). 41.9% of these inquiries were satisfied through the voice response unit.

Apr. 4, 2008 Aff. of Jared Stamell, Ex. 2 at 29, Docket Entry No. 360–13 ("MetLife Overview: Corporate Information," attached to Apr. 24, 2000 email from Cristina Amodeo to Christina Y. Tso) (emphasis in original).

MetLife prepared scripts to be used at call centers, with answers to expected queries. *See* Oct. 14, 2009 Defs.' Letter to the court, Docket Entry No. 499 (attaching scripts). The prepared responses directed callers to the New York insurance law, and emphasized that the demutualization could not become effective without approval by the Superintendent. *See id.* The Superintendent and his advisors reviewed and commented on drafts of the telephone scripts before they were used. *See id.*

## C. Superintendent's Investigation and Approval

### 1. Appointment and Reliance on Advisors

Four outside advisors were appointed by the Superintendent to assist in the review of MetLife's proposed demutualization: legal consultant Fried, Frank, Harris, Shriver & Jacobson LLP; financial consultant The Blackstone Group L.P.; actuarial consultant Milliman & Robertson, Inc., and accounting consultant Ernst & Young LLP. *See* Sup. Opinion ¶ 16; N.Y. Ins. L. § 7312(h) (authorizing appointment of outside consultants).

With the help of these advisors, the Superintendent posed searching questions to, and requested detailed information from, MetLife about the substantive details of the transaction. Actuarial and other documentation was requested to facilitate analysis. *See, e.g.*, July 6, 1999 Letter from N.Y. Ins. Dep't to MetLife, Docket Entry No. 431–5 (requesting actuarial information on behalf of consultant and stating that "[t]he department will not be in a position formally or informally to approve any aspect of the proposed transaction which is dependent upon matters which the department and its advisors have not had an adequate time to review, including any necessary revisions"); Jan. 12, 1999 Letter from MetLife to N.Y. Ins. Dep't and its Consultants, Docket Entry No. 531–4 (containing responses to information request from the Department). The Superintendent and appointed consultants reviewed and relied upon information MetLife provided voluntarily as well as in response to the Insurance Department's specific requests. *See* Sup. Opinion ¶¶ 17, 127, 131.

## 2. Public Hearing

On January 24, 2000, the Superintendent held a public hearing, at which policyholders and members of the public were invited to speak on the proposed demutualization. He put critical questions to MetLife management and directed them to answer inquiries from policyholders and the public. *See* Jan. 24, 2000 Metropolitan Life Demutualization Transcript of Proceedings, Docket Entry No. 499–4 ("Public Hr'g Tr."), *available at* http://www.ins.state.ny.us/life/demut/met_trans.pdf (last accessed Jan. 25, 2010).

Approximately 150 people attended the hearing. Sup. Opinion ¶ 25. It lasted for some three hours. *Id.* ¶ 26. The Superintendent was present, accompanied by five officials from the Insurance Department. *See* Public Hr'g Tr. at 2:4–13.

A video of the hearing was posted on the Insurance Department's website. *See id.* at 114:16; Press Release, N.Y. Dep't Ins., "Department Makes Video of Public Hearing Available on Web Site for First Time: Consumers Can Access Video and Audio of MetLife's Demutualization Hearing" (Jan. 27, 2000), *available at* http://www.ins.state.ny.us/press/2000/p0001272.htm (last accessed Jan. 25, 2010).

Anyone who registered to pose a question was provided with ten minutes to make an oral statement. Public Hr'g Tr. at 5:5–10. Twenty members of the public registered with the Insurance Department as speakers, and nine actually presented statements. *See* Sup. Opinion ¶ 26; *see also* Public Hr'g Tr. at 52:18–113:22 (statements of Richard Norton, Ralph Kabrinik, V.J. Shah, Lance Gad, Paul Benton Weeks III, Tom Tierney, Anita Kartalopoulos, Phillip Bieluch, and Thomas Welling).

Each of these speakers criticized the Plan and its various components, including the methods used to calculate policyholder compensation and the adequacy of the Policyholder Packet. *See e.g., id.* at 52:18–58:11 (statement of Richard Norton) (policyholder criticizing, among other things, valuation of "right to vote"); *Id.* at 62:14–65:4 (statement of V.J. Shah) (policyholder criticizing lack of subscription rights); *id.* at 65:7–70:19 (statement of Lance Gad) (policyholder and self-described expert, criticizing methods of allocation as unfair and inequitable); *id.* at 70:20–80:12 (statement of Paul Benton Weeks III) (attorney representing policyholders criticizing adequacy of disclosures); *id.* at 80:13–92:25 (statement of Tom Tierney) (actuary criticizing, on behalf of policyholders, adequacy of closed block and compensation to each policyholder); *id.* at 99:19–109:16 (statement of Phillip Bieluch) (actuary criticizing efficacy of closed block and adequacy of disclosures); *id.* at 109:21–113:22 (statement of Thomas Welling) (chartered underwriter and financial consultant criticizing 10–share fixed minimum allocation of compensation).

Robert Benmosche, MetLife's then Chief Executive Officer and Chairman of the Board, reiterated at the hearing the favorable conclusion in his letter included in the Policyholder Packet:

> Based on our extensive analysis and consultation with independent financial, actuarial, legal and other advisors .... [and] based on careful consideration of various elements of the plan over the preceding months, our board of directors unanimously adopted our demutualization plan. Our directors concluded, among other things, that the plan is in the best interests of MetLife and our policyholders, and that it is fair and equitable to our policyholders.

*Id.* at 10:21–11:1; *cf.* Policyholder Packet at 1, Docket Entry No. 530–12 (cover letter from Chairman Robert Benmosche) ("The Board of Directors has determined

that the reorganization is in the best interests of MetLife and its policyholders, and has found the demutualization plan to be fair and equitable to policyholders.").

MetLife Chief Financial Officer Stuart Nagler discussed the Trust, the closed block, and the method of calculating and allocating policyholder compensation. *See* Public Hr'g Tr. at 14:2–23:4. MetLife General Counsel Gary Beller "reviewed how MetLife's demutualization plan and related actions taken by MetLife will have satisfied each and every requirement of New York Insurance Law." *Id.* at 23:14–23:18. Beller emphasized that the Superintendent had reviewed and approved the Policyholder Packet, *id.* at 26:22–27:1, and that the Plan would not be effective without ultimate approval from the Superintendent, *id.* at 30:2–30:14.

A representative of MetLife's financial advisors, Goldman Sachs & Company and Credit Suisse First Bank Boston, reiterated the essence of their fairness opinions, that "the exchange of the aggregate policyholders' membership interests in MetLife for shares of holding company stock, cash or policy credits in accordance with the plan is fair from a financial point of view to [eligible] policyholders." *Id.* at 39:16–40:4. The financial advisors stated that they expected to coordinate the IPO with the Superintendent, who would be given an opportunity to monitor that component of the transaction. *Id.* at 38:18–28.

MetLife's actuarial advisor, Kenneth Beck, a principal of PricewaterhouseCoopers ("PWC"), reiterated the content of PWC's fairness opinion, that "the plan for allocating compensation to eligible policyholders is fair and equitable," and that "the plan makes appropriate provisions with regard to the objective funding and operations for the closed block, as well as providing a vehicle to make appropriate adjustments to further policy dividends if the underlying experience changes." *Id.* at 45:19–46:1.

The Superintendent directed MetLife to answer five questions, regarding, among other things, the Plan's absence of subscription rights, the anticipated timing of the IPO, and the efforts MetLife was making to find policyholders for whom MetLife had no address. *Id.* at 46:10–5:24. Statements made at the public hearing were submitted to the Insurance Department and became part of the written record of the proceedings. Sup. Opinion ¶¶ 26, 28.

### 3. Written Submissions

The record of the public hearing remained open until February 14, 2000 so that the Superintendent could obtain additional written comments, questions, or statements about MetLife's demutualization plan from policyholders and others. *Id.;* Public Hr'g Tr. at 115:25–116:2. A total of 165 letters were received by the Department. Sup. Opinion ¶ 28. Many of the letters criticized policyholder compensation and the adequacy of materials mailed in solicitation of their votes. *See* Oct. 13, 2009 Defs.' Letter to the court, Docket Entry No. 512 (attaching written objections submitted by MetLife policyholders to the Superintendent).

The written submissions and responses became part of the public record of the Insurance Department's hearing. *See* Sup. Opinion ¶ 28. They were reviewed by the Superintendent and his advisors during their investigation of MetLife's proposed demutualization. *See id.*

### 4. Opinion and Decision

On April 4, 2000, the Superintendent issued his Opinion and Decision approving MetLife's demutualization. The Superintendent's Opinion contains conclusions with respect to the fairness and equity of the demutualization and the adequacy of

the disclosure materials sent to policyholders, *see generally* Sup. Opinion ¶¶ 198–238 (section titled "Conclusions and Decision"), including the following:

1) "The reorganization of MetLife from a mutual insurer to stock company form, as set forth in the Plan, is in the best interests of MetLife and its policyholders, in compliance with Section 7312(c)(2)." *Id.* ¶ 200.

2) "The provisions of the Plan are fair and equitable to the policyholders of MetLife, in compliance with Section 7312(c)(3)." *Id.* ¶ 201.

3) "The Policyholders' Membership Interests will be exchanged for an aggregate amount of consideration that is fair and equitable to the policyholders of MetLife and meets the requirements of Section 7312, in compliance with Section 7312(d)(4)(A)." *Id.* ¶ 204.

4) "The consideration to be given to the policyholders of MetLife will be allocated among such policyholders in a manner which is fair and equitable in compliance with Section 7312(d)(4)(B)." *Id.* ¶ 205.

5) "The provisions of the Plan are fair and equitable to the policyholders of MetLife, taking into account the legitimate economic interests of participating policyholders as delineated in Section 7312, in compliance with Section 7312(d)(4)(D)." *Id.* ¶ 207.

6) "The policyholder notices and accompanying documents, including the Policyholder Information Booklets, Parts One and Two, contained sufficient information about the proposed reorganization to enable Eligible Policyholders to make an informed decision regarding the Plan, and, for that reason, were approved by the Superintendent pursuant to Section 7312(i), (k)(1)." *Id.* ¶ 216.

The sixth point, on the adequacy of the information supplied to prospective voters, is critical in rebutting any contention that notice was insufficient, unfair, or fraudulent. Other sections of the Superintendent's Opinion provide the facts and the law supporting the Superintendent's conclusions. The first three sections summarize applicable provisions of the New York Insurance Law and provide an overview of the process of MetLife's demutualization. *Id.* at ¶¶ 1–14 ("I. Legislative Background and Statutory Requirements"), ¶¶ 15–30 ("II. Procedural History"), ¶¶ 31–42 ("III. Plan of Reorganization"). The Superintendent's detailed findings and analysis with respect to specific components of MetLife's Plan are included in the following sections. *See id.* at ¶¶ 43–71 ("IV. The Trust"), ¶¶ 72–79 ("V. Purchase and Sale Program"), ¶¶ 80–112 ("VI. The IPO, Private Placements, and the Other Capital Raising Transaction"), ¶¶ 113 –141 ("VII. Eligibility and Policyholder Consideration"), ¶¶ 142–161 ("VIII. The Closed Block"), ¶¶ 162–176 ("IX. Restrictions on Acquisition of Securities by MetLife Personnel"), ¶¶ 177–181 ("X. Future Operations and Solvency"), ¶¶ 182–188 ("XI. Corporate Governance"), ¶¶ 189–191 ("XII. Tax Matters"), ¶ 192 ("XIII. Department of Labor Exemption"), ¶¶ 193–194 ("XIV. Securities Law Matters"), ¶ 195 ("XV. Expenses"), ¶¶ 196–197 ("XVI. Notice of Pendency").

Throughout, the Superintendent's Opinion describes the careful steps the Superintendent took to investigate and determine whether to approve the Plan, including a description of the public hearing and the appointment of advisors to aid in the investigation. *See id.* ¶¶ 15–17, 21. Described were the facts and materials the Superintendent relied on in rendering his Opinion, including:

- The oral and written comments and objections on the demutualization sub-

mitted to the Insurance Department by policyholders and members of the public. *See, e.g., id.* ¶¶ 34, 37, 50, 54, 66, 84, 86, 106, 125, 128, 145, 153, 188, 237.

- The opinions of actuaries and other consultants. *See, e.g., id.* ¶¶ 15–17, 42, 83, 126, 127, 129, 131, 144, 160, 161, 194.
- The compensation given to policyholders and the allocation of that compensation among those policyholders, *see, e.g., id.* ¶¶ 119–131, 205, including the fixed share component and the actuarial formula used to calculate the variable component, *see id.* ¶¶ 122–124, 126–128.
- The structure and funding of the closed bock. *See id.* ¶¶ 142–161.
- The information on the demutualization that was disclosed to policyholders. *See e.g., id.* ¶¶ 66, 216, 238.

## D. Demutualization Procedure

The Plan was approved by 93% of the approximately 2.7 million policyholders who voted. Parties' Stip. ¶ 23; Sup. Opinion ¶ 27. The Superintendent also approved the Plan, after exhaustive review and a public hearing as required by New York law, *see* Sup. Opinion ¶¶ 16–17, 25–26, as being "in the best interest of MetLife and its policyholders," "fair and equitable to the policyholders," "not detrimental to the public," not hazardous to MetLife's solvency, and otherwise in compliance with applicable law. *Id.* ¶¶ 200, 201, 238.

Demutualization became effective on April 7, 2000. Parties' Stip. ¶ 3. As a result of the conversion from mutual to stock form, policyholders' "membership interests" were extinguished. *See* N.Y. Ins. Law §§ 7312(d)(4)(A), (m), (r); Plan §§ 3.1(c), 5.2(d)(iii). The term "member-

ship interests" is defined by New York statute and the Plan to mean policyholders' rights as members of the mutual company by law or by the company's charter, and any right to vote conferred by their policies. N.Y. Ins. Law § 7312(a)(3); Plan, Art. II (defining "Policyholders' Membership Interests"). Membership interests do not include any rights expressly conferred by the insurance policies, other than the right to vote. *Id.* The demutualization did not change policyholders' premiums, benefits or eligibility for policy dividends. Sup. Opinion ¶ 154; *see* N.Y. Ins. Law § 7312(r) ("[T]he rights of all policyholders ... shall be as specified in their policies or contracts ... except for the elimination of the right to vote[.]"); *id.* § 7312(m) ("[T]he reorganized insurer shall be deemed a continuation of the corporate existence of the mutual life insurer.... [The reorganized insurer] shall be deemed to have assumed all of the obligations and liabilities of the mutual life insurer ... other than obligations and liabilities with respect to the policyholders' membership interest eliminated by the plan of reorganization."). Membership interests include the right to vote for company directors and a contingent interest in a possible distribution of surplus in the event of a solvent liquidation. Plan, Art. II (defining "Policyholders' Membership Interests"). Membership interests did not include eligibility for policy dividends, which is a contractual right that persists after demutualization. *Id.* ("The term 'Policyholders' Membership Interests' does not include rights expressly conferred upon the policyholders by their policies or contracts ... such as the right to any declared policy dividends."); *see also id.* § 3.1(b).

Under New York law and the Plan, policyholders whose policies were in force on the September 28, 1999 adoption date of the Plan (called "Eligible Policyholders" in

the Plan) were entitled to receive consideration in exchange for their membership interests. *See* N.Y. Ins. Law § 7312(e)(3); Plan, Art. II (defining "Eligible Policyholder"), §§ 3.1(c), 5.2(d)(iii). Following the precedent established by prior demutualizations, MetLife's Plan allocated to the eligible policyholders 100% of the stock of the company prior to the sale of additional shares in the IPO. *See* Sup. Opinion ¶¶ 15, 39; Plan § 3.1. A minority of the policyholders elected to receive cash at the IPO price in lieu of stock, and an even smaller minority were required for tax or regulatory reasons to receive cash or credits to their policies, determined at the IPO price of $14.25 per share. *See* Parties' Stip. ¶¶ 27, 39, 43–44; Plan § 7.3(a)-(d).

The majority of Eligible Policyholders received shares of stock in MetLife's new holding company, MetLife, Inc., held in a trust for their benefit. Parties' Stip. ¶ 43; *see* Plan § 7.3. The trust was designed to minimize the administrative costs associated with having millions of shareholders. Sup. Opinion ¶¶ 43–44. Beginning shortly after the demutualization and continuing to the present day, these policyholders were able to sell their shares, subject to certain restrictions, from the trust at the market price free of commissions. Parties' Stip. ¶ 70; Sup. Opinion ¶ 51. One year after the demutualization, policyholders could elect to withdraw their shares from the trust and hold the shares directly (for example, through their own broker) like any other shareholder, or could leave the shares in the trust so that they could take advantage of the commission-free sale program in the future. Parties' Stip. ¶ 72; Sup. Opinion ¶ 51.

MetLife, Inc.'s stock price rose to $70 per share in 2007, and is now trading at approximately $34 per share. MetLife, Inc. has paid cash dividends on the stock every year. These cash dividends are in addition to the policy dividends that MetLife continues to pay to class members who have retained their insurance policies. MetLife contends that those who sold their stock when it was trading at a lower price, or who took cash or policy credits in lieu of their allocated shares at the IPO price of $14.25 per share, benefited from the transaction, because they received tangible value in exchange for their illiquid membership interests. *See* Plan, Art. I ("Purpose of Reorganization").

The Plan's method of allocating shares among policyholders followed established precedent. Every eligible policyholder received a "fixed component," consisting of an allocation of 10 shares, which accounted for about 16% of the total consideration. *See* Sup. Opinion ¶ 122; Plan § 7.1(b)(i). The remaining 84% was allocated under the Plan according to an actuarial formula, in proportion to each participating policy's actuarial contribution to surplus. *See* Sup. Opinion ¶ 124; Plan §§ 7.1(b)(ii), 7.2(a)(i). "Actuarial contribution to surplus" is an estimate of the policy's past contributions and the projected present value of future contributions to MetLife's surplus. Parties' Stip. ¶¶ 54, 57. As defined in the Plan, a "participating" policy is one that either (i) contains an express provision for policy dividends or (ii) does not expressly state that it is nonparticipating. Plan, Art. II (defining "Participating Policy"). Policyholders who held only nonparticipating policies, or whose participating policies had zero or negative estimated actuarial contribution to surplus, received only the fixed component of ten shares and no variable component. Sup. Opinion ¶¶ 123–24.

In accordance with section 7312(d), MetLife's Plan established a dividend-protection mechanism known as a "closed block." Plan §§ 3.1(a), 8.1 ("Establishment of the Closed Block"). A closed block is an accounting mechanism designed to protect

reasonable policyholder dividend expectations by "provid[ing] for continuation of current payable dividend scales, if the experience underlying such scales continues and for appropriate adjustments in such scales if the experience changes." N.Y. Ins. Law § 7312(d)(5)(B); *see* Sup. Opinion ¶¶ 142–144; Plan § 8.1(a). The closed block includes, substantially, the individual policies that had dividends payable at the time of the demutualization. *See* Plan, Art. II (defining "Closed Block Business"). Assets are allocated to the closed block that have been determined to be sufficient to pay benefits and to continue the current dividend scale, assuming that the experience underlying that dividend scale remains the same. *See* Sup. Opinion ¶ 142; Plan § 8.1(a). Assets allocated to the closed block can only be used for the benefits, dividends, and certain expenses of the policyholders covered by the closed block; these assets do not revert to the benefit of MetLife stockholders. *See* Plan § 8.2(g).

### E. Related Lawsuits

Out of a number of suits filed in the wake of MetLife's demutualization, it appears that only the instant action and the *Fiala* state action remain pending. A purported derivative action was filed shortly before the parties reached the proposed settlement in this case and the *Fiala* case. *See Waldman v. Benmosche*, Index No. 650643/2009 (N.Y. Sup.Ct., filed Aug. 26, 2009).

The instant action was filed on April 18, 2000. Compl., Docket Entry No. 1. Plaintiffs allege: incomplete disclosure of the basis for determining the fixed 10–share allocation to policyholders; misrepresentation or incomplete disclosure about the effect of the closed block on policyholder dividends; misrepresentation of the reasons for choosing statutory method four for demutualization, *see* N.Y. Ins. Law

§ 7312(d)(4); and incomplete disclosure of the role and amount of actuarial contribution to surplus. *See generally* Second Consolidated Am. Compl., Docket Entry No. 120 ("Am. Compl."). Additional claims about the policyholder trust were deleted by amendment. *See* Oct. 7, 2009 Stip. and Order Amending the Compl., Docket Entry No. 491.

In 2003 the New York Supreme Court dismissed in their entirety claims against MetLife in *Fiala* and *Shah*, another case that was subsequently consolidated into *Fiala. See Shah v. Metro. Life Ins. Co.*, 2003 N.Y. Slip Op. 50591(U), 2003 WL 728869 (N.Y.Sup.Ct. Feb. 21, 2003), *modified sub nom. Fiala v. Metro. Life Ins. Co.*, 6 A.D.3d 320, 776 N.Y.S.2d 29 (N.Y.App. Div.2004). On appeal, the Appellate Division reinstated two claims: a claim under Insurance Law section 7312 based on the alleged allocation of excessive shares to a large policyholder, and a common-law fraud claim based on nondisclosure of an alleged plan to buy back stock after the IPO. *Fiala*, 6 A.D.3d at 321–23, 776 N.Y.S.2d 29. After remand, the *Fiala* plaintiffs recast their claim for failure to disclose the alleged share buyback plan as a section 7312 claim. *See* Revised Third Consolidated Am. Compl. ¶¶ 65–68, *Fiala v. Metro. Life Ins. Co.*, Index No. 601181/00 (N.Y.Sup.Ct., Dec. 22, 2005) (Ex. G to Dec. 28, 2009 Aff. and Decl. of Carl Micarelli in Supp. of Approval of Stip. of Settlement and in Response to Objections, Docket Entry No. 578–5 ("Micarelli Aff.")). The "excessive allocation" claim was later discontinued for lack of evidence, *see* Stip. and Withdrawal of Certain Claims, *Fiala v. Metro. Life Ins. Co.*, Index No. 601181/00 (N.Y.Sup.Ct., Feb. 22, 2008) (Ex. H to Micarelli Aff.), leaving only the "buyback" claims. MetLife filed a motion for summary judgment as to those remaining claims, which was pending at the time the parties settled. Dec. 28, 2009 Aff. and

Decl. of Kevin S. Finnegan in Supp. of Approval of the Stip. of Settlement ¶ 11, Docket Entry No. 578–1 ("Finnegan Aff.").

### F. Class Certification and Notice

In the instant action a class was certified as to all claims. The class consists of

all persons who were participating Metropolitan Life Insurance Co. ("MetLife Co.") policyholders on or about September 28, 1999, for whom MetLife Co. calculated a positive actuarial equity share ... and whose rights as participating policyholders were exchanged for shares of stock in MetLife Co., pursuant to defendants' plan of demutualization ..., excluding defendants, their officers, directors, subsidiaries and affiliates[.]

July 19, 2005 Mem. and Order 4, Docket Entry No. 181 (*In re MetLife Demut. Litig.*, 229 F.R.D. 369, 372 (E.D.N.Y.2005)). The trial court interpreted the class as including those who received cash or policy credits in addition to those who received stock. *See* August 29, 2006 Mem. and Order, Docket Entry No. 254 (*In re MetLife Demut. Litig.*, No. 00–CV–2258, 2006 WL 2524196, 2006 U.S. Dist. LEXIS 97633 (E.D.N.Y. Aug. 29, 2006)). In effect, the class consists of all policyholders who received more than 10 shares of stock, or more than $142.50 in cash or policy credits, in the demutualization (except those who opted out and certain persons associated with defendants).

Pursuant to the court's August 2, 2008 Order, Docket Entry No. 358, individual notice was mailed to approximately 6.7 million members of the class with known addresses that could be obtained through reasonable efforts, in addition to publication notice and the establishment of a toll-free number and a dedicated website. *See* Oct. 20, 2009 Decl. of Eric H. Newman Regarding Distribution of Notice of Pendency, Docket Entry No. 503; Oct. 16,

2009 Decl. of Daniel R. Burke, Docket Entry No. 503–1 (describing work done by Gilardi & Co. LLC to distribute notice of pendency to the class). MetLife has represented that it understands that nearly 13,000 class members submitted timely exclusions. *See* MetLife's Dec. 28, 2009 Mem. of Law in Supp. of Approval of the Settlement and in Response to Objections at 10, Docket Entry No. 578 ("MetLife Mem.").

In the *Fiala* state action, a class was certified as to the section 7312 cause of action only and denied as to the common-law fraud cause of action. *See Fiala v. Metro. Life Ins. Co.*, Index No. 601181/1812, 2006 WL 6190175 (N.Y.Sup. Ct. May 2, 2006), *aff'd as modified,* 52 A.D.3d 251, 859 N.Y.S.2d 426 (N.Y.App. Div.2008) (removing plaintiff Smilow as a class representative). The class in *Fiala* consists of

[a]ll Eligible Policyholders of MetLife, who owned and had in force, as of September 28, 1999, life insurance policies, annuity contracts, or accident and health insurance policies issued by MetLife, or other certificates of interest identified in the Plan. The Class will exclude therefrom the defendants, their officers, directors, subsidiaries, affiliates and legal representatives, and those who request exclusion from the Class within a specified time after notice to be set forth in a further order of this Court.

Order, *Fiala v. Metro. Life Ins. Co.*, Index No. 601181/00 (N.Y.Sup.Ct. Mar. 12, 2008) (Ex. K to Micarelli Aff.).

The New York Supreme Court, after considering the substantial expense of individually notifying the class members of the *Fiala* suit, ordered notice by publication in the *Wall Street Journal* and the *New York Post* once per week for three weeks, and notice by mail to a random sample of 500,000 class members. *See Fiala v. Met-*

*ro. Life Ins. Co.,* Index No. 601181/2000, 2007 N.Y. Slip Op. 51797(U), 17 Misc.3d 1102(A), 2007 WL 2772230, at *2–3 (N.Y.Sup.Ct. Aug. 28, 2007). Notice was given in accordance with the court's instructions. *See* Decl. of Alan Vasquez Re: Notice Procedures, *Fiala v. Metro. Life Ins. Co.,* Index No. 601181/2000 (N.Y.Sup. Ct. July 25, 2008) (Ex. M to Micarelli Aff.). All class members had at least 45 days to request exclusion from the class. *See* Ex. M. to Micarelli Aff. (attaching copies of published notice). MetLife has represented that it understands that 256 class members submitted timely exclusions in *Fiala.* *See* MetLife Mem. at 10.

### G. Discovery and Preparation for Trial

Over the course of nearly eight years, the parties engaged in extensive discovery. More than 50 depositions were taken in the two actions, and hundreds of thousands of pages of documents were produced. Finnegan Aff. ¶ 7. Over sixty thousand pages were designated as trial exhibits in the instant case. *Id.* The parties in both cases retained experts, who were prepared to testify on issues involved in the cases. *Id.* Trial in the instant action was bifurcated into liability and damages phases, *see* Oct. 15, 2009 Order, Docket Entry No. 498 ("Oct. 15, 2009 Order"). Trial on the liability phase was due to begin on November 2, 2009.

### H. Settlement Negotiations

There had been, from time to time since this case and the *Fiala* case were filed, discussions between the parties regarding the possibility of settling one or both cases. These discussions, both between the parties alone and before U.S. Magistrate Judge A. Kathleen Tomlinson, United States District Judge Thomas C. Platt, and New York Supreme Court Justice Herman Cahn (then in charge of the state case), did

not lead to any agreement on settlement prior to October 2009. *See* Finnegan Aff. ¶¶ 8–9.

After the case was reassigned to the undersigned, on the disability of Judge Platt, by Order of October 16, 2009, Docket Entry No. 501, Richard J. Davis, Esq., a prominent member of the law firm of Weil, Gotshal & Manges LLP, was appointed as Special Master to facilitate settlement. Mr. Davis acted as mediator between the parties, discussing settlement with the representatives of each of them. *See* Finnegan Aff. ¶ 9.

Jury selection in this case was completed on Friday, October 30. *See* Oct. 30, 2009 Minute Entry, Docket Entry No. 547. Trial was scheduled to start on Monday, November 2.

On the evening of Saturday, October 31, 2009, after two weeks of arm's length negotiations, the parties reached agreement, with the help of Mr. Davis, on the basic terms of a settlement, including amount and structure. *See* Finnegan Aff. ¶ 10. Mr. Davis put the terms of the parties' agreement in principle on the record on November 2, and recommended approval of the settlement. *See* Nov. 4, 2009 Mem. and Order Regarding Notice and Hearing on Approval of Proposed Settlement 5, Docket Entry No. 536 (*In re MetLife Demut. Litig.,* 262 F.R.D. 205 (E.D.N.Y. 2009)) (the "Nov. 4, 2009 Order"). The parties submitted a Stipulation of Settlement to both the state and federal courts for approval on November 5, 2009. *See* Stip. of Settlement, Docket Entry No. 539–2 (the "Settlement").

### I. Terms of Settlement

The proposed Settlement provides for a total allocation of $50 million by defendants in the federal and state cases, combined. Settlement ¶ 15. This sum is deemed to be characterized as compensatory money damages by the parties.

Distribution will be made as follows: (i) $2,500,000 will be paid in cash as a *cy pres* payment to a health-based or other not-for-profit organization or organizations; (ii) reasonable attorneys' fees and litigation expenses of the classes, as determined by this court and the *Fiala* court, will be paid in cash up to $15 million; and (iii) the remainder will be allocated in assets to the closed block established by the Plan of Reorganization. *See* Settlement ¶¶ 16–20. In exchange for these allocations, the proposed Settlement releases all claims of the plaintiffs and class members asserted in the state and federal cases, as well as any other claims concerning the demutualization and related transactions. *Id.* ¶¶ 21–22.

### J. Notice of Settlement

Notice by publication was approved by the court. *See* Nov. 4, 2009 Order at 2–5 (*In re MetLife Demut. Litig.*, 262 F.R.D. 205, 207–08 (E.D.N.Y.2009)); Nov. 6, 2009 Order Approving Form of Class Notice, Docket Entry No. 540. The same notice was approved in the *Fiala* case by orders of November 5 and 6, 2009. *See* Order Regarding Notice & Hearing on Approval of Proposed Settlement at 2, *Fiala v. Metro. Life Ins. Co.*, Index No. 601181/2000 (N.Y.Sup.Ct. Nov. 5, 2009) (Ex. O to Micarelli Aff.); Order Approving Form of Class Notice, *Fiala v. Metro. Life Ins. Co.*, Index No. 601181/2000 (N.Y.Sup.Ct. Nov. 6, 2009) (Ex. Q to Micarelli Aff.). The orders approving notice in this action and the *Fiala* state action directed notice to be made four times (twice per week for two weeks) in each of the *New York Times,* the *Wall Street Journal,* the *New York Law Journal,* and *USA Today. See, e.g.,* Nov. 4, 2009 Order at 3 (*In re MetLife Demut. Litig.*, 262 F.R.D. at 207).

A joint hearing on the fairness of the proposed Settlement was scheduled for December 30, 2009 at the United States Courthouse in Brooklyn. A December 24, 2009 deadline was set for the receipt of written objections to the proposed Settlement by class members. *See, e.g.,* Nov. 4, 2009 Order at 4 (*In re MetLife Demut. Litig.*, 262 F.R.D. at 207). Notice was published as required on November 12, 13, 17 and 19, 2009. *See* Finnegan Aff. ¶ 2 & Exs. A–1 to A–16 (copies of notice as published). Notice also was given to the Superintendent of Insurance. *Id.* ¶ 3. The form of notice and the Stipulation of Settlement were made available on the "Notices" page of the Eastern District of New York's website, which is reachable by a link from the court's home page, the address of which was included in the published notice. *Id.* ¶ 4.

### K. Objections

Five objections were submitted on behalf of six class members, by (1) Steven Waldman, (2) John J. Pentz, Jr. and Thomas Sterrett Bell, (3) Robert Gould, (4) Christopher J. Mueller, and (5) Lawrence Kuczynski. Actuary Thomas P. Tierney made an additional submission at the request of Mr. Mueller and in support of Mr. Mueller's objection. Several of these objections may have been submitted after December 24, 2009. Several of them may be directed only to the instant action or to the *Fiala* action, but not both. Setting aside issues of timeliness and treating all objections as directed to both actions, none of the objections warrants denial of approval of the proposed Settlement. *See* Part IV.F, *infra.*

### III. Hearings on Proposed Settlement and Related Applications

### A. Trial and November 2, 2009 Preliminary Fairness Hearing

Trial commenced in this action on Monday, November 2, 2009, with the swearing

in of a jury. *See* Nov. 4, 2009 Order at 1 (*In re MetLife Demut. Litig.*, 262 F.R.D. at 206). Out of the presence of the jury, the court requested a report from Special Master Richard J. Davis, Esq. Mr. Davis reported that the parties had agreed to a joint settlement of this action and the *Fiala* action. *Id.* at 2. With the parties' consent the jury was then dismissed. *Id.* Counsel for the plaintiffs in this action, counsel for the plaintiffs in *Fiala*, and counsel for MetLife all confirmed on the record that all parties had agreed to the terms of the proposed Settlement. *Id.* at 3. Terms of the settlement were read into the record. *Id.* at 2–3.

State and federal civil rules authorize, but do not require, a court to conduct a preliminary review of the settlement agreement for probable reasonableness before notice is sent to the class. Based on the information available as of November 2, 2009, it was found probable that the settlement was fair, reasonable, and adequate. *Id.* at 5. In making this preliminary finding, the court relied upon key documents in the record, and upon an extended series of hearings held and rulings made in preparation for trial. *Id.*

In particular, this court made preliminary findings, which were stated on the record and summarized in the Nov. 4, 2009 Order as follows:

The Special Master for settlement, Richard J. Davis, is a distinguished and experienced counsel appointed at the parties' unanimous suggestion. The Special Master has engaged in extensive discussions with the parties. He recommends approval of the settlement.

This case and *Fiala* have been pending for some nine years. During that time, the facts and the law have been thoroughly explored under adversarial conditions. There has been extensive litigation in the trial court and Appellate Division in the state case and in the District Court and Court of Appeals for the Second Circuit in the federal case, including, among other matters, summary judgment, class certification, and an attempted appeal of certification of a class.

Settlement negotiations have been conducted at arm's length, after full discovery. Counsel for the parties are experienced in similar litigation. They have been able to accurately assess the merits of their positions and to determine what is a reasonable settlement.

Several considerations are relevant to whether a settlement is fair, reasonable and adequate. First is the strength or weakness of the case on the merits, in comparison to the amount offered in settlement. The state substantive law on corporate functions and on demutualization has a strong bearing on the case, but the substance of this case is controlled by federal substantive statutes and the regulations of the Securities and Exchange Commission. The parties appear to have reached an appropriate balance of risks and benefits for all of those involved in this complex litigation. The total settlement amount and its division recognizes this practical balance in a pragmatic way. It provides advantages to all parties at relatively small additional cost to any of them. The cy pres portion of the settlement provides indirect benefit to those relatively few members of the class who will not benefit from the closed block portion of the settlement. That latter portion of the settlement will benefit a large number of class members who hold policies, without substantially adversely affecting shareholders of defendant.

The second consideration is whether there has been collusion. There has been no evidence of collusion. Each

side has been strongly opposed by the other.

A third element is the reaction of the class members to the settlement. The courts will decide this matter based upon the hearing on approval of the settlement. It is expected that the number of objections will be minimal relative to the size of the class.

A fourth criterion is the stage of the litigation. Here the cases are fully matured. The parties conducted discovery in a highly skillful and thorough manner. This case was settled as the trial began. All parties were thoroughly prepared on the law and the facts.

An additional factor in determining the fairness of the settlement is the amount of the class counsel's fees. The state and federal courts will ensure that the fees of the state and federal plaintiffs' counsel are reasonable. Plaintiffs' counsel shall inform the court of any agreement as to division of fees. The communication may be filed under seal, with the understanding that the documents may be unsealed by order at any time.

The courts will approve the settlement only after a hearing and a finding that the settlement is fair, reasonable and adequate. The only finding that the courts are making now is that approval is probable, based on the available information, subject to a further hearing.

Any agreement between or among the parties or counsel bearing on the settlement's reasonableness shall be filed with this court. Filing may be under seal, subject to the courts' power to order unsealing.

Where, as here, a class action has been certified and class members have had a previous opportunity to request exclusion by opting out of the class, the court may afford individual class members a new opportunity to request exclusion, but it is not required to do so. In the present cases there shall not be provided a second opportunity for exclusion. The administration of any new exclusions procedure would be expensive. The number of policyholders who would opt out now, after failing to exclude themselves previously, is likely to be minimal to the vanishing point.

*Id.* at 5–8 (*In re MetLife Demut. Litig.,* 262 F.R.D. at 208–09).

The state and federal courts set a combined schedule and procedures for: submission of a proposed Stipulation of Settlement; notice to class members; objections by class members to the proposed Settlement; and a hearing on the fairness of the proposed Settlement. This schedule and procedure were summarized in the November 4, 2009 Order of this court as follows:

The courts direct the parties to submit a proposed Stipulation of Settlement and a proposed Order regarding notice to the class members not later than November 5, 2009. The notice will be published in a form to be set out in the proposed Order, twice in the week of November 9 and twice in the week of November 16, in each of *USA Today, The Wall Street Journal, The New York Times,* and *The New York Law Journal.* The notice shall be combined for this action and the *Fiala* action. The defendants shall give notice of the settlement, no later than November 19, 2009, to the Superintendent of Insurance of the State of New York.

. . .

Arranging for notice by publication to class members and to the Superintendent of Insurance shall be defendants' responsibility. In accordance with the parties' agreement and the courts' discretion, the defendants shall bear the

costs of notice. Plaintiffs' counsel shall cooperate with defendants to facilitate the giving of notice. Counsel for the defendants shall notify the court promptly after notice has been completed.

Class members' objections to the settlement shall be in writing received by the Clerk of this court or of the New York Supreme Court, New York County, not later than December 24, 2009, or orally at the fairness hearing.

. . .

The joint fairness hearing shall be held in the United States Courthouse in Brooklyn, New York, on December 30, 2009 at 10:00 A.M. The parties shall submit a proposed order of approval of the settlement prior to December 31, 2009. The two courts will make a joint final decision on whether or not to approve the settlement as soon as practicable thereafter.

In accordance with the broad discretion in directing class notice under the Federal Rules of Civil Procedure and the New York Civil Practice Law and Rules, notice shall be given in a reasonable manner. Reasonable notice shall include the time and place of the hearing, the time and method for making objections and enough information about the proposed settlement to permit class members to form objections in an informed manner.

The best practicable notice under the circumstances is notice by publication in newspapers. In view of the millions of members of the class, notice to class members by individual postal mail, email, or radio or television advertisements, is neither necessary nor appropriate. The publication notice ordered is appropriate and sufficient in the circumstances. The timeline for notice provides reasonable, appropriate and ample opportunity for class members to oppose the settlement if they wish to do so. *See County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp. 1422, 1424 (E.D.N.Y.1989).

*Id.* at 3–5 (*In re MetLife Demut. Litig.*, 262 F.R.D. at 207–08).

With the consent of the parties, the undersigned and the Honorable Shirley Kornreich, Justice of the New York Supreme Court, consulted in private. *Id.* at 4. The judges and the parties agreed that all of those concerned waived any venue and jurisdiction objections to a joint hearing on the settlement of this action and the *Fiala* action in the Eastern District of New York and of the instant action in New York County. *Id.*

## B. December 30, 2009 Fairness Hearing

Argument on the fairness of the proposed Settlement was heard on December 30, 2009 in a joint hearing before this court and Justice Shirley Kornreich of the New York Supreme Court in the United States District Courthouse in Brooklyn. The New York State Department of Insurance was notified of the hearing, and acknowledged receipt of the notice. Dec. 30, 2009 Hr'g Tr. at 9. The case docket and the ordered hearing notice were electronically available to the United States Attorney's Office and the Securities and Exchange Commission; those offices were deemed to have been notified and to be aware of the hearing. *Id.* at 9–10. No representative of the New York Insurance Department or of any agency of the United States government appeared at the hearing.

### 1. History of Litigation, Discovery and Readiness for Trial

United States magistrate judge A. Kathleen Tomlinson addressed the history of the litigation, the state of discovery, and

the readiness of the case for trial. *Id.* at 7–8. Magistrate judge Tomlinson had supervised discovery and preliminary motions in the case starting in 2006. In connection with her involvement in the case, she reviewed and became familiar with the full history of the litigation. *Id.* at 7. The magistrate judge reported that discovery in this case had been comprehensive and complete. *Id.* at 8. She noted that a pretrial order had been submitted, that the case had been ready for trial, and that a jury had been summoned and empanelled prior to the parties' reaching a settlement. *Id.*

### 2. Arguments of Parties

Arguments were heard in support of the settlement by counsel for the plaintiffs in this case, by counsel for the plaintiffs in *Fiala,* and by counsel for MetLife. *Id.* at 13–20. All of the parties acknowledged the critical role played in settlement negotiations by Special Master Richard Davis. It was emphasized by both parties in the instant case that the proposed Settlement's use of the closed block to allocate settlement funds "ensures that the maximum amount of settlement funds will go to the benefit of the class and not be consumed through things such as administration of the settlement." *Id.* at 19 (statement of MetLife's counsel); *see id.* at 19–20 (statement of federal class counsel) (placing funds in the closed block is the most efficient way to distribute funds to the class).

### 3. Statements of Objectors

Objectors Robert A. Gould and Lawrence Kuczynski, were not present at the hearing. *Id.* at 32, 34.

### a) Thomas Sterrett Bell and John J. Pentz, Jr.

Objectors Thomas Sterrett Bell and John J. Pentz, Jr. were heard through counsel. *See id.* at 21–32. Mr. Bell and Mr. Pentz's objection was made only in the instant action, not in the *Fiala* action. *Id.* at 23.

A possible conflict between Mr. Bell and Mr. Pentz was noted. *Id.* at 22. Counsel was permitted to proceed for purposes of this argument only, based upon counsel's conclusion that no conflict existed that would prevent him from representing both Mr. Bell and Mr. Pentz. *Id.* at 22–23.

It was argued that the proposed Settlement was insufficient for all class members, in light of the class's potential recovery at trial. In particular, with respect to class members who are not current policyholders, recovery in the form of the $2.5 million *cy pres* payment was said to be inadequate. *See id.* at 23–24.

### b) Steven Waldman

Objector Steven Waldman was heard through counsel. *See id.* at 32–34. Mr. Waldman's objection was made in both the instant action and the *Fiala* action. *Id.* at 32.

Counsel for Mr. Waldman stated that MetLife's written submission in response to his objection had "in effect" made changes to the settlement. *Id.* at 33. It was argued that "[a]s a result of the objection, MetLife has come forward and said things they probably otherwise would not have said which they probably didn't want to say and this settlement has been improved based on this objection." *Id.*

The objection was said no longer to be necessary. Counsel for Mr. Waldman withdrew his objection in both the *Fiala* action and, with permission of this court, the instant action. *Id.* at 33–34.

### c) Thomas Tierney

Non-attorney Thomas Tierney appeared and stated that he had been asked to speak by objector Christopher Mueller, who had been unable to obtain counsel. *Id.* at 34. Mr. Tierney was requested to

make a written submission on behalf of Mr. Mueller within ten business days. *Id.*

#### 4. Statement of State Plaintiff Mark Smilow

Class member Mark Smilow appeared through counsel. *See id.* at 36–37. Mr. Smilow was not an objector, but he wished to be heard with respect to applications for incentive awards by named plaintiffs in the *Fiala* action. Mr. Smilow's counsel reserved argument until the February 9, 2009 hearing on applications for fees, expenses, and compensation. *Id.*

#### 5. Continuance of Hearing

The December 30, 2009 fairness hearing was continued until February 9, 2009, in the Supreme Court, New York County, for argument on applications for attorneys' fees and expenses and other compensation. A deadline of February 5, 2009 was set for submission of any objections to applications for fees, expenses, or other compensation. *Id.* at 38. MetLife was ordered to issue a press release announcing continuance of the hearing and the schedule for objections and arguments. *Id.* at 39; *see also* Dec. 30, 2009 Mem. and Order of Hearing on Fees, Expenses, and Incentive Awards, Docket Entry No. 585.

#### C. February 9, 2009 Hearing on Applications for Fees, Expenses, and Compensation

Argument on individual plaintiffs' compensation applications and counsel's applications for fees and expenses was heard on February 9, 2010 in a joint hearing before this court and the New York Supreme Court, in the New York State Courthouse at 60 Centre Street in Manhattan. Prior to the hearing written submissions were received.

The parties were represented at the hearing. Mark Smilow, a plaintiff in the state case, was present with separate counsel. Also present was a representative of objector Steven Waldman.

Waldman's counsel and the parties were heard on Waldman's application for attorneys' fees. *See* Feb. 9, 2010 Hr'g Tr. at 4–7. Class counsel's applications for fees and expenses were addressed by the parties. *Id.* at 7–9. Mr. Smilow and the parties were heard on individual plaintiffs' applications for compensation. *Id.* at 9–24. No other person requested to be heard on these or any other subject. The parties were directed to submit to the state and federal courts an agreed upon short form judgment incorporating the payment decisions described in the present document. *See id.* at 24–32; *see also* Part VII, *infra.*

### IV. Law and Application of Law to Facts

The Federal Rules of Civil Procedure require a court that has certified a class to approve any proposed settlement as "fair, reasonable, and adequate." Rule 23(e) provides:

> (e) Settlement, Voluntary Dismissal, or Compromise.
>
> (1)(A) The court must approve any settlement, voluntary dismissal, or compromise of the claims, issues, or defenses of a certified class.
>
> (B) The court must direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise.
>
> (C) The court may approve a settlement, voluntary dismissal, or compromise that would bind class members only after a hearing and on finding that the settlement, voluntary dismissal, or compromise is fair, reasonable, and adequate.
>
> (2) The parties seeking approval of a settlement, voluntary dismissal, or

compromise under Rule 23(e)(1) must file a statement identifying any agreement made in connection with the proposed settlement, voluntary dismissal, or compromise.

(3) In an action previously certified as a class action under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.

(4)(A) Any class member may object to a proposed settlement, voluntary dismissal, or compromise that requires court approval under Rule 23(e)(1)(A).

(B) An objection made under Rule 23(e)(4)(A) may be withdrawn only with the court's approval.

Pursuant to Rule 23(e), reasonable notice was given to class members, informing them of the proposed Settlement and their right to object. Evidentiary hearings were held to consider the fairness of the proposed Settlement and related applications. Class members who objected to the proposed Settlement made written submissions. Objectors were provided the opportunity to be heard at the December 30, 2009 fairness hearing, and several objectors were heard through counsel. This court and the *Fiala* court jointly received and fully considered extensive evidence on the merits of the proposed Settlement and related applications.

Based upon consideration of that evidence and of the extensive records in this case and the *Fiala* case, the proposed Settlement is found to be fair, adequate, and reasonable. The settlement is approved in this case, subject to the New York Supreme Court's concurrent approval of the settlement in the *Fiala* state action.

## A. Standard of Review

The federal court must determine that the settlement is "fair, reasonable, and adequate" before it may approve it. Fed. R.Civ.P. 23(e)(2); *see McReynolds v. Richards–Cantave,* 588 F.3d 790, 803 (2d Cir. 2009). "Whether to approve a settlement normally rests in the discretion of a district judge." *Denney v. Deutsche Bank AG,* 443 F.3d 253, 273 (2d Cir.2006); *see also McReynolds,* 588 F.3d at 800 ("A district court's determination that a settlement in a class action lawsuit is 'fair, reasonable, and adequate,' . . . is reviewed for abuse of discretion.").

■ In its exercise of that discretion, the court must engage in careful balancing. "The Court must eschew any rubber stamp approval in favor of an independent evaluation, yet, at the same time, it must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." *Detroit v. Grinnell Corp.,* 495 F.2d 448, 462 (2d Cir. 1974), *abrogated on other grounds, Goldberger v. Integrated Res., Inc.,* 209 F.3d 43 (2d Cir.2000).

> It is not necessary in order to determine whether an agreement of settlement and compromise shall be approved that the court try the case which is before it for settlement. . . . Such procedure would emasculate the very purpose for which settlements are made. The court is only called upon to consider and weigh the nature of the claim, the possible defenses, the situation of the parties, and the exercise of business judgment in determining whether the proposed settlement is reasonable.

*Id.* (original ellipsis; quoting *Young v. Katz,* 447 F.2d 431, 433 (5th Cir.1971)); *see also In re Luxottica Group S.p.A. Sec. Litig.,* 233 F.R.D. 306, 310 (E.D.N.Y.2006)

(quoting *Grinnell* ); *Maley v. Del Global Techs. Corp.*, 186 F.Supp.2d 358, 361 (S.D.N.Y.2002) (quoting *Grinnell* ).

■ In making its fairness determination, the Court should consider both the process by which the settlement agreement was negotiated and the substantive fairness of the agreed-upon terms in light of the circumstances of the litigation. *See, e.g., McReynolds*, 588 F.3d at 803–04; *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85–86 (2d Cir.2001); *Farinella v. Paypal, Inc.*, 611 F.Supp.2d 250, 264–68 (E.D.N.Y. 2009). "[G]reat weight is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation." *In re Telik, Inc. Sec. Litig.*, 576 F.Supp.2d 570, 576 (S.D.N.Y.2008) (internal quotation marks omitted).

■ There is a "strong judicial policy in favor of settlements, particularly in the class action context." *McReynolds*, 588 F.3d at 803; *see also In re PaineWebber Ltd. P'ships Litig.*, 147 F.3d 132, 138 (2d Cir.1998) (same); *In re WorldCom, Inc. Sec. Litig.*, 388 F.Supp.2d 319, 337 (S.D.N.Y.2005) ("[P]ublic policy favors settlement, especially in the case of class actions." (citing *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir.1982)). "[C]lass action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation." *In re Top Tankers, Inc. Sec. Litig.*, No. 06 Civ. 13761, 2008 WL 2944620, at *3 (S.D.N.Y. July 31, 2008) (quoting *In re Luxottica Group S.p.A. Sec. Litig.*, 233 F.R.D. at 310).

Approval of a class action settlement under New York law similarly requires a determination of whether the proposed Settlement is "fair, reasonable, and adequate." *Klein v. Robert's Am. Gourmet Food, Inc.*, 28 A.D.3d 63, 70, 808 N.Y.S.2d

766 (N.Y.App.Div.2006) (citing *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir.1982)); *see also Colt Indus. Shareholder Litig. v. Colt Industries, Inc.*, 77 N.Y.2d 185, 565 N.Y.S.2d 755, 566 N.E.2d 1160, 1167 (1991); N.Y. C.P.L.R. 908 (requiring court approval but not specifying a standard).

### B. Presumption of Fairness

■ There is "a presumption of fairness, reasonableness, and adequacy as to the settlement where a class settlement is reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." *McReynolds*, 588 F.3d at 803 (internal quotation marks and alteration omitted); *Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir.2005) (same); *see also In re Telik, Inc. Sec. Litig.*, 576 F.Supp.2d at 576 ("[A] strong presumption of fairness attaches to a class action settlement reached in arm's-length negotiations among able counsel.").

■ The lengthy history of this hard-fought litigation justifies a presumption of fairness. "[T]here could not be any better evidence of procedural integrity than the aggressive litigation spanning nearly a decade and the impassioned settlement negotiations that produced an agreement on the brink of trial, ... collusion or coercion could not conceivably have tainted the process." *Wal–Mart Stores*, 396 F.3d at 117 (internal quotation marks and alteration omitted).

As detailed above, over the course of this decade-old case, the parties have engaged in comprehensive discovery and motion practice, before both trial and appellate courts. *See* Parts II.E–G, *supra.* Experienced, highly-qualified counsel have represented both parties. The quality of counsel's work has been outstanding. After repeated efforts to negotiate a settlement at various stages in the litigation,

Special Master Richard Davis, a prominent law firm partner and mediator, guided the parties through extensive arm's-length discussions on the eve of trial that culminated in the proposed Settlement. *See* Part II.H, *supra.*

There is no indication of any collusion. The proposed Settlement leaves the amount of attorneys' fees to the discretion of the federal and state courts. It provides that "[a]n award of attorneys' fees or litigation expenses is not a necessary term of this Stipulation of Settlement and is not a condition of settlement." Settlement ¶ 16(b). "[B]ecause class counsel left the issue of attorney's fees to the discretion of the District Court, there was no indication that the Settlement was the product of bad faith or collusion." *McReynolds*, 588 F.3d at 804 (internal quotation marks omitted).

The presumption of fairness is particularly strong in the present case because the Superintendent of Insurance supervised and approved the procedures for demutualization used by MetLife. In an analogous case, the Securities and Exchange Commission supported a corporation's omission of information in registration and prospectus statements. The Commission "opined" that the law did not require "defendants to disclose the information that plaintiffs allege was omitted." The Court of Appeals for the Second Circuit held that "the Commission's position . . . is entitled to judicial deference [and is] persuasive." *See In re Morgan Stanley Information Fund Sec. Litig.*, 592 F.3d 347, 352 (2d Cir.2010).

Based on extensive discussions with the parties, Special Settlement Master Davis, a skilled neutral, recommended approval of the settlement as fair and reasonable. *See* Nov. 4, 2009 Order at 5 (*In re MetLife Demut. Litig.*, 262 F.R.D. at 208).

## C. Criteria for Approval of Settlement

The factors to be considered by a district court in making a Rule 23(e) fairness determination are:

(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through trial; (7) the ability of the defendant to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Grinnell*, 495 F.2d at 463 (citations omitted); *see also McReynolds*, 588 F.3d at 804; *In re Currency Conversion Fee Antitrust Litig.* 263 F.R.D. 110, 122–23 (S.D.N.Y.2009). In applying these factors, "not every factor must weigh in favor of the settlement, but rather the court should consider the totality of these factors in light of the particular circumstances." *In re Telik, Inc. Sec. Litig.*, 576 F.Supp.2d at 575 (internal quotation marks omitted).

Even setting aside the presumption of fairness that applies in this case, *see* Part IV.B, *supra*, the facts and law strongly support a finding that the proposed Settlement is fair, reasonable, and adequate in all respects.

### 1. Complexity, Expense, and Likely Duration of Litigation

■ The complexity, expense, and likely duration of the litigation favor the proposed Settlement.

This case involves complex legal and factual issues. This complexity is reflected

in the many fully-briefed motions argued in the District Court and the Court of Appeals for the Second Circuit in the nine years since the original complaint was filed. *See e.g., In re MetLife Demutualization Litig.*, 156 F.Supp.2d 254 (E.D.N.Y. 2001) (denying MetLife's motion to dismiss); *In re Metlife Demutualization Litig.*, 322 F.Supp.2d. 267 (E.D.N.Y.2004) (denying MetLife's second motion to dismiss); *In re MetLife Demutualization Litig.*, 229 F.R.D. 369 (E.D.N.Y.2005) (certifying plaintiff class), *pet. for interlocutory appeal denied* No. 05–8020 (2d Cir. Mar. 29, 2009); *In re MetLife Demutualization Litig.*, 624 F.Supp.2d 232 (E.D.N.Y.2009) (denying cross-motions for partial summary judgment); Order Regarding Motions In Limine, *In Re MetLife Demutualization Litig.*, No. 00–cv–2258 (E.D.N.Y. Oct. 30, 2009) (Docket Entry No. 537).

Were it not for the settlement, the case would have continued to be fiercely contested. MetLife has demonstrated a commitment to defend the case through and beyond trial, if necessary. The liability phase of trial was projected to last several weeks and would have occupied many attorneys for each party. The parties' witness lists contemplated potential testimony from nearly forty witnesses, including four experts, and over sixty thousand pages of documents had been designated as trial exhibits. *See* Micarelli Aff. ¶ 5. The proof on many disputed issues—which involve complex financial concepts—would likely have included a battle of experts, leaving the trier of fact with difficult questions to resolve. *See* Oct. 15, 2009 Order at 3 (stating court was disinclined to grant parties' *Daubert* motions to exclude expert testimony).

In the event that the plaintiffs prevailed in the liability phase, a damages phase of the trial would then follow. *See* Oct. 15, 2009 Order (bifurcating trial into liability and damages phases). Regardless of the outcome at trial, post-trial motions and an appeal by the losing party were likely, possibly followed by a new trial in the event of a reversal. *See In re Crazy Eddie Sec. Litig.*, 824 F.Supp. 320, 324 (E.D.N.Y.1993) (detailing risks of further litigation and delay in absence of settlement). "[V]ictory—even at the trial stage—is not a guarantee of ultimate success." *In re Michael Milken and Assocs. Sec. Litig.*, 150 F.R.D. 46, 53 (S.D.N.Y. 1993) (noting that likelihood of appeals and resultant delay favored settlement). The litigation would have been likely to continue for many more years. There was a serious risk of no recovery for the classes and an insubstantial risk of billions in damages for defendants.

The *Fiala* state case presents similar complexities. *See* Part II, *supra* (citing decisions on significant motions over the course of the case). As in the federal case, expensive litigation would have been likely to drag on for an extended period. MetLife's summary judgment motion was pending. Regardless of the outcome of that motion, an appeal, either interlocutory or otherwise, was likely. If summary judgment were denied, there would then be a trial, perhaps comparable to the federal trial in length and complexity. There would then be a likely appeal, possibly followed by a new trial or trials.

The proposed Settlement provides an immediate and certain benefit to members of the classes. Avoided are the substantial burdens and costs that continued and uncertain litigation would impose on the parties, non-party witnesses, and the courts. Delay at the trial stage and through post-trial motions and the appellate process might have forced class members to wait years longer for any recovery. This would have increased the fees and expenses of plaintiffs' counsel and reduced the value of

any award to the class. Settlement of this action before significant additional resources have been expended benefits the class. Class members will receive compensation now rather than rely on an uncertain recovery of an unknown sum at some point in the future.

The possibility of an adverse result to defendant was minimal. But the overhanging possibility of a huge award could not be ignored by responsible persons. And the cost of the litigation and lost time of executives of MetLife would likely be no less than the cost of the settlement.

### 2. Favorable Reaction of Class

█ The reaction of the class members favors the proposed Settlement.

"It is well settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy. In fact, the lack of objections may well evidence the fairness of the Settlement." *Maley v. Del Global Techs. Corp.*, 186 F.Supp.2d at 362 (citations and internal quotation marks omitted); *see also In re Am. Bank Note Holographics*, 127 F.Supp.2d 418, 425 (S.D.N.Y. 2001) (same).

This proposed Settlement has been well received by the class: Five objections to the proposed Settlement were submitted by six of the approximately 11 million members of the federal and state classes—a rate of objection of well below .000001%. This ratio of objectors compares favorably with settlements approved in other class actions. *See, e.g., Wal–Mart Stores*, 396 F.3d at 118 (settlement is fair where "[o]nly eighteen class members out of five million objected to the Settlement"); *In re Sony SXRD Rear Projection Television Class Action Litig.*, No. 06 Civ. 5173, 2008 WL 1956267, at *6 (S.D.N.Y. May 1, 2008) ("Of approximately 175,000 class members, only 22 (0.0126%) have chosen to opt out of the class, and only 45 have voiced objec-

tions. The small number of opt-outs and objections relative to the size of the class in this case supports approval of the Settlement."); *In re AOL Time Warner ERISA Litig.*, No. 02 Civ. 8853, 2006 WL 2789862, at *6 (S.D.N.Y. Sept. 27, 2006) (settlement warrants approval where, of a putative class of approximately 65,000 members, "the Court received only two objections, and only one directed at the nature of the Settlement or the Class"); *In re Am. Bank Note Holographics*, 127 F.Supp.2d at 425 (settlement warrants approval where there were no objections and five shareholders sought exclusion out of a class of more than 5,000 members).

Objections to the proposed Settlement were addressed in briefs submitted by the parties. In light of the parties' responses, one of the five objections was withdrawn at the December 30, 2009 fairness hearing. *See* Part III.B.3.b, *supra.* The substance of class members' objections is addressed below. *See* Part IV.F, *infra.*

### 3. Stage of Proceedings and Amount of Discovery Completed

█ The stage of the proceedings and the amount of discovery favor the proposed Settlement.

"This factor relates to whether the plaintiffs had sufficient information on the merits of the case to enter into a settlement, and whether the Court has sufficient information to evaluate such a settlement." *Parker v. Time Warner Entertainment Co., L.P.*, 631 F.Supp.2d 242, 259 (E.D.N.Y.2009) (citation omitted). "If all discovery has been completed and the case is ready to go to trial, the court obviously has sufficient evidence to determine the adequacy of settlement." *Wal–Mart Stores*, 396 F.3d at 118 (internal quotation marks omitted; quoting 4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 11:45, at 129 (4th ed.2002)). Ex-

tensive discovery ensures that the parties have had access to sufficient material to evaluate their case and to assess the adequacy of the settlement proposal in light of the strengths and weaknesses of their positions. *See Parker*, 631 F.Supp.2d at 259.

The parties were at an advanced stage in the case, and fully prepared for trial. They were able to make an informed decision on the merits of the Settlement. Defense and class counsel have "had sufficient information to act intelligently." *In re PaineWebber Ltd. Partnerships Litig.*, 171 F.R.D. 104, 126 (S.D.N.Y.1997). The court has sufficient evidence to determine the adequacy of the Settlement.

After over nine years of litigation, the parties agreed to the proposed Settlement just as trial in the federal case was beginning, and when summary judgment after close of discovery in the *Fiala* state case was pending. The parties engaged in thorough and exhaustive discovery. Plaintiffs took over 50 depositions and obtained hundreds of thousands of pages of documents in discovery. *See* Part II.G, *supra.* Both plaintiffs and defendants retained experts who reviewed and opined on the merits of the case. *Id.* The parties briefed and argued a motion to dismiss, motions for summary judgment, a motion for class certification, and others. *See* Part II, *supra* (citing trial and appellate court decisions on parties' motions).

Critical evidentiary rulings on the parties' motions in limine in the weeks before trial in this action served to clarify the parties' relative likelihood of success. *See, e.g.,* Oct. 15, 2009 Order. After extensive briefing and argument, the Superintendent's Order approving the Plan of demutualization was ruled admissible as non-hearsay evidence of MetLife's scienter—a critical factual issue. *See* Nov. 24, 2009 Mem. and Order on Admissibility of New York Insurance Superintendent's Opinion,

Docket Entry No. 555 ("Nov. 24, 2009 Order"). It was determined that the information MetLife was supplied by the Superintendent and his advisors, and transmitted to potential voters, was central to the defendants' state of mind. *Id.* at 4. "This evidentiary ruling favoring defendants [made] it almost impossible for plaintiffs to prove their case." *Id.*

### 4. Risks of Establishing Liability and Risks of Establishing Damages

█ The risks of establishing liability and risks of establishing damages favor the proposed Settlement. The risk that plaintiffs would fail to establish liability or damages was high.

█ "The most important factor is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement." *American Medical Ass'n v. United Healthcare Corp.*, No. 00 Civ. 2800, 2009 WL 4403185, at *4 (S.D.N.Y. Dec. 1, 2009) (quoting *Grinnell*, 495 F.2d at 455). In making this evaluation, "the Court's primary concern is with the substantive terms of the settlement and how they compare to the likely result of a trial." *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 455 (S.D.N.Y.2004) (internal quotation marks omitted).

The essence of a settlement agreement is compromise, "a yielding of absolutes and an abandoning of highest hopes." *United States v. N.Y. City Bd. of Educ.*, 85 F.Supp.2d 130, 157 (E.D.N.Y.2000) (quoting *Milstein v. Werner*, 57 F.R.D. 515, 524–25 (S.D.N.Y.1972)). Each side gains the benefit of immediate resolution of the litigation and some measure of vindication for its position while foregoing the opportunity to achieve an unmitigated victory. *EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir.1985) (citing *United States v. Arm-*

*our & Co.,* 402 U.S. 673, 681, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971); *McDonald v. Chicago Milwaukee Corp.,* 565 F.2d 416, 429 (7th Cir.1977); and *United States v. Jackson,* 519 F.2d 1147, 1152 (5th Cir.1975)).

*In re Luxottica Group S.p.A. Sec. Litig.,* 233 F.R.D. at 316. "The fact that the class potentially could have achieved a greater recovery at trial is not dispositive and does not preclude the court from finding that the settlement is within a 'range of reasonableness' that is appropriate for approval." *Id.*

The apparent weakness of plaintiffs' claims in this action has been repeatedly noted. In denying MetLife's motion to dismiss the original complaint, Judge Platt observed that the only remedy available under section 12(a)(2) of the Securities Act for plaintiffs who retained their stock was rescission in exchange for the purchase price. July 23, 2001 Mem. and Order, Docket Entry No. 34 (*In re MetLife Demut. Litig.,* 156 F.Supp.2d 254, 269 (E.D.N.Y.2001)). This could result in no damages to most of the class because the stock price rose above what plaintiffs said their interests had been worth. In denying summary judgment, Judge Platt stated that MetLife had "strong factual support for its argument that it conducted its demutualization properly," and that plaintiffs' "theories appear increasingly desperate in light of the factual record accumulated so far." May 27, 2009 Mem. and Order 52, Docket Entry No. 386 (*In re MetLife Demut. Litig.,* 624 F.Supp.2d 232, 264 (E.D.N.Y.2009)). It was noted that "[i]t appears that the demutualization process has been an overall boon to policyholders, at least insofar as those who took stock have seen the price of the stock rise appreciably and have also kept the benefits of their life insurance policies." *Id.* at 53 (624 F.Supp.2d at 264).

Shortly before trial, the court reiterated that that "[t]he defendants' evidence with respect to no fraud is very strong" and "[t]he defendants' view of no damages is very strong." Oct. 13, 2009 Hr'g Tr. at 13:14–16. The ruling that the Superintendent's Opinion's was admissible at trial made "it almost impossible for plaintiffs to prove their case." Nov. 24, 2009 Order at 4. Had the parties not reached a settlement, the court would be obliged to revisit the prior ruling denying MetLife's motion for summary judgment in light of the decision on admissibility of the Superintendent's Opinion.

### a) Difficulty of Establishing Material Misrepresentation or Omission

Available to MetLife at trial were several strong defenses to plaintiffs' allegations of material misrepresentations or omissions.

*First,* plaintiffs alleged that the demutualization documents "misled policyholders regarding the value of the variable component of policyholder consideration in relation to the estimated value of policyholders' contribution to surplus, specifically, by omitting the fact that MetLife had calculated policyholders' contribution to surplus at over $15 billion, while the value of the stock distributed to policyholders was less than $10 billion." Dec. 22, 2009 Mem. in Supp. of Final Approval of Settlement and Plan of Allocation of Settlement Proceeds at 7–8, Docket Entry No. 560 ("Fed. Pl. Mem."); *see also* Am. Compl. ¶¶ 55–56.

Defendants proposed to argue that the "contribution to surplus" number was not a fund held by the company, but an actuarial estimate of the past and expected future profit that the company would earn from policies under certain assumptions. *See* MetLife Mem. at 17; *see also* Plan § 7.2. The figure is said not to have been used for the purpose of valuing the company, the company's stock, or the dollar

value of any particular policyholder's consideration. MetLife Mem. at 17 (citing Actuarial Standards Board, Actuarial Standard of Practice No. 37, *Allocation of Policyholder Consideration in Mutual Life Insurance Company Demutualizations* § 3.2.4 (June 2000), *available at* http://www.actuarialstandardsboard.org/pdf/asops/asop037_070.pdf (last accessed Dec. 28, 2009)). MetLife could also have argued that under no law, either state or federal, and in no transaction, has a demutualizing company been required to distribute to policyholders the full value of the contribution to surplus. *See* Fed. Pl. Mem. at 10.

Plaintiffs' theory was undermined by the court's finding that, as a matter of law, policyholders "were not 'owners' of the mutual insurance company." Oct. 15, 2009 Order at 2; *see also Murray v. Metro. Life Ins. Co.*, 583 F.3d 173, 177 (2d Cir.2009) (" '[I]n a mutual company . . . the relation between the policy-holder and the company [is] one of contract, measured by the terms of the policy.' " (quoting *Uhlman v. N.Y. Life Ins. Co.*, 109 N.Y. 421, 17 N.E. 363, 365 (1888))).

Plaintiffs would have faced substantial difficulty in showing that the alleged misrepresentations or omissions relating to the "contribution to surplus" calculation were misleading or material to policyholders' vote on the demutualization. *See, e.g., Basic Inc. v. Levinson*, 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ("An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." (internal quotation marks omitted)).

*Second,* plaintiffs alleged that the demutualization documents "misled policyholders as to why MetLife chose one method of demutualization as opposed to another available method by suggesting that the chosen method was the most appropriate option, without revealing that the method not chosen would have resulted in greater consideration for policyholders." Fed. Pl. Mem. at 7; *see also* Am. Compl. ¶¶ 56(g).

The court's decision denying summary judgment pointed out that "[t]here is clearly no absolute requirement to disclose any business plan considered alongside the disclosed plan, particularly where the facts show that consideration of the alternative plan was quickly discarded." May 27, 2009 Mem. and Order at 63, Docket Entry No. 386 (*In re MetLife Demut. Litig.*, 624 F.Supp.2d at 270). Plaintiffs "ha[d] not established that MetLife's real reason for not pursing Method 2 was a desire to reduce the amount of equity in the IPO." *Id.* "MetLife [had] provide[d] convincing evidence that Method 2 would not have worked and would have been untenable for a variety of reasons." *Id.*

*Third,* plaintiffs alleged that the demutualization documents "misled policyholders regarding the calculation of the fixed component of policyholder consideration by suggesting that the determination of 10 shares as the fixed component was based on actuarial concepts and standards of practice rather than an arbitrary rule of thumb." Fed. Pl. Mem. at 8; *see also* Am. Compl. ¶¶ 55–56.

MetLife was prepared to persuasively argue that nothing in the Policyholder Packets mailed to policyholders suggested that the fixed component was based on an actuarial formula. *See* MetLife Mem. at 19. The Policyholder Packet stated only that the fixed component was equal to 10 shares per policyholder, *see* Plan § 7.1(b)(i), and that statement is said to have been accurate and complete. Thus, it was contended that plaintiffs could not prove a material misrepresentation or omission. In its decision on summary judgment the court declared that plaintiffs'

position that "the fixed component created a windfall to non-participating policyholders" is "unsupported by any facts." May 27, 2009 Order at 53 (*In re MetLife Demut. Litig.*, 624 F.Supp.2d at 264).

*Fourth*, plaintiffs alleged that the demutualization documents "misled policyholders by claiming that future dividends would not be diminished in any way, without disclosing that the Closed Block constituted a limitation on the dividends that would be paid." Fed. Pl. Mem. at 8; *see also* Am. Compl. ¶¶ 55(j), 56(b)-(c).

The Policyholder Information Booklet informed policyholders that (i) the assets allocated to the closed block were expected to maintain the 1999 dividend scales; and (ii) if the assets in the closed block perform better than expected, the dividends paid would be more, and conversely, if the assets return less than expected, the dividends paid would be lower. Policyholder Packet, Docket Entry No. 530-13 at 19. The closed block is properly argued by MetLife to be consistent with the requirements of New York law. MetLife Mem. at 20 (citing N.Y. Ins. Law § 7312(d)(5)). The Superintendent's actuarial consultant found that the closed block was adequately funded for these purposes. Sup. Opinion ¶ 161. Nothing in the Plan prevented MetLife from exercising its discretion to pay dividends on closed block policies from outside the closed block, and dividends are not limited to the assets in the closed block. *See* MetLife Mem. at 21 (citing Plan Art. VIII).

### b) Difficulty of Establishing Intent to Deceive

To succeed on their Rule 10b–5 claims plaintiffs must prove that MetLife acted with intent to deceive. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007); *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir.2001). MetLife has marshaled

strong evidence that it believed the challenged disclosures were complete and accurate, and that deceptive intent was lacking.

MetLife developed the Plan of Reorganization and the Policyholder Information Booklet under the intense scrutiny of the Department of Insurance, which provided the necessary approval only after reviewing and commenting on virtually every aspect of the transaction, including several revisions of the Policyholder Information Booklet and other materials sent to policyholders. *See generally* Nov. 24, 2009 Order (detailing the Insurance Department's pivotal role in the demutualization). In its review, the Insurance Department was assisted by a number of experienced professionals—including actuaries, financial advisors, accountants, and attorneys. *See* Sup. Opinion ¶¶ 16–17. In approving the demutualization, the Superintendent not only found that the Plan of Reorganization was "fair and equitable to policyholders," *id.* ¶ 238, but explicitly found that the Policyholder Information Booklet "contained sufficient information about the proposed reorganization to enable the Eligible Policyholders to make an informed decision regarding the Plan and, for that reason, [was] approved by the Superintendent," *id.* ¶ 216. MetLife could have argued at trial that its Board and management relied on the Superintendent's review and expertise in assuring themselves that the demutualization was being conducted properly.

### c) Difficulty of Proving Injury to Class Members

For the plaintiffs' Rule 10b–5 claim—and arguably for the *Fiala* state plaintiffs' Section 7312 claim—the measure of damages is out-of-pocket loss. *See, e.g., GVA Market Neutral Master Ltd. v. Veras Capital Partners Offshore Fund, Ltd.*, 580 F.Supp.2d 321, 333 (S.D.N.Y.2008) (Rule 10b–5 damages) (citing *Panos v. Island*

*Gem Enters. Ltd.*, 880 F.Supp. 169, 176 (S.D.N.Y.1995)); *see also, e.g., Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 646 N.Y.S.2d 76, 668 N.E.2d 1370, 1373 (1996) ("In an action to recover damages for fraud … [t]he true measure of damage is indemnity for the actual pecuniary loss sustained as the direct result of the wrong or what is known as the out-of-pocket rule.") (internal quotation marks omitted).

For plaintiffs' claim under section 12(a)(2), *see* 15 U.S.C. § 77*l*(a)(2), the remedy is limited to rescission, meaning that class members would be entitled to surrender their stock (or the sale price, if they sold it) and recover what they paid for it, adjusted for interest and dividends. 15 U.S.C. § 77*l*(a); July 23, 2001 Mem. and Order, Docket Entry No. 34 (*In re MetLife Demut. Litig.*, 156 F.Supp.2d at 269). On plaintiffs' own view, the value of their membership interests was no more than $25.54 per share—and the stock is now trading above $34. Stockholder dividends have been paid in the meantime, and at one time the stock was trading as high as $70. *See* Part II.D, *supra.* The evidence suggests that the demutualization was a benefit, not a detriment, to policyholders. *See* May 27, 2009 Mem. and Order 53, Docket Entry No. 386 (*In re MetLife Demut. Litig.*, 624 F.Supp.2d at 264) ("[I]t also appears that the demutualization process has been an overall boon to policyholders[.]").

Because the MetLife stock appreciated in value, the rescission remedy would appear to have no value for class members who chose to retain the stock or who sold when the market was up. Plaintiffs also faced significant difficulties in proving their valuation of membership interests in the mutual insurance company since MetLife argued that such interests are essentially worthless. *See* MetLife Mem. at 25–26 & n. 5 (citing *Soc'y for Savs. v. Bowers*, 349 U.S. 143, 150, 75 S.Ct. 607, 99 L.Ed. 950 (1955); *Tancredi v. Metro. Life Ins. Co.*, 149 F.Supp.2d 80, 87 (S.D.N.Y.2001); *Grobe v. Erie County Mut. Ins. Co.*, 39 A.D. 183, 186, 57 N.Y.S. 290 (N.Y.App.Div. 1899), *aff'd on op. below*, 169 N.Y. 613, 62 N.E. 1096 (1902)).

Proof is lacking to support a theory that dividends were reduced as a result of the closed block, or that any plan to repurchase shares harmed class members. *See, e.g., Shah v. Metro. Life Ins. Co.*, Index Nos. 108887/00, 601181/00, 2003 WL 728869, at *16 (N.Y.Sup.Ct. Feb. 21, 2003) (Cahn, J.) ("Plaintiffs assert that, following the announcement of the share repurchase in June 2000, the price of MetLife shares increased. Policyholders who held onto their shares presumably benefitted thereby.")

### d) Other Defenses

MetLife has asserted other defenses to liability and damages, set out at length in its motions to dismiss and for summary judgment. *See* MetLife Mem. at 27. Some of those arguments were rejected by the court, but remain open to MetLife at trial, post-trial, and on appeal. Because a fairness determination on a class settlement is not meant to be an adjudication of the merits, it is not necessary to rehearse all of the defenses here. They might have posed additional risks to any recovery by the class. MetLife could have pursued these and other legal issues at trial, in post-trial motions, and on appeal. The risks and costs of establishing liability were enormous.

Even if plaintiffs had succeeded in establishing defendants' liability, a substantial dispute on the measure of damages would have remained. The damage assessments of plaintiffs' and defendant's trial experts varied substantially. In such a "battle of the experts," the jury could well

have been swayed by defendants' experts, finding that the plaintiffs were entitled to little or no recovery even if liability were established. *See, e.g., PaineWebber,* 171 F.R.D. at 129 (noting unpredictability of outcome of battle of damage experts).

### e) Difficulty of Proving Claims in State Action

For the reasons discussed above, the *Fiala* plaintiffs faced substantial difficulties in proving their remaining section 7312 claim based on an undisclosed stock buyback scheme. Difficulties of proving injury to class members similar to those in the instant case faced the state plaintiffs. Strong defenses were available to MetLife that might have prevented the state plaintiffs from establishing necessary elements of their section 7312 claim. *See, e.g.,* MetLife Mem. at 23–25.

### 5. Risks of Maintaining Action Through Trial

 The risks of maintaining the class action through trial favor the proposed Settlement.

In light of the difficulty plaintiffs faced in proving injury to class members, there appeared to be some doubt whether the class representatives sustained injury. In the event named plaintiffs could show no injury, a conflict of interest could potentially arise between the class representatives and other class members who may have been injured, raising concerns about the ability of the class representatives to try the damages phase of the case, in the event that the liability phase terminated in favor of the class. *See* Oct. 13, 2009 Hr'g Tr. at 4:19–5:18 (statement of the court).

Where initial certification is proper, "the claims of the class members would not need to be mooted or destroyed because subsequent events or the proof at trial had undermined the named plaintiffs' individual claims." *Sirota v. Solitron Devices,*

*Inc.,* 673 F.2d 566, 572 (2d Cir.1982) (citing *East Texas Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395, 406 n. 12, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977)). Rather, an opportunity to substitute a new named plaintiff should be provided. *McAnaney v. Astoria Financial Corp.,* No. 04–CV–1101, 2007 WL 2702348, at *13 (E.D.N.Y. Sept. 12, 2007). Nonetheless, the risk of having to seek out a new class representative after so many years of litigation, and the further delay that could be occasioned by discovery and motion practice with respect to any new representative, weigh in favor of settlement.

The risks posed by post-trial motions and appeals, and by delay generally, have already been discussed. *See* Part IV.C.1, *supra.* Likely delay, and uncertain prospects of recovery even if plaintiffs should prevail at trial, weigh in favor of settlement rather than maintaining the action through trial.

### 6. Ability of MetLife to Withstand a Greater Judgment

MetLife's ability to withstand a greater judgment weighs neither in favor of nor against the proposed Settlement.

MetLife is a multi-billion dollar corporation. It might have withstood a greater judgment. The ability of the defendant to withstand a greater judgment is not relevant under these circumstances. Courts have recognized that the defendant's ability to pay is much less important than other factors, especially where "the other *Grinnell* factors weigh heavily in favor of settlement approval." *Global Crossing,* 225 F.R.D. at 460; *Telik,* 576 F.Supp.2d at 580 ("[T]his factor alone does not prevent the Court from approving the Settlement where the other *Grinnell* factors are satisfied."). "[T]he fact that a defendant is able to pay more than it offers in settlement does not, standing alone, indicate that the settlement is unreasonable or in-

adequate." *Global Crossing*, 225 F.R.D. at 460 (internal quotation marks omitted); *see also Parker v. Time Warner Entertainment Co.*, 631 F.Supp.2d at 261 (same).

MetLife is a large, stable insurance company, and the settlement was not driven by any concern about MetLife's ability to pay. Under these circumstances, ability to pay is not a factor in the settlement, and does not weigh either for or against approval. *See Telik*, 576 F.Supp.2d at 580.

### 7. Range of Reasonableness of Settlement Fund in Light of Possible Recovery and Risks of Litigation

■ The range of reasonableness of the settlement fund in light of the possible recovery at trial, and in light of the risks of litigation, support approval of the settlement.

■ The determination of a "reasonable" settlement "is not susceptible of a mathematical equation yielding a particularized sum, but turns on whether the settlement falls within a range of reasonableness." *PaineWebber*, 171 F.R.D. at 130 (internal quotation marks omitted). This "range of reasonableness" "recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir.1972).

"[T]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Grinnell*, 495 F.2d at 455 n. 2; *see also Telik*, 576 F.Supp.2d at 580 ("[G]iven the problems with the case, almost any amount could be deemed reasonable[.]"); *Conolly v. Universal Am. Fin. Corp.*, Index No. 13422/07, 2008 N.Y. Slip. Op. 52018(U), 21 Misc.3d 1109(A), 2008 WL 4514098, at *8–11 (N.Y.Sup.Ct. Oct. 8, 2008) (approving settlement that provided for modification of corporate governance provisions and no payment of money to plaintiffs, because "[p]laintiffs are represented by very experienced counsel and the Court accepts their collective judgment that they confront serious obstacles to recovery and that, if the case is pursued, there is a significant risk that the class might recover nothing, a result that could only be achieved at significant expense to both [litigants].").

■ "The fact that the class potentially could have achieved a greater recovery at trial is not dispositive and does not preclude the court from finding that the settlement is within a 'range of reasonableness' that is appropriate for approval." *In re Luxottica Group S.p.A. Sec. Litig.*, 233 F.R.D. at 316; *see also Grinnell*, 495 F.2d at 455 ("The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved.").

The proposed Settlement is reasonable for MetLife because it allows MetLife to avoid the expense and distraction resulting from a trial, appeal, and possible retrial in two separate cases, and to eliminate the miniscule risk of a substantial verdict for the classes.

The proposed Settlement is reasonable for plaintiffs in light both of the meaningful benefit to the classes that it represents, and of the substantial obstacles to proving critical elements of plaintiffs' claims with respect to liability and damages. *See* Part IV.C.4, *supra*. Under the circumstances arguably *any* settlement, no matter how small, would be reasonable. *See Telik*, 576 F.Supp.2d at 580; *Conolly*, 2008 N.Y. Slip Op. 52018(U), at *10–11; *see also In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145, 150–51 (2d Cir.1987) (approving "essentially a payment of nuisance value"

where plaintiffs faced "many factual and legal difficulties").

### 8. Attorneys' Fees and Expenses

The amount of attorneys' fees is not a relevant factor in approval of the settlement.

Left to the courts' discretion are fees. The Settlement provides that "[a]n award of attorneys' fees or litigation expenses is not a necessary term of this Stipulation of Settlement and is not a condition of settlement." Settlement ¶ 16(b). Because no specific fee request is part of the Settlement, the reasonableness of the fees requested by plaintiffs has no bearing, one way or the other, on the fairness of the total Settlement. If anything, the absence of a specific determination of attorneys' fees as part of the Settlement favors the Settlement by demonstrating a lack of collusion between the parties. *See* Part II.I, *supra; see also McReynolds*, 588 F.3d at 804 ("[B]ecause class counsel left the issue of attorney's fees to the discretion of the District Court, there was no indication that the Settlement was the product of bad faith or collusion." (internal quotation marks omitted)).

The parties have addressed fees and expenses in plaintiff's counsel's application for fees and expenses, and in defendants' separate brief. Fees are discussed in Part V, *infra.*

### D. Manner of Allocation of Settlement Funds

The proposed Settlement's allocation of settlement funds is fair and reasonable. Allocated would be at least $32.5 million of the $50 million settlement fund to the closed block, $2.5 million to a health-based nonprofit organization in the form of a *cy pres* award, and up to $15 million to attorneys' fees, reimbursement of expenses, and related compensation. *See* Stipulation ¶¶ 15—20; Dec. 22, 2009 Lead Counsel's Joint Application for an Award of Attorneys' Fees and Reimbursement of Expenses 1, Docket Entry No. 562 ("Fed. Pl. Fee App.").

■ "[T]he adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information. In particular, the opinion of experienced and informed counsel is entitled to considerable weight." *Alleyne v. Time Moving & Storage Inc.*, 264 F.R.D. 41, 52 (E.D.N.Y.2010); *see also In re Sterling Foster & Co., Inc. Sec. Litig.*, 238 F.Supp.2d 480, 486 (E.D.N.Y.2002) (allocation of settlement must be "fair and reasonable" (citing *PaineWebber*, 171 F.R.D. at 133)). The purpose of developing a plan of allocation is to devise a method that permits the equitable distribution of limited settlement proceeds to eligible class members. *Beecher v. Able*, 575 F.2d 1010, 1016 (2d Cir.1978).

■ Trial courts have broad discretion in approving plans for the allocation of settlement funds. To be found "fair and reasonable," the plan for distribution "need have only a reasonable, rational basis," when recommended "by competent and experienced class counsel." *Global Crossing*, 225 F.R.D. at 462 (internal quotation marks omitted); *Maley v. Del Global Techs. Corp.*, 186 F.Supp.2d 358, 367 (S.D.N.Y.2002) (same).

The Settlement's allocation plan meets these requirements and warrants approval.

### 1. $32.5 Million Allocation to the Closed Block

■ The settlement delivers settlement funds to class members primarily through an allocation to the closed block worth, in light of class counsel's application for up to $15 million in fees and expenses,

at least $32.5 million. The money in the closed block can only be used to pay dividends and benefits on policies in the closed block—that is, policies that were in force on the record date of the demutualization that fall within the class definition. *See* Plan Art. II (defining "Closed Block Business") & § 8.2 ("Operation of the Closed Block"); *see also* Dec. 18, 2009 Decl. of Michael Harwood in Supp. of Approval of the Stip. of Settlement and in Response to Objections ¶ 6, Docket Entry No. 578–4 ("Harwood Decl."). The $32.5 million allocation will, through the closed block, go to members of the state and federal classes, in proportion to their pre-demutualization contributions to surplus. A negligible portion of this amount may incidentally benefit those who opted out or were otherwise excluded from the class.

"Fluid recoveries" of this type, which do not call for direct calculation and distribution of precise recoveries to the class members, can be a fair means of delivering value to class members without undue administrative costs. *See, e.g., Schwab v. Philip Morris USA, Inc.,* No. CV 04–1945, 2005 WL 3032556, at *4–17 (E.D.N.Y. Nov. 14, 2005) (discussing legal basis for fluid recovery and citing authorities); *Weber v. Goodman,* No. CV–97–1376, 1998 WL 1807355, at *5 (E.D.N.Y. June 1, 1998) ("[T]he Second Circuit has not allowed for fluid recovery, *see, e.g., Van Gemert v. Boeing Co.,* 553 F.2d 812, 815 (2d Cir. 1977), except where made pursuant to a settlement agreement. *See Beecher v. Able,* 575 F.2d 1010, 1015 (2d Cir.1978)."). "[F]luid recovery has been accepted in some contexts by nearly all federal circuits that have considered it. It is most commonly employed by federal courts for damage distribution in settled cases." *Schwab,* 2005 WL 3032556, at *7 (citing cases).

The closed block provides the opportunity to distribute settlement funds to the majority of class members while incurring almost no incremental administrative costs, since the process of investing closed block funds and determining closed block dividends is one that MetLife already carries out as part of its regular business operations; adding $32.5 million to the closed block will not alter the process or its cost. The Plan requires that MetLife manage dividend payments from the closed block in an equitable manner, subject to monitoring by the New York Insurance Department. *See* Plan § 8.2 ("Operation of the Closed Block"). The assets added to the closed block by the settlement, and the income earned from investment of those assets, will reach millions of class members. *See* Harwood Decl. ¶ 6.

Given the size of the classes—about 11 million members in the aggregate—the cost of calculating, printing and mailing individual checks to class members would run into millions of dollars, and would eat up a substantial amount of the settlement fund. Even assuming optimistically that the administrative cost of preparing and mailing about 11 million checks, including postage, material and labor costs, would be only $2.00 per class member (a minimal estimate), the costs of administering the settlement payout would deplete more than half of the settlement funds remaining after payment of fees and expenses of class counsel and the *cy pres* allocation. Utilization of the closed block technique means that much more of the settlement fund will benefit class members than would otherwise be possible.

If individual checks were mailed as hypothesized above, average class members would be left with a payment of less than $2.00. Payments in such small amounts create "excessive and unnecessary expenses" that are not "in the overall interests of the class as a whole." *See Global Crossing,* 225 F.R.D. at 463 (agreeing with

party's contention that "settlements that distribute checks for less than $10 require disproportionately more follow-up, have a disproportionately high number of uncashed checks, require more checks to be reissued, and often involve second or third distributions of settlement funds").

### 2. $2.5 Million *Cy Pres* Allocation

A small portion of class members will not benefit from the allocation to the closed block. They include class members who have died or whose policies have lapsed. With these class members in mind, the settlement includes a *cy pres* allocation of $2.5 million to a health-based nonprofit organization in lieu of a direct payment to the former and non-closed-block policyholder class members.

 A *cy pres* allocation is warranted in this case. *See Fears v. Wilhelmina Model Agency*, 315 Fed.Appx. 333, 336 (2d Cir.2009). *Cy pres* remedies are appropriate "in circumstances in which direct distribution to individual class members is not economically feasible" and where "the proof of individual claims would be burdensome or the distribution of damages costly." *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 436 (2d Cir.2007) (internal quotations and citations omitted). A *cy pres* payment, as an adjunct to a payment by other means to some members of the class, is warranted where the amount to be distributed to the remaining class members is small relative to the administrative costs of a direct distribution. *See Id.; In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d 24, 33–34 (1st Cir.2009); *In re "Agent Orange" Prod. Liab. Litig.*, 611 F.Supp. 1396, 1403 (E.D.N.Y.1985), *aff'd*, 818 F.2d 179, 181–82 (2d Cir.1987); *Klein v. Robert's Am. Gourmet Food, Inc.*, 28 A.D.3d 63, 73–74, 808 N.Y.S.2d 766 (N.Y.App.Div.2006); *see also* 4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 11:20, at 28–

31 (4th ed.2002) ("*[C]y pres* distributions are proper in connection with a class settlement, subject to court approval of the particular application of the funds. Thus, even in circuits that have ruled that cy pres or fluid class recovery distributions are not valid in contested adjudications, *these distributions have obtained a stamp of approval as part of a class settlement.*" (emphasis added; footnotes omitted)).

Criteria for a *cy pres* payment are satisfied here. The non-closed-block portion of the settlement fund is only $2.5 million, and would probably have to be distributed among millions of former and non-closed-block policyholders. The administrative cost of direct payments would deplete available funds for this group. The administrative burden is aggravated by the fact that the non-closed-block portion of the class includes former policyholders whose policies went out of force after the demutualization. Because MetLife does not maintain current addresses for the former policyholders, determining their present location (assuming they were alive), and mailing individual small checks to them would be substantially more burdensome than a mailing to the current policyholders.

The parties and the court agree that the appropriate *cy pres* donee shall be the Foundation for the National Institutes of Health. The research it finances is health-related and will redound to the benefit of the members of the class on whose behalf it is made. A request was received from the Ovarian Cancer Research Fund ("OCRF") to be considered as a possible recipient of the *cy pres* allocation. OCRF appears to be a highly reputable organization doing useful work. The state and federal courts and parties believe, however, that the *cy pres* allocation should be made to a national and impartial body, with a broad mandate, devoted to the dis-

tribution of such funds. It has the expertise to allocate to particular worthwhile health-related research projects.

### 3. Division of Settlement Amount Between Closed–Block and Non–Closed–Block Allocations

■ Allocation of a smaller amount of recovery to former policyholders and other non-closed-block policyholders than to the closed-block policyholders is fair and reasonable.

"[N]othing requires a settlement to benefit all class members equally. Such a rule would itself result in an inequitable windfall to certain class members, to the detriment of others." *Global Crossing*, 225 F.R.D. at 462 n. 14; *see also In re Enron Corp. Sec. Litig.*, No. MDL–1446, Civil Action No. H–01–3624, 2008 WL 4178151, at *2 (S.D.Tex. Sept. 8, 2008). Relative strength and value of different categories of claims may be considered. *See, e.g., Global Crossing*, 225 F.R.D. at 462 & n. 14.

Considered as a group, the claims of former policyholders and non-closed-block policyholders are weaker than those of closed-block policyholders. The non-closed-block policyholders include (1) institutional (*i.e.*, group) policyholders, (2) individual holders of nonparticipating and other non-dividend-paying policies, and (3) former policyholders. *See* Plan Art. II (defining "Closed Block Business").

*First,* the institutional policyholders include large and sophisticated business entities—many of which are highly knowledgeable about insurance matters and employ analysts to help administer their pension and insurance plans. It would be particularly difficult to show that these policyholders were deceived by MetLife's alleged misrepresentations or omissions. It is notable that no group policyholder mounted a legal challenge to the demutualization, notwithstanding their generally greater level of sophistication and resources to finance a lawsuit.

*Second,* the nonparticipating policyholders are not part of the federal class—the federal plaintiffs contend that nonparticipating policyholders received an unfair windfall as a result of the alleged misrepresentations and omissions. And holders of non-dividend-paying policies were not adversely affected by the demutualization or utilization of the closed block.

*Third,* the former policyholders do not fully share in all of plaintiffs' claims. It is alleged that policyholders' membership interests were extinguished for inadequate consideration. Former policyholders—whose policies lapsed or otherwise went out of force within a few years after the demutualization—arguably would not have retained membership interests even if MetLife remained a mutual company. Former participating policyholders gave up any claims to future dividends, which the federal plaintiffs alleged might be unfairly reduced, once their policies were no longer in force.

The certified class representatives include members of both the closed-block and non-closed-block groups. In this action, named plaintiff Mary DeVito is a former policyholder; in the *Fiala* action named plaintiff Vijay Shah is a former policyholder. *See* Finnegan Aff. ¶ 13 & Ex. B. The conclusion is warranted that class representatives adequately took into account the interests of both groups of class members in negotiating the Settlement. Any conflict of interest between the two groups is *de minimis* in view of the relatively small benefit to each member of the class.

For these reasons, it is within the range of reasonable settlements to allocate less to the *cy pres* payment for non-closed-block class members than to the closed-block class members.

### E. Notice of Settlement

■ Notice of the Settlement was appropriate and adequate. The Superintendent was notified directly. Class members were notified by publication over a two-week period, four times in each of four widely read newspapers. *See* Part II. J, *infra;* Finnegan Aff. ¶ 2 & Ex. A–1 through A–16 (copies of notice as published). The form of notice and the Stipulation of Settlement were made available on the "Notices" page of the Eastern District of New York's website, which is reachable by a link from the court's home page, and the address of which was included in the published notice. *See* Part II.J, *infra.*

Rule 23(e)(1) of the Federal Rules of Civil Procedure requires notice of a settlement to be made "in a reasonable manner." Individual notice of a settlement reached after notice of pendency was previously mailed is not required. "[T]he district court has virtually complete discretion as to the manner of giving notice to class members." *Handschu v. Special Services Div.,* 787 F.2d 828, 833 (2d Cir. 1986). Notice by publication is appropriate where individual notice would be burdensome or expensive. *Handschu,* 787 F.2d at 832–33; *W. Va. v. Chas. Pfizer & Co.,* 440 F.2d 1079, 1090 (2d Cir.1971).

New York law requires notice of a settlement "in such manner as the court directs." CPLR 908. Courts have broad discretion to order notice by publication. *See, e.g., In re Colt Indus. Shareholder Litig.,* 155 A.D.2d 154, 160, 553 N.Y.S.2d 138 (N.Y.App. Div. 1st Dep't 1990), *aff'd as modified,* 77 N.Y.2d 185, 565 N.Y.S.2d 755, 566 N.E.2d 1160 (1991).

In the present case,

> [i]n view of the millions of members of the class, notice to class members by individual postal mail, email or radio or television advertisements, is neither necessary nor appropriate. The publication notice ordered is appropriate and sufficient in the circumstances. The timeline for notice provides reasonable, appropriate and ample opportunity for class members to oppose the settlement if they wish to do so.

Nov. 4, 2009 Order at 5 (*In re MetLife Demut. Litig.,* 262 F.R.D. at 208); *see also* Order Regarding Notice & Hearing on Approval of Proposed Settlement at 2, *Fiala v. Metro. Life Ins. Co.,* Index No. 601181/2000 (N.Y.Sup.Ct. Nov. 5, 2009) (Ex. O to Micarelli Aff.) ("In accordance with Article 9 of the [New York] CPLR and specifically CPLR 907 and 908, the court determines that notice by publication in the manner specified, is reasonable and appropriate.").

It is not necessary to provide the class members with an opportunity to opt out of the Settlement. *See* Fed.R.Civ.P. 23(e)(4) (court "may" allow a new opportunity to request exclusion); CPLR 903 (court "may" allow class members to request exclusion); *see also Denney v. Deutsche Bank AG,* 443 F.3d 253, 271 (2d Cir.2006) ("The decision whether to approve a settlement that does not allow a new opportunity to elect exclusion is confided to the court's discretion." (quoting Adv. Comm. 2003 Notes to Fed.R.Civ.P. 23(e)(3))). Because the class members were given "notice of the action[s], the opportunity to opt out, notice of the proposed Settlement, and the opportunity to object," the court is not required to afford "a second opportunity to opt out." *See Wal–Mart Stores,* 396 F.3d at 114 (citing *Class Plaintiffs v. City of Seattle,* 955 F.2d 1268, 1289 (9th Cir. 1992)). If any class members wished to control the prosecution or settlement of their own claims, they could have opted out or sought to intervene after notice of pendency was given. *See id.* at 115 (class members were "required to opt out at the class notice stage if [they] did not wish to

be bound by the Settlement"). The enormous cost of further prosecuting this action as well as the lack of any realistic probability of success make it almost certain that no one would want to opt out at this point in the litigation and carry it on in her or his individual behalf.

### F. Objections to Settlement

None of the five objections filed in these cases offers any valid reason to withhold approval of the Settlement.

#### 1. Steven Waldman

On December 28, 2009, objector Steven Waldman submitted a written objection to the proposed Settlement. *See* Dec. 22, 2009 Objection to Proposed Class Action Settlement by Class Member Steven Waldman, Request for Discovery and Application for Adjournment of Settlement Hearing Pending Discovery, Docket Entry No. 571 ("Waldman Obj."). MetLife responded to Waldman's objection on several grounds, and offered relevant clarifications of the terms of the proposed Settlement. *See* MetLife Mem. at 39–45. Waldman appeared at the December 30, 2009 fairness hearing and stated that MetLife's clarifications had satisfied his objections. *See* Dec. 30, 2009 Hr'g Tr. at 33. He then withdrew his objection with respect to the state case, and his request to withdraw his objection with respect to the federal case was granted pursuant to Rule 23(e)(5) of the Federal Rules of Civil Procedure. *Id.* at 33–34.

Waldman's written submission argued: (1) that MetLife had discretion to choose and value assets added to the closed block, with no independent check on its valuation, *see* Waldman Obj. at 4; (ii) that MetLife had discretion to distribute, or not distribute, the closed block assets at any time over the life of the closed block, potentially permitting none of the assets to be distributed to living class members, *see id.* at 4–

5; (iii) that because the closed block's liabilities exceeded its assets, and because the performance of the closed block assets left some question whether the shortfall would ever be made up, it was doubtful whether it would ever be possible to distribute closed block assets to policyholders, *see id.* at 5–6; and (iv) that notice to the class was inadequate. Waldman sought discovery related to these issues. *See id.* at 6–8.

At the December 30 hearing Waldman's counsel endorsed MetLife's response to Waldman's objection:

> In making the objection, we had several concerns.
>
> One of the principal concerns was paragraph 16C of the stipulation which provided that MetLife could value the assets going into the so-called closed block.
>
> And human nature being what it was, since they had the discretion, we were concerned what would be going in there and the value of it.
>
> The second major concern was the so-called tontine issue, that the assets would sit for a hundred years and not benefit the current class and then be a windfall at the very, very end.
>
> Now, in addressing these issues, defendants have come forward and they have made changes in effect. They have said no, we're now public[ ]ly disclosing that these assets will in fact either be mark-to-market, i.e. securities, or they will be valued by an independent person.
>
> Now, that is a sea change. That improves the settlement and absent the objection, this wouldn't have happened.
>
> The second thing they say of significance in their objection is that there won't be a tontine effect because they will carefully monitor the fund so the assets are paid out appropriately.

Now, what I'm saying is thus, as a result of the objection, MetLife has come forward and said things they probably otherwise would not have said which they probably didn't want to say and this settlement has been improved based on this objection.

As a result therefore, objector Waldman would like to seek to withdraw his objection because I think the result of the objection has resulted in an improvement of the settlement and therefore, there is no need to continue the objection.

Dec. 30 Hr'g Tr. at 32–33. At the hearing Waldman did not address or renew his objection based on the performance of the closed block assets, his objection to class notice, or the request for further discovery.

Because Waldman declared that he was fully satisfied by MetLife's responses to the issues raised in his objection, and formally withdrew the objection on the record, MetLife's cogent and fully convincing response to Waldman's objection is reproduced below in full:

A. The Objection by Steven Waldman is Without Merit

Objector Steven Waldman has recently commenced a purported derivative suit against certain of MetLife's directors, claiming (among other things) that the alleged wrongdoing pleaded in the *In re MetLife* and *Fiala* complaints harmed MetLife by resulting in the expenses of this very litigation. *Waldman v. Benmosche*, Index No. 650643/2009 (N.Y. Sup.Ct. N.Y. County, filed Aug. 26, 2009). The suit was filed over nine years after the litigation supposedly causing the harm had commenced. On December 8, 2009, Waldman's counsel provided the parties with an objection to the proposed settlement.

In opposition to the proposed settlement, Waldman makes four allegations: (i) that MetLife has unfettered discretion to choose and value assets that are added to the closed block under the agreement; (ii) that MetLife has unfettered discretion to distribute, or not distribute, the assets added to the closed block and may begin to do so in 100 years or more, (iii) that the closed block is in "dire financial straits" and is unable to pay annual policy dividends; and (iv) that notice to the class was inadequate. The Waldman objection also seeks discovery and further notice to the class. None of these objections is well taken.

1. Waldman's Objection Misunderstands How the Closed Block Works.

Fundamentally, Waldman's objection to the operation of the closed block misunderstands the rules governing the operation of the closed block.

*First*, Waldman's objection regarding the assets to be allocated to the closed block rests on a misunderstanding of the regulatory constraints that apply to MetLife. The Stipulation of Settlement requires the assets to be valued at their "current market value as calculated by MetLife." Stipulation of Settlement ¶ 16(c). That calculation, in turn, is governed by rules established by the New York Insurance Department, which require that assets added to the closed block be valued either by established public markets or through an arms' length third-party valuation. [Dec. 18, 2009 Decl. of Michael Harwood in Supp. of Approval of the Stip. of Settlement an in Response to Objections ¶ 4, Docket Entry No. 578–4 ("Harwood Decl.")]. Because of these rigid valuation rules, MetLife does not have the discretion in valuing the assets of the closed block that (for example) an ordinary business corporation would have in valuing assets

on its books. MetLife also does not have unfettered discretion in choosing the assets to allocate to the closed block. The Plan of Reorganization requires that the majority of the closed block assets be investment grade quality, [Plan] § 8.2(b)(1), and that the closed block be managed in good faith and "as if it were an independent entity apart from the Company." *Id.* § 8.2(b)(iv).

*Second,* Waldman asserts that "[i]t is unclear whether or not the Settlement at bar actually requires any assets contributed to the Closed Block ever be distributed to any living class member," and that "it appears that MetLife has discretion to distribute the assets to policyholders, or not to distribute them, providing them with nothing." Waldman Obj. at 2. Waldman further contends that the clause in the Stipulation of Settlement that provides that assets added to the closed block may be distributed at any time "over the remaining life of the Closed Block" means that MetLife could "begin[ ] a distribution 100 years hence ... and continue[ ] it for 50 years after that." *Id.* at 3.

Again, this objection fundamentally misunderstands the operation of the closed block and is fully disposed of by Article VIII of the Plan of Reorganization, which was designed to ensure that MetLife does not operate the closed block in the manner that Waldman posits. Under the Plan of Reorganization, no assets in the closed block may be used for the benefit of the shareholders, [Plan] § 8.2(g), and any asset transfers between the closed block and the remainder of the company must be to the benefit of the closed block. [*Id.*] § 8.2(b)(v). Any assets added to the closed block as part of the proposed settlement are thus certain to be distributed to the millions of class members

whose policies are in the closed block. Harwood Decl. ¶ 5–6.

Moreover, the dividends paid to closed block policyholders are calculated annually with the goals of (*i*) exhausting the closed block assets with the last claim, and (*ii*) avoiding unreasonable buildups of assets benefiting only the later-to-die policyholders, known as "tontine effects." [Plan] § 8.2(d)(i). To that end, MetLife, in consultation with the New York Insurance Department has established a "glidepath" to guide the amount of assets and liabilities retained in the closed block toward meeting these goals. Harwood Decl. ¶¶ 9, 12. The Insurance Department, through annual reporting and quinquennial on-site reviews, has been closely monitoring the closed block to ensure that it is properly managed. [Plan] § 8.2(d)(ii) and (iii).

The rules governing the closed block ensure that any assets added to the closed block, at any time, will be distributed to closed block policyholders. Any assets added to the closed block as part of the proposed settlement are thus certain to be distributed to the millions of class members whose policies are in the closed block. Harwood Decl. ¶ 6. Assets placed in the closed block in connection with the proposed settlement will be commingled with the existing assets, Harwood Decl. ¶ 5, and the newly added assets will be paid out according to the governing principles of the closed block along with all the existing closed block assets. [Plan] § 8.2(b)(ii) and (iii); Harwood Decl. ¶ 5. Because money is fungible, it would be a meaningless abstraction to earmark the settlement funds for payment separate from the other funds.

*Third,* the allegation that the closed block is in "dire financial straits" and has suffered a "multi-billion dollar shortfall," Waldman Obj. n. 4, is without basis in fact. The closed block is healthy and

operating well within the very conservative range established by the Department of Insurance, which continues to closely monitor the closed block's operations. Harwood Decl. ¶ 12. There has been no "multi-billion dollar shortfall." *Id.*

Waldman's misunderstanding of accounting terminology used in the Company's quarterly financial statements is responsible for his misplaced assertion that "billions of dollars in accrued dividend obligations have now been erased, and the dividend obligations for 2008 and the first nine months of 2009 have been set at *zero.*" Waldman Obj. n. 3 (emphasis in original). He apparently draws this statement from the note to MetLife, Inc.'s financial statements that refers to a Policyholder Dividend Obligation, or PDO, of zero. *See Id.* at n. 6 (citing MetLife, Inc.'s Form 10–Q filed 11/04/09 at F–66–67). PDO, however, is a GAAP accounting concept that has no direct relationship to the amount of annual dividends paid to policyholders. Harwood Decl. ¶ 7. A PDO of zero indicates only that the closed block did not operate at a surplus over the "GAAP-determined glidepath"—which would be the case if the company was right on target in paying projected closed block dividends, converted to a GAAP basis. It does *not* mean that the company will be paying zero dollars in annual dividends to closed block policyholders. *Id.* ¶ 11. Contrary to Waldman's implication, MetLife paid approximately $1.5 billion in annual dividends to closed block policyholders in 2008, will pay approximately the same amount in 2009, and has approved the payment of over $1.3 billion for 2010. *Id.* And, in any event, adding funds to the closed block would be expected to increase dividends to closed-block policyholders regardless of the closed block's current financial state.

*Finally,* Waldman's objections ignore the costs that would be imposed by requiring entirely new procedures for dealing with the small additional amount that the settlement will contribute to the closed block. Cost efficiency is the reason for distributing the settlement funds through the closed block, and establishing burdensome new requirements would eliminate some of the benefits of that efficiency. Moreover, given that the settlement is distributing value in exchange for essentially worthless nuisance claims, Waldman's objections—even if they had merit, which they do not—would be trivial. Any amount, or no amount at all, would be a fair settlement of the claims in these actions. *See supra* pp. 316-17.

2. Publication Notice of the Proposed Settlement was Constitutionally Adequate

Waldman relies on the 1950 Supreme Court decision *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306 (1950), to support his position that publication notice was constitutionally inadequate. *See* Waldman Obj. at 9. Waldman's reading of *Mullane* amounts to a claim that publication is *never* adequate. *See id.* (referring to the "general inadequacy of publication notice"). Waldman ignores, however, that the Second Circuit has repeatedly held that notice of a settlement by publication is adequate, once class members have been given notice of pendency and an opportunity to opt out. *See Handschu,* 787 F.2d at 832–33; *W. Va. v. Chas.,* 440 F.2d at 1090; *In re Joint E. & S. Dist. Asbestos Litig.,* 129 B.R. 710 at 800 [ (E.D.N.Y. 1991) ]; *Dolgow v. Anderson,* 43 F.R.D. [472,] 497–498 [ (E.D.N.Y.1968) ]; *see*

*also supra* p. 321. Indeed, Waldman acknowledges an exception in "cases . . . where the costs of such notice would eviscerate the settlement fund," Waldman Obj. at 10, ignoring the massive expense of administering individual notice and opt-outs for a class of over 11 million people.

Waldman also argues that because many Americans receive their news on the Internet, MetLife should have released a press release to ensure Internet coverage of the settlement. *Id.* at 10. However, he identifies no basis for requiring such notice in addition to publication notice; and in any event, news of the settlement is reported on a number of publicly accessible Internet sites. *See, e.g.,* http: //www.law.com/jsp/article.jsp?id=1202435311218 (posted Nov. 10, 2009, last accessed Dec. 28, 2009).

The Waldman objection further alleges that MetLife misdirected class members who read the notice of settlement because "[t]he printed *New York Law Journal, New York Times,* [and] *Wall Street Journal* notices filed with the District Court on November 12–13, 2009 direct readers to 'http://nyed.uscourts.gov/Notices.cfm,' which returns no Internet page." Waldman Obj. n. 10. This allegation is simply false. Each of the sixteen instances of the Notice of Settlement published by MetLife contained a correct, working URL (web page address): http://www.nyed.uscourts.gov/Notices. None of the notices contains the URL to which Waldman refers. *See* Finnegan Aff., exs. A–1 to A–16. In any event, even if any class members had been confused by seeing a supposedly incorrect URL, they could still easily access the information by the "Notices" link from the Court's home page. The published notice also contained a telephone number and address at which class members could contact class counsel for information. In addition, we un-

derstand that the federal and state courts each had multiple hard copies of the Stipulation of Settlement on hand to give out to class members who requested them. Finally, attorneys and others with accounts on PACER (the federal courts' electronic docketing system), could always obtain a copy of the Stipulation of Settlement through that avenue in the unlikely event that they could not figure out any other way to obtain a copy.

MetLife Mem. at 39–45 (footnotes omitted).

### 2. John J. Pentz, Jr. and Thomas Sterrett Bell

John J. Pentz, Jr. and Thomas Sterrett Bell filed an objection on December 18, 2009. *See* Dec. 18, 2009 Objection to Class Action Settlement and Request for Attorneys' Fees and Notice of Intention to Appear, Docket Entry No. 558 ("Pentz–Bell Obj."). Counsel for objectors Pentz and Bell appeared at the December 30, 2009 fairness hearing to argue in support of their objection. Their objections are meritless.

Pentz and Bell's written submission argues: (1) that no more than $15 million in combined fees and expenses should be awarded to class counsel, *see id.* at 5–6; (2) that notice of and opportunity to object to class counsel's motions for attorneys' fees were insufficient under Rule 23(h) of the Federal Rules of Civil Procedure, *see id.* at 2–3; and (3) that "[t]he settlement must be rejected because of the failure to formally certify a former policyholder subclass, as well as the patently inequitable settlement allocation that completely excludes that subclass from any substantial benefits," *see id.* at 3–4. At the December 30, 2009 fairness hearing, the third argument was expanded and clarified. In particular, recovery for former policyholders

in the form of the $2.5 million *cy pres* payment was said to be inadequate, in light of a possible recovery at trial. *See* Dec. 30, 2009 Hr'g Tr. at 23–24, 31–32.

Pentz and Bell's first issue concerning the overall amount of attorneys' fees and expenses is moot. As discussed below, $15 million will be awarded in combined attorneys' fees, expenses, and compensation to named plaintiffs. *See* Parts V–VI, *infra*. This is consistent with Pentz and Bell's position.

Pentz and Bell's second argument, concerning notice and opportunity to object to counsel's applications for fees and expenses, is based in part upon the misconception that the notice provided to class members by publication on November 12, 13, 17 and 19, 2009 and the December 30, 2009 fairness hearing concerned class counsel's applications for attorneys' fees and expenses, rather than only the proposed overall Settlement. *See* Pentz–Bell Obj. at 1–3. A separate hearing was held on February 9, 2010 regarding applications for attorneys' fees and expenses. *See* Part III.C, *supra*. Class members were provided with separate notice and an opportunity to object to applications for fees and related costs. *See* Part III.B.5, *supra*.

As discussed below, notice and opportunity to object to counsel's applications for fees and expenses were proper and adequate. *See* Part V.D, *infra*. Individual notice of a motion for attorneys' fees and expenses is not required—Rule 23(h), like Rule 23(e)(1), requires only notice to the class "in a reasonable manner."

Pentz and Bell's third point, regarding the desirability of a subclass and the adequacy of the $2.5 million *cy pres* recovery for former policyholders, is not persuasive. For reasons already discussed, the Settlement's *cy pres* allocation is warranted. *See* Part IV.D.2, *supra*. Allocation of a smaller amount of recovery to former and non-closed-block policyholders than to closed-block policyholders is fair and reasonable. *See* Part IV.D.3, *supra*.

■■ Certification of a subclass of former policyholders is not warranted. Fracturing the class into subclasses whenever groups receive different treatment under a plan of distribution would place undesirable obstacles in the way of class action settlements, and is unnecessary as a matter of law. "[T]here is no rule that settlements benefit all class members equally." *In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 0165, 2007 WL 4115809, at *13 (S.D.N.Y. Nov. 7, 2007) (quoting *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1148 (11th Cir.1983)); *see also In re Enron*, 2008 WL 4178151, at *2 ("[A] class action settlement need not necessarily treat all class members equally." (internal quotation marks omitted)); *In re Cendant Corp. Sec. Litig.*, 109 F.Supp.2d 235, 252 (D.N.J.2000) ("[U]nless the court reviewing settlement finds ... 'stark conflicts of interest ...,' a settlement which contains class members who may recover different amounts is acceptable." (quoting *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1146 (8th Cir.1999))); *Petruzzi's, Inc. v. Darling–Delaware Co.*, 880 F.Supp. 292, 300–01 (M.D.Pa.1995) ("[D]isparate treatment of class members may be justified by a demonstration that the favored class members have different claims or greater damages[.]"). In view of plaintiffs' likelihood of success at trial, creation of subclasses would waste resources and needlessly interfere with the achievement of a settlement.

### 3. Robert Gould

Robert Gould filed an objection on December 23, 2009. *See* Objection to Proposed Settlement, and Objection to Attorneys' Fees Request, Docket Entry No. 564

("Gould Obj."). Gould's objection argues: (1) that "[c]lass members who no longer obtain a benefit from the closed block receive no benefit from the settlement," *see id.* at 1; (2) that "the settlement takes $2.5 million owed to the class and gives it instead to a third party as cy pres," but that "[u]nclaimed funds should be paid to class members, not third parties," *see id.* at 2; (3) that it is unfair for the class members' releases to become effective as of the date of the entry of the final judgment in either the state or federal action (whichever is later), while defendants are not required to pay or allocate the settlement amount until all appeals of the approval of the settlement date are final, *see id.* at 2; (4) that class members should have been provided an opportunity to opt out of the Settlement and that notice was inadequate, *see id.* at 2–3; and (5) that notice and opportunity to object to counsel's applications for fees and costs prior to the December 30, 2009 hearing were inadequate, *see id.* at 3–4.

Gould's first two arguments, concerning the treatment of former policyholders and the *cy pres* allocation, are not persuasive for reasons already discussed. *See* Parts IV.D & F.2, *supra.* The Settlement's *cy pres* allocation is warranted. *See* Part IV. D.2, *supra.* Allocation of a smaller amount of recovery to former and non-closed-block policyholders than to closed-block policyholders is fair and reasonable. *See* Part IV.D.3, *supra.*

Gould's third argument, concerning the timing of events prescribed by the Settlement, is without merit. The Settlement provides for class members' releases to become effective as of the date of entry of the final judgment in either the state or federal action (whichever is later). Settlement ¶ 21. MetLife is not required to distribute the settlement amount until all appeals of the approval of the Settlement are final. *Id.* ¶¶ 14(s), 18. This schedule

is sensible because if the settlement were rejected on appeal, the task of retroactively unwinding the allocation of assets to the closed block could be complex and administratively costly, and the recovery of fees and expenses paid to class counsel—and the *cy pres* donation to a non-profit organization—would be difficult if not impossible. Under the timing of payments pursuant to the Settlement, the releases can easily be undone if the settlement approval is reversed on appeal.

Gould suggests that MetLife pay interest on the settlement amount during the period between the effective date of the releases and the date of distribution. First, this is contrary to the bargain the parties struck in arm's length negotiations. Second, if there are appeals they will be by class member objectors—not MetLife, who supports the settlement. If the issue was of moment, the court would consider requiring an appealing objector to post an appropriate bond to protect the value of the settlement to the class members. *See, e.g., Allapattah Services, Inc. v. Exxon Corp.,* No. 91–0986–CIV, 2006 WL 1132371, at *18 (S. Fla. April 7, 2006) ($13.5 million bond; "[T]he highly detrimental impact of an appeal of the settlement agreement as to the entire class renders it appropriate for the Court to require [an objector] to post an appeal bond pursuant to Federal Rule of Appellate Procedure 7."). The absence of a requirement that MetLife pay interest is fair and reasonable in light of the weakness of plaintiffs' underlying claims and the improbability that MetLife would want to utilize any (unlikely) appeal for delay.

Gould's fourth and fifth arguments, concerning notice of the settlement and opportunity to opt out, and notice and opportunity to object to applications for attorneys' fees, are without merit for the reasons already discussed. *See* Parts IV.E & F.2,

*supra.* Notice of the settlement was appropriate and adequate; a second opportunity to opt out was not required. *See* Part IV.E, *supra.* Gould apparently did not understand that there would be a separate opportunity to object to applications for attorneys' fees and expenses, and a second hearing on this issue. *See* Part III.C, *supra.* Notice of applications for attorneys' fees was adequate, for reasons discussed below. *See* Part V.D, *infra.*

### 4. Christopher P. Mueller

Christopher P. Mueller served a *pro se* written submission on MetLife's counsel on December 25, 2009. *See* Objection of Policyholder Christopher Mueller to Pending Settlement and Request to the Court that it Appoint Counsel to Argue on his Behalf at the Dec. 30, 2009 Fairness Hr'g, Docket Entry No. 580 ("Mueller Obj.").

Mueller contends: (1) that the Settlement is "woefully inadequate," because plaintiffs alleged billions of dollars in damages, *see* Mueller Obj. ¶ 3; (2) that the settlement amount has "no rational basis," because damages should be calculated by comparing plaintiffs' financial situation after the demutualization with what would have happened without demutualization, and "[t]his natural actuarial process was not followed in developing the proposed settlement," *see id.* ¶ 1; and (3) that allowing the case to go to trial could have set precedent addressing perceived shortcomings in the current laws pertaining to demutualization, *see id.* ¶ 5. Mueller incorporated by reference arguments previously made to the court by Thomas Tierney. *See id.* ¶ 6; Oct. 6, 2009 Amicus Curiae Br. of Thomas Tierney, Docket Entry No. 492 ("Tierney Amicus Br.").

Mueller's first argument, concerning the difference between the damages alleged and the settlement amount, ignores the weakness of plaintiffs' claims. "[T]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Grinnell,* 495 F.2d at 455 n. 2. For the reasons already discussed, the proposed Settlement is reasonable in light both of the meaningful benefit to the class that it represents, and of the substantial obstacles to proving critical elements of plaintiffs' claims with respect to liability and damages. *See* Parts IV.C.4 & 7, *supra.*

Mueller's second argument, concerning the actuarial methods used to arrive at the settlement amount, is unfounded. Both parties did perform the kind of calculation Mueller proposes. MetLife contends that such a calculation "reveals that the class members benefited from the demutualization, and have no damages whatsoever." MetLife Mem. at 50. The Settlement, reached through arms' length negotiations, represented what plaintiffs' excellent counsel concluded was in the interests of the class in light of the lack of strength of their claims.

■ Mueller's third argument, concerning the precedent that a trial of this case might have set, is irrelevant to the fairness of the proposed Settlement vis-à-vis the class members in this case. Neither Mueller, nor anyone else, was willing to finance further litigation. Since there would be no party in interest, there would be no claim or controversy under the Constitution, *see* Const. Art. III, § 2; such abstract litigation as Mueller requests would be without jurisdictional basis. *Cf. In re Zyprexa Prods. Liab. Litig.,* 594 F.3d 113, 118–19 (2d Cir.2010) (refusing advisory mandamus).

The arguments offered by Thomas Tierney, which Mueller incorporates in his objection by reference, are addressed below. *See* Part IV.F.6, *infra.*

### 5. Lawrence Kuczynski

Lawrence Kuczynski faxed a *pro se* letter to the court on December 27, 2009, and

a follow-up letter was received on February 5, 2009. *See* Dec. 23, 2009 Letter from Lawrence Kuczynski to Clerk of Court, E.D.N.Y., Docket No. 568; Feb. 5, 2009 Email from Lawrence Kuczynski to the court (together, the "Kuczynski Obj."). Kuczynski alleges that MetLife did not adequately disclose its former ownership of the Stuyvesant Town and Peter Cooper Village apartment complexes in connection with the demutualization or in documents filed with the Securities and Exchange Commission ("SEC"). *See id.*

■ MetLife's disclosures, or failures to disclose, relating to its real estate assets are not relevant to the fairness of the proposed Settlement in this case. Plaintiffs have alleged: incomplete disclosure of the basis for determining the fixed 10–share allocation to policyholders; misrepresentation or incomplete disclosure about the effect of the closed block on policyholder dividends; misrepresentation of the reasons for choosing statutory method four for demutualization, *see* N.Y. Ins. Law § 7312(d)(4); incomplete disclosure of the role and amount of actuarial contribution to surplus; and, in the *Fiala* case, misrepresentation or incomplete disclosure regarding an alleged share buyback scheme. *See generally* Second Consolidated Am. Compl., Docket Entry No. 120 ("Am. Compl."); Revised Third Consolidated Am. Compl. ¶¶ 65–68, *Fiala v. Metro. Life Ins. Co.*, Index No. 601181/00 (N.Y.Sup.Ct., Dec. 22, 2005) (Ex. G to Micarelli Aff.). These allegations do not touch on MetLife's real estate assets or related disclosures. Kuczynski's objection is not on point.

### 6. Thomas P. Tierney, in Support of Mueller's Objection

■ On January 19, 2009, at the invitation of the courts, *see* Dec. 30, 2009 Hr'g Tr. at 35, actuary Thomas P. Tierney made a written submission in support of Mueller's objection. *See* Jan. 9, 2010 Actuary Thomas P. Tierney's Objection to the Pending Settlement, Docket Entry No. 590 ("Tierney Obj."). Tierney had previously made a written submission to the court styled as an "Amicus Curiae Brief," arguing that the MetLife demutualization was flawed. *See* Tierney Amicus Br. The arguments stated in Tierney's amicus brief were incorporated into Mueller's written objection by reference. *See* Mueller Obj. ¶ 6.

At the time of the demutualization, Tierney appeared as an objector at the Superintendent's January 24, 2000 hearing. *See* Public Hr'g Tr. at 80:13–92:25 (statement of Tom Tierney) (criticizing adequacy of closed block and compensation to each policyholder). He later submitted a letter to the Superintendent further elaborating upon his objection. *See* Tierney Amicus Br., Attachment at 6–7 (Feb. 14, 2000 Letter to Superintendent Neil Levin).

Tierney's submissions in this case, consistent with objections he made at the time of the demutualization, argue that the MetLife demutualization was flawed because: (1) shares of MetLife stock were not distributed to MetLife policyholders according to an appropriate actuarial formula, *see* Tierney Amicus Br. ¶¶ 21, 23–25; Tierney Obj. ¶ 4; and (2) the demutualization violated participating policyholders' rights to receive insurance at an at-cost basis and to have MetLife's surplus returned to them in the form of policyholder dividends, *see* Tierney Amicus Br. ¶ 21; Tierney Obj. ¶ 4.

Tierney's first argument rests on his assertion that the distribution of MetLife stock using a formula based on actuarial equity share was both "a breach of contract" and "actuarially unsound." Tierney

Amicus Br. ¶ 25 & Attachment at 6–7. Tierney proposes an alternative actuarial formula which he considers more sound. *Id.* ¶ 23 & Attachment at 6–7.

Whatever the merits of Tierney's actuarial argument, it is not relevant to the fairness of the proposed Settlement. Plaintiffs in this action have challenged both the use of the 10–share fixed component of policyholder compensation and the disclosures relating to the role and the amount of the actuarial contribution to surplus calculation. *See* Part II.E, *supra.* They have not challenged the formula, based on actuarial equity share, that was used to allocate the variable component of compensation. Tierney's argument does not speak to the strength of plaintiffs' claims.

Tierney's second argument appears to reflect disapproval, not of the MetLife demutualization in particular, but of the statutory demutualization process in general as it is implemented in New York. The MetLife demutualization is described in the following terms:

> What MetLife did when it demutualized was to change its dividend formulae so that the value of future dividends that would be paid on its in-force policies at that time would be $15.34 Billion [i.e., the amount of MetLife's then-existing book surplus, plus the present value at that time of expected contributions to surplus] less than what it would have been had the company not demutualized and had it remained true to its at-cost contractual pledge to policyholders. What it did through actuarial manipulation of its dividend formulae was to convert what should have been $15.34 Billion of (mostly after-tax) policyowner dividends into $15.34 Billion of (mostly pre-tax) stockholder dividends—an event which, of course, ballooned the value of the newly issued MetLife stock.

Tierney Amicus Br. ¶ 28. Tierney objects that this process was a "scam," but not because of any specific features of the MetLife demutualization: "The process described [in the passage quoted above] is the essence of the demutualization scam *as it's been practiced in North America for most of the past 20 years*—monies that are contractually required to be paid as policyholder dividends are converted (via actuarial skullduggery and smoke-'n-mirrors) to stockholder dividends; the associated stock rises in price; and the owners of same reap a windfall." *Id.* ¶ 29 (emphasis added).

It must be conceded by Tierney that the demutualization method used by MetLife was correct as a matter of New York insurance law: "The Court's recent observation that 'MetLife marshals a convincing body of evidence that its demutualization was conducted in accordance with standard actuarial practices and in compliance with New York insurance law' *is nominally correct[.]* ... New York law ... *was technically complied with[.]* " *Id.* ¶ 33 (emphases added). Not only insurance company executives, but also "regulators [and] legislators" are said to be among those responsible for the demutualization "scam." *Id.* ¶ 30.

Tierney's argument thus places him at odds with the substantive law of New York, the practices of the Superintendent and the New York Insurance Department, and the standards of the actuarial profession governing demutualization and the calculation of policy dividends. Tierney appears to object to the demutualization practice which in effect converts part of the mutual insurance policyholder dividends to corporate shareholders profits. But this conversion seems the essence of demutualization—approved as legislative policy by New York statute.

Tierney has a long history of objecting to demutualizations, as documented in the *curriculum vitae* attached to his brief. *See* Tierney Amicus Br., Attachment at 1–5. Whether his positions attacking New York substantive law are sound as a matter of policy or actuarial principle is not at issue in this case. Tierney's arguments are not relevant to the claims plaintiffs have asserted or to the fairness of the proposed Settlement of those claims.

## V. Fees and Expenses

### A. Class Counsel's Joint Application for Fees and Expenses

Class counsel in this action and the *Fiala* state action submitted integrated applications for attorneys' fees and expenses. *See* Fed. Pl. Fee App.; Dec. 22, 2009 Mem. in Supp. of Final Approval of the Settlement, Awarding Attorneys' Fees and Reimbursement of Expenses, and Granting Compensatory Awards to the Representative Pls., Docket Entry No. 563–1 ("State Pl. Mem.").

Pursuant to Rule 23(h) of the Federal Rules of Civil Procedure and Rule 909 of the New York Civil Practice Law and Rules, federal and state class counsel jointly request an award of attorneys' fees and reimbursement of expenses in the amount of $15 million, consisting of approximately $10.5 million (or 21%) of the total settlement amount for fees (to be distributed as federal and state counsel have agreed among themselves) after deducting reimbursement of expenses of approximately $4.5 million. *See* Fed. Pl. Fee App. at 1; State Pl. Mem. at 4–5.

### B. Standard of Review for Award of Fees and Expenses to Class Counsel

■ "[A] litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980); *see also In re Ashanti Goldfields Sec. Litig.*, No. 00–CV–717, 2005 WL 3050284, at *2 (E.D.N.Y. Nov. 15, 2005); *Maley v. Del Global Techs. Corp.*, 186 F.Supp.2d 358, 369 (S.D.N.Y. 2002) ("[C]lass counsel who create a settlement fund for the benefit of a class are entitled to be compensated for their services from that settlement fund."); *Sternberg v. Citicorp Credit Servs., Inc.*, 110 Misc.2d 804, 809, 442 N.Y.S.2d 1017 (N.Y.Sup.Ct.1981) ("[T]he judgment fund and its accrued interest is the appropriate source for the payment of the attorneys' fees.").

Awards of fair attorneys' fees from a common fund encourage skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons, and therefore discourage future misconduct of a similar nature. *See Hicks v. Morgan Stanley & Co.*, No. 01 Civ. 10071, 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005) ("To make certain that the public is represented by talented and experienced trial counsel, the remuneration should be both fair and rewarding." (citation and internal quotation marks omitted)); *Michels v. Phoenix Home Life Mut. Ins. Co.*, Index No. 5318–95, 1997 WL 1161145, at *31, 1997 N.Y. Misc. LEXIS 171, at *92 (N.Y.Sup.Ct. Jan. 3, 1997) ("[G]enerous fee awards in cases such as this serve the dual purpose of encouraging plaintiffs' attorneys to act as private attorneys general and discouraging wrongdoing."); *see also In re Visa Check/Mastermoney Antitrust Litig.*, No. 96–CV–5238, 2008 WL 1787674, at *8 (E.D.N.Y. Apr. 14, 2008) (finding that there is "commendable sentiment in favor of providing lawyers with sufficient incentive to undertake the complex task of competently representing the financial inter-

ests of class members once settlement has resulted in the creation of a significant common fund" (internal quotation marks omitted)).

■ Under both federal and New York law, the amount of an attorney's fee to be awarded from the common fund created in a class action must be "reasonable." Fed. R.Civ.P. 23(h); N.Y. C.P.L.R. 909; *see also Goldberger v. Integrated Resources, Inc.,* 209 F.3d 43, 47 (2d Cir.2000); *Flemming v. Barnwell Nursing Home & Health Facilities, Inc.,* 56 A.D.3d 162, 164–65, 865 N.Y.S.2d 706 (N.Y.App. Div.3d Dep't 2008), *leave to appeal granted,* 13 N.Y.3d 710, 890 N.Y.S.2d 448, 918 N.E.2d 963 (2009). The fees must be "assessed based on scrutiny of the unique circumstances of each case, and a jealous regard to the rights of those who are interested in the fund." *Goldberger,* 209 F.3d at 53 (internal quotation marks omitted); *see also Klein v. Robert's Am. Gourmet Food, Inc.,* 28 A.D.3d 63, 75, 808 N.Y.S.2d 766 (N.Y.App. Div.2d Dep't 2006) ("The amount awarded in attorneys' fees must be based on the 'reasonable value of the legal services rendered.'" (quoting N.Y. C.P.L.R. 909)). An appropriate fee is intended to approximate what counsel would receive if they were bargaining for their services in the marketplace. *Missouri v. Jenkins,* 491 U.S. 274, 285, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989).

■ The following criteria must be considered in evaluating a request for attorneys' fees in a common fund case:

> (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation ...; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Goldberger,* 209 F.3d at 50 (citation and internal quotation marks omitted; ellipsis in original). State courts in New York have cited similar factors to consider. *See Sternberg,* 110 Misc.2d at 810, 442 N.Y.S.2d 1017 (noting derivation of factors used in N.Y. state cases from federal case law).

In considering these factors, courts should avoid benchmarks, *Goldberger,* 209 F.3d at 51–52, and remain cognizant of the "overarching concern for moderation" in awarding attorneys' fees, *id.* at 53. New York courts generally follow the same approach as federal courts in the Second Circuit, including *Goldberger,* in determining a reasonable fee to award to class counsel. *See, e.g., Nager v. Teachers' Retirement Sys. of City of N.Y.,* 57 A.D.3d 389, 390, 869 N.Y.S.2d 492 (N.Y.App. Div. 1st Dep't 2008) (citing *Goldberger*); *Ciura v. Muto,* 24 A.D.3d 1209, 1210, 808 N.Y.S.2d 842 (N.Y.App. Div. 4th Dep't 2005) (in awarding class counsel fees, court "should consider factors such as the novelty and difficulty of the questions presented [and] the skill requisite to perform the legal services properly" (internal quotation marks omitted)).

The Court of Appeals for the Second Circuit has authorized district courts to employ either the percentage-of-the fund method or the lodestar method when awarding fees in common fund cases. *See Goldberger,* 209 F.3d at 47–50. New York state courts are also permitted to use either or both methods. *See Flemming,* 56 A.D.3d at 165, 865 N.Y.S.2d 706.

In expressly approving the percentage method, the Court of Appeals for the Second Circuit recognized that "the lodestar method proved vexing" and had resulted in "an inevitable waste of judicial resources." *Goldberger,* 209 F.3d at 48–49; *see also Savoie v. Merchs. Bank,* 166 F.3d 456, 460 (2d Cir.1999) ("The percentage-of-the-fund method has been deemed a solution to

certain problems that may arise when the lodestar method is used in common fund cases."). Thus, the trend among district courts in the Second Circuit is to award fees according to the percentage-of-the-fund method, rather than the lodestar method. *See, e.g., Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 121 (2d Cir.2005) ("The trend in this Circuit is toward the percentage method, which directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." (internal quotation marks omitted)); *Ashanti,* 2005 WL 3050284, at *2; *In re Elan Sec. Litig.,* 385 F.Supp.2d 363, 373 (S.D.N.Y.2005).

New York state courts have "note[d] that federal courts around the country, including federal district courts in New York, appear to be turning away from the lodestar/multiplier approach, and are returning to the more traditional percentage of the recovery approach." *Willson v. New York Life Ins. Co.,* Index No. 94/127804, 1995 N.Y. Misc. LEXIS 652, at *90–91 (N.Y.Sup.Ct. Nov. 8, 1995); *see also Michels,* 1997 WL 1161145, at *30–31, 1997 N.Y. Misc. LEXIS 171, at *91. These New York state courts have tested the reasonableness of a fee by "first look[ing] to the percentage of the recovery approach" and then applying the lodestar method. *Willson,* 1995 N.Y. Misc. LEXIS 652, at *90–93; *see also Michels,* 1997 WL 1161145, at *31–32, 1997 N.Y. Misc. LEXIS 171, at *93–94. Other state courts in New York have continued to employ the lodestar method of determining reasonable fees. *See Ousmane v. City of New York,* Index No. 402648/04, 22 Misc.3d 1136(A), 2009 WL 722294, at *9 (N.Y.Sup.Ct. Mar. 17, 2009).

■■■ When considering hourly rates for attorneys the court need not take into account the location of the attorneys' offices or the venue of the case. *See, e.g.,* Mark Fass, *Circuit's Approach to Calculation of Attorneys' Fees, N.Y.L.J.,* Jan. 27, 2010, p. 1; *cf. Simmons v. New York City Transit Auth.,* 575 F.3d 170, 177 (2d Cir. 2009) (considering venue in calculating fees). Judicial notice is taken of the fact that the plaintiff class action securities bar consists of skilled counsel who litigate nationally, requiring—and obtaining—high fees based on relatively uniform hourly rates wherever the cases they bring are prosecuted. All class counsel in the present case were of Cadillac limousine quality. They are entitled to high hourly rates in computing compensation, at least to the extent that it is available from this recovery.

## C. Criteria for Approval of Fees and Expenses

Class counsel's requested attorneys' fees are justified under both the percentage-of-the-fund method and the lodestar method. Other factors relevant to the evaluation of an application for fees and expenses favor the fee request.

### 1. Percentage-of-the-fund Method

■■■ The compensation requested here, 21% of the $50 million settlement fund (to be divided as federal and state counsel have agreed), is reasonable and within the normal range of percentage fees awarded in the federal courts in the Second Circuit and the New York State courts. The requested award is also consistent with statistical trends in class action attorneys' fee awards, as documented in a recent empirical study.

Relevant federal decisions include, e.g., *In re Veeco Instruments Inc. Sec. Litig.,* No. 05 MDL 1695, 2007 WL 4115808, at *12 (S.D.N.Y. Nov. 7, 2007) (30% of $5.5 million settlement); *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.,* No. 03 MDL 1529, 2006 WL 3378705, at *5

(S.D.N.Y. Nov. 16, 2006) (21.4% of $454 million settlement); *In re Oxford Health Plans, Inc. Sec. Litig.*, No. MDL 1222, 2003 U.S. Dist. LEXIS 26795, at *13 (S.D.N.Y. June 12, 2003) (28% of unspecified total settlement); *Kurzweil v. Philip Morris Cos.*, Nos. 94 Civ. 2373, 94 Civ. 2546, 1999 WL 1076105, at *1 (S.D.N.Y. Nov. 30, 1999) (30% of $123 million settlement); *Hicks*, 2005 WL 2757792, at *9–11 (30% of $10 million settlement); *In re Blech Sec. Litig.*, No. 94 Civ. 7696, 2002 WL 31720381, at *1–2 (S.D.N.Y. Dec. 4, 2002) (33–1/3% of $2.795 million settlement); *Maley*, 186 F.Supp.2d at 374 (33–1/3% of $11.5 million settlement).

Comparable New York state court decisions include, *e.g.*, *Flemming*, 56 A.D.3d at 166, 865 N.Y.S.2d 706 (45% of $950,000 settlement); *Mark Fabrics Inc. v. GMAC Commercial Credit LLC*, Index No. 604631/02, 2005 WL 6216029, 2005 N.Y. Misc. LEXIS 3566, at *5 (N.Y.Sup.Ct. Dec. 22, 2005) (approximately 30% of $850,000 settlement). In both the federal and state cases cited above, expenses incurred by class counsel were reimbursed from the settlement.

A recent empirical study of published decisions in federal and state class action cases from 1993 through 2008 found that "regardless of the methodology for calculating fees ostensibly employed by the courts, the overwhelmingly important determinant of the fee was simply the size of the recovery obtained by the class." Theodore Eisenberg & Geoffrey P. Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993–2008*, 7 J. Empirical Legal Stud. 248, 250 (2010) ("Eisenberg & Miller 2009"); *see also generally* Theodore Eisenberg & Geoffrey P. Miller, Attorney Fees in Class Action Settlements: An Empirical Study, 1 J. Empirical Legal Stud. 27 (2004); Brian T. Fitzpatrick, An Empirical Study of Class Action Settlements and Their Fee Awards, 7 J. Empirical Legal Stud. (Forthcoming 2010). Overall, Eisenberg and Miller found that, for cases in which the class recovery was between $38.3 million and $69.6 million, the mean fee award was 20.5% of the total recovery; the median fee award was 21.9%. *See* Eisenberg & Miller 2009 at 17–18 & Table 7. The fees requested in this case, amounting to approximately 21% of the class recovery, are squarely within this range.

## 2. Lodestar Method

Cross-checking a fee awarded under the percentage-of-the-fund method against counsel's lodestar helps to ensure the reasonableness of the proposed award. *See, e.g., Goldberger*, 209 F.3d at 50. New York courts have tested the reasonableness of a fee award by using both methods. *See, e.g., Willson*, 1995 N.Y. Misc. LEXIS 652, at *93–95.

Fees representing multiples above the lodestar are often awarded to reflect the risk and contingent nature of the litigation, the result obtained, and the quality of the attorney's work. *See, e.g., Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 167–69 (3d Cir.1973), subsequently refined in *Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 116–18 (3d Cir.1976) (en banc). "[M]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." *In re Cendant Corp., Derivative Action Litig.*, 232 F.Supp.2d 327, 341–42 (D.N.J.2002) (citations omitted); *see also In re Interpublic Sec. Litig.*, No. 03–CV–1194, 2004 WL 2397190, at *12, 2004 U.S. Dist. LEXIS 21429, at *36–37 (S.D.N.Y. Oct. 26, 2004) (awarding multiplier of 3.96 and noting that in recent years, multipliers of between 3 and 4.5 have been common in securities class actions); *Willson*, 1995

N.Y. Misc. LEXIS 652, at *93–95 (approving multiplier of 4.6 times lodestar and noting multipliers in other cases ranging from 6 to 12 times the lodestar); *Michels,* 1997 WL 1161145, at *32, 1997 N.Y. Misc. LEXIS 171, at *93–95 (approving multiplier of 3.3, noting range of 6 to 12). *Cf.* Eisenberg & Miller 2009 at 25–26 & Table 15 (finding that, for cases in which the class recovery was between $38.3 million and $69.6 million, the mean lodestar multiplier used was 1.98; the median lodestar multiplier used was 1.75).

The total lodestar of counsel, derived by multiplying the hours and current hourly rates reported by each firm, is $42,842,818.25. *See* Dec. 22, 2009 Decl. of Jared B. Stamell in Supp. of Attorneys' Fees and Reimbursement of Expenses ¶ 15, Docket Entry No. 562–3 ("Stamell Fee Decl."). The hours spent on the case were required. They were charged at customary rates for lawyers and other personnel of the experience and skill of those in this litigation. When appropriate, work was assigned to junior partners, associates and paraprofessionals to limit costs. The charges are supported by contemporaneous records.

The requested 21% fee, which amounts to approximately $10.5 million (without interest), represents a fraction rather than a multiple of counsel's accumulated lodestar. The relatively modest fee relative to lodestar is warranted based upon the recovery actually achieved. A full lodestar award with an adequate multiplier would have left almost nothing for the class. The lodestar cross-check supports the requested percentage fee.

### 3. Other Factors

■■■ Other criteria to be considered in evaluating a request for attorneys' fees include:

(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . .; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Goldberger,* 209 F.3d at 50 (citation and internal quotation marks omitted). Analysis of these factors supports approval of class counsel's fee request.

### a) Time and Labor Expended

The significant effort devoted to this case by class counsel supports the requested fee.

In prosecuting this action and the *Fiala* state action over some ten years, class counsel have, among other things: located and interviewed witnesses; retained and consulted with outside damages experts, including actuarial and valuation experts; consulted with outside insurance industry experts; reviewed relevant publicly available information and materials produced by MetLife and other parties in discovery; engaged in protracted discovery; and, in the instant action, prepared for and begun trial. Counsel filed amended complaints, moved for class certification, and opposed multiple motions to dismiss, motions for summary judgment, and appeals. *See generally* Dec. 22, 2009 Decl. of Jared B. Stamell in Supp. of Lead Plaintiffs' Mot. for Final Approval of Settlement and Plan of Allocation of Settlement Proceeds ¶¶ 1—172, Docket Entry No. 560–2 ("Stamell Decl."). Multiple time-consuming formal mediation sessions and additional negotiations have taken place. *Id.* ¶¶ 158, 169. Counsel devoted time and skill to negotiating the specific terms of the proposed Settlement, documenting it in the Stipulation of Settlement, and preparing for the fairness hearings. *See id.* ¶¶ 169, 170.

### b) Magnitude and Complexity of the Litigation

The magnitude and complexity of these cases required intensive efforts by counsel, and support the requested fee.

Securities class actions are often complex. *See In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, No. 02–CV–5575, 2006 WL 903236, at *8, 2006 U.S. Dist. LEXIS 17588, at *31 (S.D.N.Y. Apr. 6, 2006). This action and the *Fiala* action were no exception. MetLife is one of the largest insurance companies in the United States. Plaintiffs alleged that MetLife had deceived members of huge classes—its policyholders—in its demutualization.

Building a case based on this contention required sophistication and an extensive investigation to understand the circumstances surrounding the alleged fraud. The efforts required of counsel are apparent from the record in the instant case, including numerous memoranda and motion papers and voluminous discovery materials. Counsel analyzed, among other things, the contents of the Policyholder Information Booklet and other demutualization materials sent to policyholders. MetLife policyholders and former MetLife employees were located and interviewed or deposed. Demutualization disclosures, detailed financial information, and other public statements were investigated to evaluate the significance of MetLife's disclosures and to determine the value of the consideration tendered to class members. Insurance industry and damages experts had to be consulted regarding the complex issues presented. *See* Parts II.G, IVC.1 & 4, *supra.*

### c) Risk of the Litigation

The significant risks associated with continuing prosecution of these cases through to trial support the requested fee.

The risk of the litigation is often cited as the "first, and most important, *Goldberger* factor." *In re Bristol–Myers Squibb Sec. Litig.*, 361 F.Supp.2d 229, 233 (S.D.N.Y. 2005); *see also Goldberger,* 209 F.3d at 54; *Washington Fed. v. Village Mall Townhouses, Inc.*, 90 Misc.2d 227, 394 N.Y.S.2d 772, 776 (1977) ("The foremost of these factors is the attorney's 'risk of litigation', i.e., the fact that despite the most vigorous and competent of efforts success is never guaranteed . . . .") (citation omitted).

> No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success. Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended.

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir.1974) (citation omitted). "Little about litigation is risk-free, and class actions confront even more substantial risks than other forms of litigation." *Teachers' Ret. Sys. v. A.C.L.N., Ltd.*, 2004 WL 1087261, at *3, 2004 U.S. Dist. LEXIS 8608, at *11 (S.D.N.Y. May 14, 2004); *see also In re Am. Bank Note Holographics Sec. Litig.*, 127 F.Supp.2d 418, 433 (S.D.N.Y.2001) (finding it is "appropriate to take this [contingent-fee] risk into account in determining the appropriate fee to award"). In particular, "securities actions have become more difficult from a plaintiff's perspective in the wake of the [Private Securities Litigation Reform Act]." *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 194 (E.D.Pa. 2000).

For reasons already discussed, this case presented significant risks with respect to establishing both liability and damages. *See* Part IV.C.4, *supra.* Plaintiffs faced

challenges in (1) proving misrepresentations or omissions; (2) demonstrating that those misrepresentations or omissions were actionable, particularly in light of the Superintendent's Opinion; (3) substantiating that the classes' losses were caused by MetLife's misrepresentations and omissions; and (4) proving scienter and materiality given difficult legal standards and MetLife's strong defenses. *See id.*

Defendants denied all claims against them and asserted that the documents sent to policyholders before the demutualization were complete, accurate, and not misleading. It was argued that there were no misleading omissions or misrepresentations on which the class members could have relied when deciding how to vote. The demutualization was also said to be fair and equitable to as well as beneficial for policyholders. MetLife was prepared to present strong evidence, including expert testimony, in support of these and other defenses to plaintiffs' claims. *See id.* Plaintiffs faced particular difficulties in establishing damages and proving scienter. *See* Part IV.C.4.b-c, *supra.*

From the outset, these actions were difficult, with no assurance that counsel would see any compensation for the time and resources they expended on behalf of the classes.

#### d) Quality of Representation

The quality of class counsel's representation favors the requested fee.

Quality of representation is an important factor in considering a fee request. *See Ressler v. Jacobson,* 149 F.R.D. 651, 654 (M.D.Fla.1992). "[P]rosecution and management of a complex national class action requires unique legal skills and abilities." *Edmonds v. United States,* 658 F.Supp. 1126, 1137 (D.S.C.1987); *see also Flemming,* 865 N.Y.S.2d at 709 (approving fees in a "complex case" that transpired "over the course of six years and involved an

area of law without much case law to lend guidance"). The quality of the opposition should be taken into consideration in assessing the quality of the plaintiffs' counsel's performance. *See In re Warner Communications Sec. Litig.,* 618 F.Supp. 735, 749 (S.D.N.Y.1985); *see also In re Merrill Lynch Tyco Research Sec. Litig.,* 249 F.R.D. 124, 141 (S.D.N.Y.2008); *Flemming,* 865 N.Y.S.2d at 709 (in awarding fee, noting "defendant's tenacious fight against plaintiff on every issue").

This case required a thorough investigation, extensive discovery, and the skill to respond to complex legal and factual defenses raised by highly qualified defense counsel. Given the complexity of the causes of action, the presence of numerous contested issues (including scienter, causation, and damages), and the Superintendent's formal conclusion that the demutualization was "fair and equitable" to policyholders, only well-qualified counsel could have litigated this case and achieved the proposed Settlement.

Plaintiffs were opposed in this litigation by highly skilled defense counsel well-versed in the defense of complex civil cases. Counsel's victories in opposing MetLife's motions to dismiss and for summary judgment, and in winning certification for the classes, clearly indicate the skill with which the cases were prosecuted. *See* Part II, *supra* (citing state and federal decisions in plaintiffs' favor).

Counsel litigated vigorously in an effort to obtain the maximum possible recovery. That the case did not settle until trial had begun demonstrates counsel's willingness to continue to litigate rather than accept a settlement that they perceived to be unfavorable to the classes.

#### e) Requested Fee in Relation to the Settlement

Comparison of the requested fee in relation to the settlement favors the requested fee.

There are two possible benchmarks for comparing the relationship of the requested fee to the settlement: comparison to fee awards in comparable cases, *see, e.g., Taft v. Ackermans,* No. 02–CV–7951, 2007 WL 414493, at *10 (S.D.N.Y. Jan. 31, 2007), or "the unique circumstances of each case," *see In re Merrill Lynch & Co. Research Reports Sec. Litig.,* 246 F.R.D. 156, 174 (S.D.N.Y.2007) (citations and quotations omitted); *see also, e.g., Ling v. Cantley & Sedacca, L.L.P.,* No. 04–CV–4566, 2006 WL 290477, at *3 (S.D.N.Y. Feb. 8, 2006) (stating that relationship of fee request to settlement should be "based on the characteristics of [each] particular case"). Courts in New York State have compared fees to those awarded in other cases. *See Michels,* 1997 WL 1161145, at *32, 1997 N.Y. Misc. LEXIS 171, at *93; *Willson,* 1995 N.Y. Misc. LEXIS 652, at *92–93.

The fee request is justifiable relative to either benchmark. First, as detailed above, the present request for a fee award of 21% of the settlement amount is reasonable in relation to the fees typically awarded in similar complex class actions. *See* Part V.C.1, *supra.* Second, the difficult challenges faced by plaintiffs in this case— such as the risks of proving critical elements of their claims with respect to liability and damages—increased the litigation risks and support the requested fee. *See* Part IV.C.4, *supra.*

### f) Public Policy Considerations

Public policy considerations support the requested fee.

■ "A strong public policy concern exists for rewarding firms for bringing successful securities litigation." *Ashanti,* 2005 WL 3050284, at *5; *see also Bristol–Myers Squibb,* 361 F.Supp.2d at 236 ("[P]ublic policy supports granting attorneys fees that are sufficient to encourage plaintiffs' counsel to bring securities class actions that supplement the efforts of the

SEC."); *Basic Inc. v. Levinson,* 485 U.S. 224, 230–31, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (the federal securities laws are remedial in nature, and the courts must encourage private lawsuits to effectuate their purpose of protecting investors); *Michels,* 1997 WL 1161145, at *31, 1997 N.Y. Misc. LEXIS 171, at *92 (noting that "generous fee awards in cases such as this serve the dual purpose of encouraging plaintiffs' attorneys to act as private attorneys general and discouraging wrongdoing").

Private securities actions provide "a most effective weapon in the enforcement of the securities laws and are a necessary supplement to [SEC] action." *Eichler v. Berner,* 472 U.S. 299, 310, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985) (internal quotation marks and citation omitted); *see also Tellabs,* 551 U.S. at 313, 127 S.Ct. 2499. Lawyers that pursue private suits on behalf of investors augment the SEC by "acting as 'private attorneys general.'" *Ressler,* 149 F.R.D. at 657 (citation omitted). In addition, the typical class representative is unlikely to be able to pursue long and protracted litigation at his or her own expense. "[P]ublic policy favors the granting of counsel fees sufficient to reward counsel for bringing these actions and to encourage them to bring additional such actions." *Id.*

### 4. Class Counsel's Expenses

■ Class counsel's request for reimbursement of approximately $4.5 million in expenses is fair and reasonable.

In connection with settlement of a class action, counsel's reasonable out-of-pocket expenses are properly awarded. *See In re Indep. Energy Holdings PLC Sec. Litig.,* 302 F.Supp.2d 180, 183 n. 3 (S.D.N.Y.2003) (the court may compensate class counsel for reasonable out-of-pocket expenses necessary to the representation of the class); *see also In re EVCI Career Colleges Hold-*

*ing Corp. Sec. Litig.,* No. 05–CV–10240, 2007 WL 2230177, at *18, 2007 U.S. Dist. LEXIS 57918, at *58 (S.D.N.Y. July 27, 2007) (approving class counsel's expenses that "were essential to the successful prosecution and resolution of the Action"); *Flemming,* 865 N.Y.S.2d at 708–09. *Cf.* Part V.C.1, *supra* (citing federal and New York state cases awarding expenses to class counsel).

Class counsel have satisfactorily demonstrated that they incurred a total of approximately $4.5 million in litigation expenses on behalf of the classes in the prosecution of these actions. *See* Stamell Fee Decl. ¶ 16 & Ex. E; *see also* Feb. 9, 2010 Supplemental Decl. of Jared B. Stamell in Supp. of Attorneys' Fees and Reimbursement of Expenses & Ex. A, Docket Entry No. 605. The expenses for which reimbursement is sought are of the type that are necessarily incurred in litigation and routinely charged to clients billed by the hour. Stamell Fee Decl. ¶ 12. Counsel's expenses are set forth in detail in each firm's affidavit. *Id.* ¶ 17. These expenses include, among others things: expert fees, electronic research charges, long distance telephone and facsimile charges, postage and delivery expenses, discovery costs, filing fees, photocopying, expenses associated with locating and interviewing dozens of witnesses, and out-of-town travel expenses. *Id.* ¶¶ 12–13, 16.

The expenses charged are supported by proper records. They are necessary and appropriate. They were actually incurred on the class's behalf.

### 5. Reaction of the Classes to Fee and Expense Application

No relevant objection to class counsel's joint application for fees and expenses was made by any class member. The favorable reaction of the class supports counsel's application.

Adequate notice and opportunity to object to applications for fees and expenses was provided to the class. *See* Part V.D, *infra.* Despite this notice, only one objection was submitted by class members concerning the fees and expenses to be awarded to class counsel. Objectors John Pentz and Thomas Sterrett Bell argued that no more than $15 million in combined fees and expenses should be awarded to class counsel. *See* Pentz–Bell Obj. at 5–6. No other objection concerning applications for fees and expenses has been received.

Because class counsel has requested only $15 million in combined attorneys' fees, expenses, and compensation to named plaintiffs, *see* Part V.A, *supra,* and the court is approving this request, *see* Part V.C.6, *infra,* Pentz and Bell's objection is moot.

### 6. Award of Fees and Expenses to Class Counsel

In light of the criteria considered above, the fees and expenses requested by class counsel are reasonable. Class counsel's joint application warrants approval.

The plaintiff law firms that participated have agreed to divide the fee and expense awards in a reasonable and appropriate way. *See* Feb. 9, 2009 Hr'g Tr. at 28–32; *see also* Dec. 22, 2009 Stip., Docket Entry No. 574 (stipulating any fee award to be allocated 62% to federal counsel and 38% to state counsel). The fee splits will be based on a pro rata share of time and hourly rates; the expenses are apportioned by actual costs advanced. *See* Feb. 9, 2010 Hr'g Tr. at 28–32.

Attorneys' fees and expenses are awarded from the Settlement fund in the total amount of $15 million. Some $4.5 million of this amount is awarded for class counsel's expenses. Amounts awarded for objector Steven Waldman's counsel's fees and for compensation to named plaintiffs, *see* Parts V.F & VI, *infra,* also shall be

deducted from the $15 million total. The remainder of the award, approximately $10.5 million, is awarded to class counsel as fees.

### D. Notice of Applications for Fees and Expenses

▮ Notice and opportunity to object to counsel's applications for fees and expenses were proper and adequate.

Rule 23(h) of the Federal Rules of Civil Procedure requires notice to the class of a motion for attorneys' fees by class counsel. Individual notice is not required—Rule 23(h)(1), like Rule 23(e)(1) concerning notice of settlement, requires only notice to the class "in a reasonable manner." *See* Part IV.E, *supra.* For the same reasons applicable in the Rule 23(e)(1) context, "the district court has virtually complete discretion as to the manner of giving notice to class members." *Handschu v. Special Services Div.,* 787 F.2d 828, 833 (2d Cir.1986). Notice by publication is appropriate where individual notice would be burdensome or expensive. *Id.* at 832–33; *W. Va. v. Chas. Pfizer & Co.,* 440 F.2d 1079, 1090–91 (2d Cir.1971).

Notice that counsel intended to apply for an award of attorneys' fees not to exceed 30% of the Settlement Funds and up to $5 million in expenses was published twice in each of the weeks of November 9, 2009 and November 16, 2009 in the following publications: *USA Today, The Wall Street Journal, The New York Times,* and *The New York Law Journal. See* Part II.J, *supra.* Class counsel's joint application for an award of fees and expenses was filed in both this court and the state court on December 22, 2009. All submissions concerning the joint application were publicly available at the time of filing on the Eastern District of New York's Electronic Case Filing ("ECF") system.

The December 30, 2009 fairness hearing was continued until February 9, 2010 for argument on plaintiffs' counsel's applications for attorneys' fees, any applications on behalf of individual plaintiffs for compensation, and any other applications for fees and expenses. *See* Dec. 30, 2009 Order, Docket Entry No. 585 ("Dec. 30, 2009 Order"). A deadline of February 5, 2010 was set for objections to applications for fees, expenses, or other compensation. *Id.*

The December 30, 2009 Order, which provided the schedule and procedures for objections to fee applications, was filed and docketed on the ECF system, where it is available to the public. *Id.* Plaintiffs' counsel were directed to provide a copy of this Order to each of the named plaintiffs, and to class members or their counsel who submitted objections to the proposed Settlement. *Id.* MetLife was directed to issue a press release stating the schedule for argument and objections concerning applications for fees, expenses, and incentive awards. *Id.* MetLife issued a press release consistent with these instructions on January 8, 2010. *See* Jan. 8, 2010 Notice of Issuance of Press Release & Ex. (Press Release, MetLife, Inc., "Courts Set Deadline for Objections to Fee Applications in Class Action Settlement," Jan. 8, 2010), Docket Entry Nos. 589 & 589–1. The December 30, 2009 Order concluded:

> Individual notice has already been provided to class members upon certification of the class in the federal case, and notice has been given by publication and otherwise of the proposed settlement and fairness hearing. These measures constitute adequate notice to class members in a reasonable manner for purposes of Rule 23(h) of the Federal Rules of Civil Procedure.

In their objections filed on December 18 and December 23, 2009, objectors Robert Gould and John Pentz and Thomas Ster-

rett Bell objected to the notice and opportunity to object to applications for fees and expenses. *See* Pentz–Bell Obj. at 1–3; Gould Obj. at 3–4. These objections were based in part upon the misconception that the notice provided to class members by publication in November 2009 and the December 30, 2009 fairness hearing concerned class counsel's applications for attorneys' fees and expenses, rather than only the overall fairness of the proposed Settlement. Because class members were provided with separate notice and an opportunity to object to fees applications, these objections are moot. No other objection to the notice or opportunity to object to fee applications was received.

### E. MetLife's Objections to Class Counsel's Application for Fees and Expenses

MetLife objects to class counsel's applications for fees and expenses, arguing that the requested amounts are excessive. *See* Dec. 28, 2009 MetLife's Mem. of Law in Opp. to Pls.' Application for Incentive Payments to Named Pls. and in Partial Opp. to Pls.' Application for an Award of Attorneys' Fees and Litig. Expenses, Docket Entry No. 577 ("MetLife Fees Mem.").

These objections are without merit. A number of arguments are advanced, asserting that this action and the *Fiala* action were "meritless and wasteful" and "attorney-driven," that plaintiff's claims were frivolous and should never have been brought, that class counsel's efforts were often wasteful or duplicative, and that the quality of class representation was low. MetLife contends that class counsel should be awarded no more than 10% of the settlement fund, or $5 million, plus reasonable and verifiable expenses. *Id.* at 1.

Defendant advances the following specific arguments.

- "Because so much of class counsel's effort was wasteful and unnecessary, the time and labor expended does not favor a large fee award." Class counsel in either the federal or state action are alleged to have, for example: taken cumulative or unnecessary depositions, wasted time during depositions on pointless questions, and filed a tactical motion to disqualify MetLife's counsel shortly before trial. *See* MetLife Fees Mem. at 4–6.

- "The size and complexity of the litigation and the burden imposed on the courts and defendants, favors a smaller rather than a larger fee award here." The complexity of the case is said to derive from class counsel's "kitchen sink" approach and unwillingness to eliminate meritless claims. *Id.* at 6–7.

- "The risks of litigation favor a smaller rather than a larger fee award here, because plaintiffs never should have brought this litigation." Class counsel are alleged to have brought these actions on the assumption that even a meritless claim would settle for at least nuisance value. A large fee award is discouraged in order to avoid incentivizing lawsuits of dubious merit. *Id.* at 7–8.

- "Quality of representation does not favor the fee application because class counsel's efforts did not lead to a large recovery." The settlement for less than one percent of alleged damages is said to reflect poorly on the quality of representation. *Id.* at 9.

- "Although the proportion of the settlement fund being sought is similar to fee awards in other cases, this case warrants a smaller fee." *Id.* at 9.

- "Public policy favors reducing the requested fees because there is no need

for 'private attorneys' general in policing demutualizations, and because of the interest in discouraging frivolous litigation." New York law is said to commit oversight of demutualizations to the Superintendent. Plaintiffs' claims are characterized as "dubious" in light of the Superintendent's approval of MetLife's demutualization. *Id.* at 10–11.

These arguments are unpersuasive. They provide no valid basis for reducing the fees and expenses awarded to class counsel. The allegedly wasteful efforts of class counsel are not relevant because the fee award is well below class counsel's lodestar calculation, and is primarily based on the percent-of-the-fund method of calculating fees. MetLife appears to concede that the litigations were large and complex, and does "not dispute that the requested 21% fee falls within the range of fees that have been awarded in prior cases." *Id.* at 6, 9. Plaintiffs' claims, though weak, *see* Part IV.C.4, *supra,* may have a scintilla of merit. That they survived many years of litigation and numerous dispositive motions by an able and vigorous defense team attests to this, and to the adequacy of the representation provided by class counsel. *See* Part II.E & IV.C.3, *supra.*

### F. Objector Steven Waldman's Application for Attorney's Fees

■ Objector Steven Waldman moves for a joint award of attorneys' fees in the adjusted lodestar amount of $42,816.50. *See* Jan. 21, 2010 Mem. in Supp. of Mot. for a Joint Award of Attorneys' Fees to Counsel for Objector Steven Waldman at 1, Docket Entry No. 596. No multiplier is requested and no expenses are sought. *Id.* at 7.

MetLife and the federal plaintiffs oppose Waldman's request for attorneys' fees.

*See* Feb. 5, 2010 MetLife Mem. in Opp. to Objector Steven Waldman's Mot. for a Joint Award of Attorneys' Fees to Counsel, Docket Entry No. 600; Feb. 5, 2010 Pls.' Opp. to Objector Steven Waldman's Application for Attorneys' Fees, Docket Entry No. 601.

The parties' objections to Waldman's application are persuasive in part. The request for fees warrants approval in part. Attorneys' fees are awarded in the amount of $25,000.

■ "[O]bjectors have a valuable and important role to perform in preventing collusive or otherwise unfavorable settlements, and ... they are entitled to an allowance as compensation for attorneys' fees and expenses where a proper showing has been made that the settlement was improved as a result of their efforts." *White v. Auerbach,* 500 F.2d 822, 828 (2d Cir.1974). "Ordinarily, the trial judge has broad discretion in deciding whether, and in what amount, attorneys' fees should be awarded, since he is in the best position to determine whether the participation of objectors assisted the court and enhanced the recovery." *Id.*

■ An award of attorneys' fees for an objector does not require that an economic benefit to the class occur, or that the objection influence the court's decision. *See Park v. Thomson Corp.,* 633 F.Supp.2d 8, 11 (S.D.N.Y.2009). "[S]ome courts have ... rewarded objectors' counsel for advancing non-frivolous arguments and transforming the settlement hearing into a truly adversarial proceeding." *Id.* (internal quotation marks omitted); *accord, Howes v. Atkins,* 668 F.Supp. 1021, 1027 (E.D.Ky.1987) ("Objectors' counsel ably performed the role of devil's advocate in this litigation and is deserving of a fee award for this service, even though the settlement was not improved.").

The parties point out that the terms of the Settlement did not change as a result of Waldman's objections. No change has been made concerning the assets that will be placed into the closed block pursuant to the Settlement. The administration of the closed block and the distribution of dividends to closed block policyholders have not been affected.

Waldman's objections were nonetheless of some use. They served to clarify the proposed Settlement and MetLife's positions regarding implementation of the Settlement. In particular, Waldman's arguments led MetLife to elaborate on the record upon: (1) the checks in place to ensure that the choice and valuation of assets to be transferred into the closed block are not left to the sole discretion of MetLife; and (2) the provisions that protect against a "tontine" effect—an unreasonable build-up of assets over time benefitting only later-to-die policyholders—and ensure the settlement consideration will be distributed to class members in the form of dividends from the closed block within a reasonable time. *See* Part IV.F.1, *supra; see also, e.g., Denney v. Jenkens & Gilchrist,* 230 F.R.D. 317, 354 (S.D.N.Y.2005) *aff'd in part, vacated in part on other grounds,* 443 F.3d 253 (2d Cir.2006) (awarding fees to objectors' counsel, finding that objections "served to generate debate and focus the issues before the Court[ ]" and "conferred a benefit on the class by forcing the settling parties to clarify the judgment credit provision, removing certain ambiguities that might have worked to the detriment of class members in subsequent proceedings").

Compensation for an objector who has made no contribution except to attempt to hijack the settlement for ransom purposes is not encouraged. But in this case, Waldman's objection resulted in MetLife's clarifying and placing on the record exactly how the closed block would be handled to protect the class.

Objector's counsel reviewed the voluminous case record in this action and the *Fiala* action, including key pleadings and decisions of the court, examined the structure and history of the closed block, reviewed the class notice provided, examined the terms of the Settlement, researched relevant legal issues, drafted Waldman's objection, and prepared for and appeared at the December 30, 2009 fairness hearing. *See* Jan. 21, 2010 Decl. of Roy L. Jacobs in Supp. of Mot. for a Joint Award of Attorneys' Fees to Counsel for Objector Steven Waldman ¶ 3, Docket Entry No. 594 ("Jacobs Decl."); Jan. 21, 2010 Decl. of Laurence D. Paskowitz in Supp. of Mot. for a Joint Award of Attorneys' Fees to Counsel for Steven Waldman ¶ 2, Docket Entry No. 595 ("Paskowitz Decl.").

Counsel's combined overall lodestar was $50,551.50. *See* Jacobs Decl. ¶ 4; Paskowitz Decl. ¶ 3. This lodestar figure was reduced to $42,816.50 to account for time expended on notice issues, which were briefed in Waldman's Objection but produced no benefit to the class. *Id.* The lodestar calculation is supported by proper records.

Given the complexity of this case, and the very limited contribution of Waldman towards clarification of the settlement, an award of a portion of the requested fee in the amount of $25,000, as an expense of attorneys for the classes, is reasonable and comparable to the fees awarded to objectors' counsel in similar circumstances. *See e.g., In re Elan Sec. Litig.,* 385 F.Supp.2d 363, 377 (S.D.N.Y.2005) ($85,050 in fees); *Denney,* 230 F.R.D. at 354 ($81,665 in fees); *Howes v. Atkins,* 668 F.Supp. 1021, 1027 (E.D.Ky.1987) ($100,000 in fees). The sum of $25,000 is awarded to Waldman.

## VI. Compensation to Class Representatives

### A. Federal Plaintiffs' Applications for Compensation Pursuant to PSLRA

 Lead plaintiffs in this case request awards as authorized by the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(a)(4), in recognition of the time and effort they expended over the course of this nearly decade-long litigation. They request $1,500 each—$6,000 in the aggregate—to come out of the $15 million approved for attorneys' fees and expenses. *See* Part V.C.6, *supra.*

MetLife objects to the federal lead plaintiffs' application on the ground that "none of the four federal class representatives asserts any actual lost wages or other documented expenses." MetLife Fees Br. at 14. No objection has been made by any class member to the federal lead plaintiffs' application.

The awards requested by federal lead plaintiffs are reasonable and are approved. The PSLRA authorizes "the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class." 15 U.S.C. § 78u–4(a)(4); *see also* H.R. Conf. Rep. No. 104–369, at 35 (Nov. 28, 1995), U.S.Code Cong. & Admin.News 1995, pp. 730, 734 ("[L]ead plaintiffs should be reimbursed for reasonable costs and expenses associated with service as lead plaintiff, including lost wages, and [the committee] grants the courts discretion to award fees accordingly"); S.Rep. No. 104–98, at 10 (June 19, 1995) ("Recognizing that service as the lead plaintiff may require court appearances or other duties involving time away from work, the Committee grants courts discretion to award the lead plaintiff reimbursement for 'reasonable costs and expenses' (including lost wages) directly relating to representation of the class.").

Courts "routinely award such costs and expenses both to reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place." *In re Gilat Satellite Networks, Ltd.,* No. CV–02–1510, 2007 WL 2743675, at *19 (E.D.N.Y. Sept. 18, 2007) (citation omitted). The considerations relevant to approving such awards include:

> the existence of special circumstances including the personal risk (if any) incurred by the plaintiff applicant in becoming and continuing as a litigant, the time and effort expended by that plaintiff in assisting in the prosecution of the litigation or in bringing to bear added value (e.g., factual expertise), any other burdens sustained by that plaintiff in lending himself or herself to the prosecution of the claim, and of course, the ultimate recovery.

*Frank v. Eastman Kodak Co.,* 228 F.R.D. 174, 187 (W.D.N.Y.2005) (citing cases).

In class actions such as those seeking lost wages or elimination of sex and race discrimination, the named plaintiffs will often be entitled to a substantially greater award than other members of the class. *See, e.g., Sheppard v. Consolidated Edison Co. of New York, Inc.,* No. 94–CV–0403, 2002 WL 2003206, at *5 (E.D.N.Y. Aug. 1, 2002) (citing *Roberts v. Texaco, Inc.,* 979 F.Supp. 185, 200 (S.D.N.Y.1997)). They may have done substantial work in organizing other workers to support the suit, in gathering information about the workplace, and in taking the heat of a resentful management; an assumption of an earned extra award to them is thus warranted. In most securities actions, the minor investor—or as in this litigation, one policyhold-

er among millions—does little but lend a name; proof of extra work on behalf of the class is then required for any award.

The time and effort expended by lead plaintiffs supports a very limited award. They fulfilled their obligations as representatives of the classes by consulting with counsel, contributing their time, and participating in prosecuting the case. Two of the four had insurance industry or actuarial experience and made that experience available to counsel. *See* Dec. 22, 2009 Decl. of Jared B. Stamell in Supp. of Application of Lead Pls. in the Fed. Action for an Award Under the PSLRA ¶ 4, Docket Entry No. 561–2. One resides near the Central Islip courthouse and attended hearings. *Id.* Each lead plaintiff reviewed some motions, discovery materials, and other papers submitted by the parties. *Id.* at ¶ 3. Each was deposed and produced documents pursuant to defendants' demands. *Id.* at ¶ 4; *see also generally* Feb. 5, 2010 Decl. of Jared B. Stamell, Exs. A–D (declarations of lead plaintiffs concerning efforts undertaken in support of prosecution of the litigation).

PSLRA awards are not limited to "lost wages or other documented expenses." *See* MetLife Fees Br. at 14. Compensation may be awarded in recognition of, for example, "the time and effort expended by that plaintiff in assisting in the prosecution of the litigation or in bringing to bear added value (e.g., factual expertise)." *Frank*, 228 F.R.D. at 187. MetLife's objection to the relatively modest compensation requested by federal lead plaintiffs is rejected.

In considering PSLRA awards it is appropriate to "consider the relationship between the requested incentive award and the amounts recovered by absent class members under the settlement." *Denney*, 230 F.R.D. at 355. By that standard, the $1,500 compensatory awards requested by

each of four federal lead plaintiffs—$6,000 in the aggregate—are reasonable and appropriate relative to the $50 million overall settlement. *See, e.g., In re Top Tankers, Inc. Sec. Litig.*, No. 06 Civ. 13761, 2008 WL 2944620 (S.D.N.Y. July 31, 2008) (award of $3,000 to lead plaintiff out of $1.2 million settlement); *Hicks v. Morgan Stanley*, No. 01 Civ. 10071, 2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005) (award of $7,500 to lead plaintiff out of $10 million settlement); *see also Parker v. Time Warner Entertainment Co., L.P.*, 631 F.Supp.2d 242, 276 (E.D.N.Y.2009) ("Given the minimal amount of the [$2,500] awards [and] the time and effort the Representative Plaintiffs expended in bringing this suit on behalf of the Class ... the Court approves them.").

The approved compensation payments are awarded in recognition of lead plaintiffs' services rendered on behalf of the class and in support of class counsel's efforts to prosecute this litigation. Awards to individual plaintiffs are considered in the nature of attorneys' expenses, rather than attorneys' fees or "incentive awards." *Cf.* Part VI.B, *infra* (discussing compensation payments to individual state plaintiffs).

Compensation is awarded to the following federal plaintiffs in the amounts indicated, to be treated as expenses under the $15,000,000.00 awarded for fees and expenses:

- Mary Adele DeVito $1,500.00
- Michael A. Giannattasio $1,500.00
- Kevin L. Hyms $1,500.00
- Harry S. Purnell, III $1,500.00

### B. State Plaintiffs' Applications for Compensation

Eight plaintiffs in the *Fiala* case request compensation in recognition of their efforts on behalf of the class, "under the standards set forth in the PSLRA." State Pl. Mem. at 41–42. They seek awards rang-

ing in size from $1,000 to $20,000 to come out of the $15 million approved for attorneys' fees and expenses. *See* Part V.C.6, *supra.* While these requested amounts arise in the state litigation, this court must consider them since they affect the size of the settlement left to the class and its counsel in this federal case.

MetLife objects to the state plaintiffs' application on the grounds, among others, that "New York law does not permit incentive payments to named plaintiffs in a class action," that two of the applying plaintiffs are not designated class representatives, that two of the applying plaintiffs have not been employed and should therefore be ineligible to recover "lost wages," and that one of the applying plaintiffs purchased a MetLife policy for purely speculative and opportunistic reasons. MetLife Fees Br. at 13–15. No objection has been made by any class member to the state lead plaintiffs' application.

The awards requested by state plaintiffs are approved in part and denied in part.

### 1. New York Law Concerning "Incentive Awards"

 It appears that "incentive awards" are not available as a matter of New York law. The New York Supreme Court Appellate Division, Third Department, has held that "New York law does not authorize incentive awards for named plaintiffs in class actions." *Flemming v. Barnwell Nursing Home & Health Facilities, Inc.,* 56 A.D.3d 162, 166, 865 N.Y.S.2d 706 (N.Y.App. Div.3d Dep't 2008). *But cf. In re Colt Indus. Shareholder Litig.,* 77 N.Y.2d 185, 193–94, 565 N.Y.S.2d 755, 566 N.E.2d 1160 (1991) ("New York's class action statute (CPLR 901–909) has much in common with Federal rule 23."). As a result, class representatives may not recover compensation "for their time or efforts in bringing lawsuits." *Id.* at 167, 865 N.Y.S.2d 706. The state plaintiffs ac-

knowledge this adverse precedent. *See* Dec. 30, 2009 Reply Mem. in Supp. of Final Approval of the Settlement, Awarding Attorneys' Fees and Reimbursement of Expenses, and Granting Compensatory Awards to the Representative Pls. at 8, Docket Entry No. 584 ("State Pl. Reply").

The state plaintiffs cite a favorable trial court decision. *See Id.* (citing *Mark Fabrics, Inc. v. GMAC Commercial Credit LLC,* Index No. 604631/02, 2005 WL 6216029, 2005 NY. Misc. LEXIS 3566, at *5 (N.Y.Sup.Ct. Dec. 22, 2005) (Cahn, J.) (approving incentive award, without analysis)); *see also* Dec. 29, 2009 Pl. Mark Smilow's Mem. in Further Supp. of His Application for an Incentive Award at 1–2, Docket Entry No. 588 ("Smilow Mem.") (same). It appears that the Third Department's *Flemming* decision is binding precedent in the *Fiala* action. *See People v. Shakur,* 215 A.D.2d 184, 185, 627 N.Y.S.2d 341 (N.Y.App.Div. 1st Dep't 1995) ("Trial courts within this department must follow the determination of the Appellate Division in another department until such time as [the Appellate Division for the First Department] or the Court of Appeals passes on the question.") (citations omitted).

### 2. Plaintiffs Theresa Hazen, Mark Smilow, and Vijay Shah

State plaintiffs Theresa Hazen and Mark D. Smilow are not designated class representatives. Evidence indicates that state plaintiff Vijay J. Shah joined the *Fiala* litigation for purely speculative and opportunistic reasons.

 Plaintiff Smilow was designated a class representative by the New York Supreme Court on June 30, 2007, but removed by the Appellate Division on June 5, 2008. *See* Smilow Mem. at 3 (citing *Fiala v. Metro. Life Ins. Co.,* 52 A.D.3d 251, 251, 859 N.Y.S.2d 426 (N.Y.App. Div. 1st Dep't 2008)). The Appellate Division

noted that "the avoidance of an appearance of impropriety[ ] require[s] that plaintiff Mark Smilow, an associate at plaintiffs' co-lead counsel, be removed as a class representative, even though he has personally retained other counsel." *Fiala*, 52 A.D.3d at 251, 859 N.Y.S.2d 426. In view of the relatively short period of time during which Smilow was a class representative, and the circumstances of his removal, no award of compensation to him is warranted.

■ Plaintiff Hanzen was conditionally allowed to serve as class representative on behalf of her husband Paul Hanzen, a class member, subject to presentation of proof that she was authorized to act as Mr. Hanzen's conservator or representative. *See* MetLife Fee Br. at 13–14; Dec. 28, 2009 Aff. and Decl. of Carl Micarelli in Response to Pls.' Requests for Fees and Compensation ("Micarelli Fees Decl."), Ex. A at 2, Docket Entry No. 577–2 (Order, *Fiala v. Metro. Life Ins. Co.*, Index No. 601181/00 (N.Y.Sup.Ct. Jan. 30, 2007)). It appears not to be contested that no such proof was ever presented by Ms. Hanzen. *See* Micarelli Fees Aff. ¶ 10; State Pl. Mem. at 9. Because Hanzen is not a class representative, no award of compensation to her is warranted.

Plaintiff Shah acknowledged in deposition testimony that he viewed MetLife as a candidate to demutualize, and purchased the minimum annuity available in the hope of participating in such a demutualization and possibly receiving money or subscription rights. *See* Micarelli Fees Decl., Ex. B at 45 (Sept. 17, 2004 Dep. Tr. of Vijay J. Shah). Shah's speculative and self-interested conduct does not warrant compensation out of the Settlement amount.

### 3. Compensation for Efforts on Behalf of the Class

Intra-class conflicts may arise where class representatives are given large awards or amounts of compensation in addition to the benefits conferred on fellow class members. Apparently binding New York precedent holds that "incentive awards" are not available as a matter of New York law. For these reasons, state plaintiffs' applications are denied to the extent they seek more than de minimis amounts for time and effort actually expended, in recognition of their efforts on behalf of the class.

Consistent with the state plaintiffs' invocation of the PSLRA standards governing compensation awards, the applications of class representatives Fiala, Beliunas, Brophy, and Ira and June Gelb are deemed warranted to the extent that they seek reasonable compensation for time and effort expended in rendering essentially paraprofessional services on behalf of the class and in support of plaintiffs' counsel's efforts to prosecute the litigation. As in the case of compensation awarded to lead plaintiffs in the federal case, awards to individual state plaintiffs are considered in the nature of attorneys' expenses, rather than attorneys' fees or "incentive awards." *See* Part VI.A, *supra*.

MetLife's contention that plaintiffs who have not been employed for pay should not be eligible to receive compensation for services rendered is not adopted. No reason is offered why compensation should be limited to lost wages. *See* Part V.A, *supra*. As was previously noted, under the PSLRA, compensation may be awarded in recognition of, for example, "the time and effort expended by that plaintiff in assisting in the prosecution of the litigation or in bringing to bear added value (e.g., factual expertise)." *Frank*, 228 F.R.D. at 187. For the same reasons already discussed, reasonable compensation awards to state plaintiffs who have not been employed for pay are justified.

Based on the value of the work actually contributed, compensation for time expended on a paraprofessional expense-incurred basis is awarded to the following state plaintiffs in the amounts indicated, to be treated as expenses under the $15,000,000.00 awarded for fees and expenses:

- Eugenia J. Fiala $1,500.00
- Paulette Beliunas $1,500.00
- John Brophy $1,500.00
- Ira J. Gelb $1,500.00
- June Gelb $1,000.00

## VII. Conclusion

The settlement is fair and reasonable. It is approved. The case is dismissed on the merits.

The allocation of attorneys' fees and expenses is approved in the total sum of $15,000,000.00. Individual plaintiffs' compensation is approved in part and denied in part as indicated above, in the total amount of $13,000.00 to be charged against the $15,000,000.00 as expenses. A legal fee of $25,000.00 is allocated to an objector, as noted above, to be charged against the $15,000,000.00 as expenses.

The *cy pres* allocation is approved, as noted above, in the sum of $2,500,000.00.

The allocation to the closed block of $32,500,000.00 is approved as noted above.

The total approved as the settlement amount is $50,000,000.00.

The parties shall submit to both courts a short form of judgment by 5:00 PM on Friday February 26, 2010. The form of judgment shall indicate the full and correct names of the recipients for, and the exact amounts of, all payments to be made by the defendant in accordance with this Memorandum, Order and Judgment.

The parties may apply to the federal and state courts should any problems arise during execution of the Settlement.

This Memorandum, Order and Judgment is stayed until a parallel judgment approving the settlement is filed and docketed by the New York Supreme Court in the *Fiala* Case.

SO ORDERED.